UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal Number:** |
| | : | |
| | : | **VIOLATION:** |
| | : | |
| | : | **Count One:** |
| | : | **18 U.S.C. § 371** |
| **v.** | : | **(Conspiracy)** |
| | : | |
| **JACK A. ABRAMOFF,** | : | **Count Two:** |
| | : | **18 U.S.C. §§ 1341, 1346 and 2** |
| **Defendant.** | : | **(Honest Services Mail Fraud)** |
| | : | |
| | : | **Count Three:** |
| | : | **26 U.S.C. § 7201** |
| | : | **(Tax Evasion)** |

## INFORMATION

The United States charges that:

## COUNT ONE

### 18 U.S.C. § 371 - Conspiracy

### GENERAL ALLEGATIONS

Unless specified otherwise, at all relevant times:

1.     From in or about 1994 to in or about 2004, defendant JACK A. ABRAMOFF was a Washington, D.C. lobbyist. In 1994, defendant ABRAMOFF joined a law and lobbying firm ("Firm A"). In January 2001, defendant ABRAMOFF joined a second law and lobbying firm ("Firm B").

2.     Defendant ABRAMOFF solicited and obtained lobbying business from groups and companies throughout the United States, including Native American tribal governments operating, and interested in operating, gaming casinos. Defendant ABRAMOFF sought to further his clients'

interests by lobbying public officials, including, but not limited to, Members of the United States Congress. Defendant ABRAMOFF also sought to further his clients' interests by recommending vendors for grass roots work, public relations services and election campaign support.

3. In or about January 2001, Michael Scanlon ("Scanlon") established a business to provide grass roots work, public relations services and election campaign support. Scanlon also formed other companies that were used primarily to receive money for services and work performed by others (collectively referred to as "CCS").

4. In or about May 2003, defendant ABRAMOFF established a business called GrassRoots Interactive ("GRI"), which had its principal offices in Silver Spring, Maryland. GRI was purportedly formed to provide grass roots work, public relations services, and election campaign support.

5. In July 1999, Abramoff established a private foundation called Capital Athletic Foundation ("CAF") for which he sought and received federal tax-exempt status, in part to provide funding for a non-profit school.

## THE CONSPIRACY AND ITS OBJECTS

6. From at least as early as 1997 through at least April 2004, in the District of Columbia and elsewhere, the defendant,

**JACK A. ABRAMOFF**,

did knowingly conspire and agree with Scanlon and with others to commit the following offenses against the United States:

    (A)    to devise a scheme and artifice to defraud and deprive defendant ABRAMOFF's clients of their right to defendant ABRAMOFF's honest services, performed free

2

    from deceit, fraud, concealment, conflict of interest and self-dealing, in violation of 18 U.S.C. §§ 1341, 1343, and 1346;

(B) to devise a scheme and artifice to defraud and to obtain money and property from the clients of defendant ABRAMOFF and Scanlon through intentionally and materially false and fraudulent misrepresentations, pretenses, and promises, in violation of 18 U.S.C. §§ 1341 and 1343;

(C) to devise a scheme and artifice to defraud and deprive Firm B of its right to defendant ABRAMOFF's honest services, performed free from deceit, fraud, concealment, conflict of interest and self-dealing, in violation of 18 U.S.C. §§ 1341, 1343, and 1346;

(D) to corruptly give, offer and promise things of value, including money, meals, trips and entertainment, to public officials and their relatives with the intent to influence, and in return for agreements to perform, officials acts benefitting defendant ABRAMOFF, Scanlon, and their clients, in violation of 18 U.S.C. §§ 201(b)(1), 1341, 1343, and 1346; and

(E) to knowingly cause former senior Congressional staff members to make, with the intent to influence, communications to and appearances before Members of Congress, their employees and employees of Congressional Committees, on matters on which the former congressional staff members were seeking official action on behalf of other persons within one year of the Congressional staff members' employment by those Members of Congress or Congressional Committees, in violation of 18 U.S.C. § 207(e).

## PURPOSES OF THE CONSPIRACY

7. It was a purpose of the conspiracy for defendant ABRAMOFF, Scanlon and others to enrich themselves by obtaining substantial funds from their clients through fraud and concealment. A further purpose of the conspiracy was to obtain benefits for themselves and others through corrupt means.

## MANNER AND MEANS

8. The conspiracy was carried out through the following manner and means:

   A. Defendant ABRAMOFF and sometimes others would persuade clients that they needed to hire CCS or GRI to perform certain grass roots and public relations services to accomplish the goals that defendant ABRAMOFF identified for them.

   B. Defendant ABRAMOFF and sometimes others would cause CCS or GRI to charge clients prices that incorporated huge profit margins for the purpose of generating funds for and concealing kickbacks that would be paid to defendant ABRAMOFF.

   C. Defendant ABRAMOFF received approximately fifty percent of the net profits Scanlon, through CCS, obtained from clients referred by defendant ABRAMOFF. Defendant ABRAMOFF would receive this money through entities he owned and controlled. Defendant ABRAMOFF and Scanlon would conceal these kickbacks from their clients.

   D. Defendant ABRAMOFF and others would cause clients to falsely believe that some of the fees charged were being used for specific purposes, when in fact, defendant ABRAMOFF and others would use those funds for their own personal benefit and not for the benefit of their clients.

E. On some occasions, defendant ABRAMOFF would falsely represent to his clients that he had no relationship with, or received no financial benefit from, CCS or GRI, when in fact defendant ABRAMOFF received substantial monetary payments from those entities.

F. Defendant ABRAMOFF and others would offer and provide things of value to public officials, including trips, campaign contributions, meals and entertainment in exchange for agreements that the public officials would use their official positions and influence to benefit defendant ABRAMOFF's clients and defendant ABRAMOFF's businesses.

G. Defendant ABRAMOFF and others would hire senior congressional staff members as lobbyists, and those former congressional staff members, with the knowledge and encouragement of defendant ABRAMOFF and others despite the federal one year lobbying ban, would communicate with their former employers, either Members of Congress or Congressional Committees, and their staffs, in order to influence official action.

## OVERT ACTS

9. In furtherance of the conspiracy and to achieve its purposes, defendant ABRAMOFF, Scanlon and others committed the following overt acts, among others, in the District of Columbia and elsewhere:

**Deprivation of Abramoff's Clients' Right To Abramoff's Honest Services**

Mississippi Tribe

10.     In or about 1995, defendant ABRAMOFF was hired by a Native American tribal client based in Mississippi ("Mississippi Tribe") to provide lobbying services on various issues, including taxation of the tribe by the Federal government as well as other issues relating to Tribal sovereignty. Defendant ABRAMOFF used his knowledge of lobbying and grass roots work, which was superior to the Mississippi Tribe's knowledge of these areas, to secure and keep the trust and confidence of the Mississippi Tribe.

11.     In or about early 2001, defendant ABRAMOFF advised the Mississippi Tribe to hire CCS while concealing the fact that defendant ABRAMOFF would receive approximately fifty percent of the net profits from the Mississippi Tribe's payments to CCS.

12.     From in or about June 2001 until in or about April 2004, the Mississippi Tribe paid CCS approximately $14,765,000. Pursuant to their secret profit-sharing agreement, defendant ABRAMOFF and Scanlon concealed from the Mississippi Tribe that approximately fifty percent of the profit, approximately $6,364,000, including money that was not passed through CCS, was kicked back to defendant ABRAMOFF pursuant to their secret arrangement.

Louisiana Tribe

13.     In or about March 2001, defendant ABRAMOFF and Scanlon successfully solicited a Native American tribal client based in Louisiana ("Louisiana Tribe") to hire them to provide lobbying and grass roots services to the tribe. Defendant ABRAMOFF used his knowledge of lobbying and grass roots work, which was superior to the Louisiana Tribe's knowledge of these areas, to secure and keep the trust and confidence of the Louisiana Tribe.

14.    In or about March 2001, after CCS had been paid for the first project, defendant ABRAMOFF recommended and advised the Louisiana Tribe to rehire CCS while concealing the fact that defendant ABRAMOFF would receive fifty percent of the net profits from the Louisiana Tribe's payments to CCS.

15.    From in or about March 2001 to in or about May 2003, the Louisiana Tribe paid Scanlon and related entities approximately $30,510,000. Defendant ABRAMOFF and Scanlon concealed from the Louisiana Tribe that approximately fifty percent of the profit, approximately $11,450,000, including money that was not passed through CCS, was kicked back to defendant ABRAMOFF pursuant to their secret arrangement.

Michigan Tribe

16.    In or about January 2002, defendant ABRAMOFF and Scanlon successfully solicited a Native American tribal client based in Michigan ("Michigan Tribe") to hire them to provide lobbying and grass roots services to the tribe. Defendant ABRAMOFF used his knowledge of lobbying and grass roots work, which was superior to the Michigan Tribe's knowledge of these areas, to secure and keep the trust and confidence of the Michigan Tribe.

17.    In or about June 2002, defendant ABRAMOFF encouraged the Michigan Tribe to expand its contract with CCS while concealing the fact that defendant ABRAMOFF would receive approximately fifty percent of the profits from the Michigan Tribe's payments to CCS.

18.    From in or about June 2002 to in or about October 2003, the Michigan Tribe paid CCS approximately $3,500,000. Pursuant to their secret arrangement, defendant ABRAMOFF and Scanlon concealed from the Michigan Tribe that approximately fifty percent of the profit, approximately $540,000, was kicked back to defendant ABRAMOFF.

Texas Tribe

19.  In or about February 2002, defendant ABRAMOFF and Scanlon successfully solicited a Native American tribal client based in Texas ("Texas Tribe #1") to hire them to provide lobbying and grass roots services to the tribe to reopen their casino through federal legislation. After Texas Tribe #1 paid $4,200,000 to CCS, defendant ABRAMOFF concealed his work to oppose Texas Tribe #1's efforts to reopen its casino under state law. Defendant ABRAMOFF falsely represented that he would work for free to represent Texas Tribe #1, all the while concealing from the Texas Tribe #1 that approximately fifty percent of CCS's net profits, approximately $1,850,000, was kicked back to Abramoff pursuant to his secret arrangement with Scanlon.

**Fraud Based on Affirmative Misrepresentations**

20.  On or about June 6, 2002, defendant ABRAMOFF and a lobbying colleague, who was also a former congressional staffer ("Staffer A") successfully solicited one of Firm B's clients, a distilled beverages company, for a $25,000 payment to CAF. Instead of using the money for CAF and contrary to CAF's tax exempt purpose, defendant ABRAMOFF used this money for his personal and professional benefit to partially pay for a golfing trip to Scotland for public officials, members of his staff and others.

**Deprivation of Abramoff's Employer's Right To Abramoff's Honest Services**

21.  In 2001, defendant ABRAMOFF successfully solicited a wireless telephone company ("Wireless Company") to make at least $50,000 in payments to CAF. In exchange for making the payments to this entity, defendant ABRAMOFF stated that no lobbying payments need be made to Firm B, and that defendant ABRAMOFF would undertake a lobbying effort to assist Wireless Company in securing a license to install wireless telephone infrastructure for the United States

House of Representatives. In 2001 and early 2002, defendant ABRAMOFF and his Firm B colleagues lobbied for the Wireless Company without any formal retainer agreement or any payments to Firm B. At no time did defendant ABRAMOFF inform his employer, Firm B, of the payments totaling $50,000 to CAF that were diverted from Firm B.

**Bribery and Honest Services Fraud Involving Public Officials**

22. From in or about 1999 through in or about April 2004, defendant ABRAMOFF, Scanlon and others, together and separately, provided a stream of things of value to a Member of the United States House of Representatives ("Representative #1") and members of his staff, including but not limited to a lavish trip to Scotland to play golf on world-famous courses, tickets to sporting events and other entertainment, regular meals at defendant ABRAMOFF's upscale restaurant, and campaign contributions for Representative #1, his political action committee, and other political committees on behalf of Representative #1.

23. In exchange for those things of value, from in or about March 2000 through in or about April 2004, defendant ABRAMOFF, Scanlon and others, together and separately, sought and received Representative #1's agreement to perform a series of official acts to benefit defendant ABRAMOFF's businesses, clients and others, including but not limited to, agreements to support and pass legislation, agreements to place statements into the Congressional Record, meetings with defendant ABRAMOFF's clients, and advancing the application of a client of defendant ABRAMOFF for a license to install wireless telephone infrastructure in the House of Representatives.

## Post-Employment Restrictions of Congressional Staffers

24.     Beginning in March 2002, defendant ABRAMOFF and a former staffer to Representative #1 ("Staffer B") contacted Representative #1, officials employed by the Office of Representative #1, and officials employed by a House Committee ("Committee"), of which Representative #1 was the chairman. These contacts occurred within one year of Staffer B having served as the Staff Director of the Committee and Chief of Staff for Representative #1. Defendant ABRAMOFF intended that Staffer B make these appearances and communications for the purpose of influencing official action on behalf of defendant ABRAMOFF's and Staffer B's clients, including Texas Tribe #1 and Wireless Company.

All in violation of 18 United States Code, Section 371.

## COUNT TWO

**18 U.S.C. §§ 1341, 1346 and 2 - Honest Services Mail Fraud of a Public Official**

25. Paragraphs 1 through 5, 19, and 22 through 24 are realleged as though fully stated herein.

26. From in or about 1999 through in or about April 2004, in the District of Columbia and elsewhere, having devised and intending to devise a scheme and artifice to defraud and deprive the United States, his constituents and the United States House of Representatives of the right to the honest services of a Member of the United States House of Representatives, Representative #1, and his staff, including the right to conscientious, loyal, faithful, disinterested, unbiased service, to be performed free of deceit, undue influence, conflict of interest, self-enrichment, self-dealing, concealment, bribery, fraud and corruption, by corruptly offering and providing a stream of things of value, including money, meals, trips and entertainment to Representative #1 and his staff, in return for their agreements to perform official acts benefitting defendant ABRAMOFF and his clients as described in paragraphs 1 through 5, 19, and 22 through 24, defendant,

## JACK A. ABRAMOFF,

knowingly and willfully, for the purpose of executing, and aiding and abetting, the above-described scheme and artifice and attempting to do so, that is funding a Scotland golf trip for Representative #1 and his staff, caused a $50,000 check solicited by Texas Tribe # 1 and defendant ABRAMOFF to be delivered by mail and commercial delivery service from Texas on or about August 12, 2002 according to the directions thereon to defendant ABRAMOFF in the District of Columbia.

All in violation of 18 United States Code, Sections 1341, 1346 and 2.

## COUNT THREE

### 26 U.S.C. § 7201 - Tax Evasion

27. Paragraphs 1 through 5 and 7 through 24 are realleged as though fully stated herein.

28. Beginning on or about January 1, 2002, the exact date being unknown, through October 17, 2003, in the District of Columbia and elsewhere, defendant

**JACK A. ABRAMOFF**,

a resident of Silver Spring, Maryland, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 2002, by committing at least one affirmative act of evasion including, but not limited to:

    (a) Making and using, and causing to be made and used, false documents, false entries and alterations to financial books and records, and false invoices;

    (b) Concealing assets and sources of income through the use of nominees including, but not limited to, tax-exempt organizations;

    (c) Concealing substantial amounts of illegally derived income; and

    (d) Filing, and causing to be filed, a false joint U.S. Individual Income Tax Return, Form 1040, for the 2002 calendar year

all for the purpose of concealing additional unreported taxable income received by, or on behalf of, the defendant during the 2002 calendar year, on which income, as the defendant then and there well knew and believed, there was due and owing to the United States of America a substantial amount of income tax.

All in violation of Title 26, United States Code, Section 7201.

NOEL L. HILLMAN
Chief, Public Integrity Section

_____          Date: 1/3/06
Mary K. Butler
M. Kendall Day
Trial Attorneys


PAUL E. PELLETIER
Acting Chief, Fraud Section

_____          Date: 1/3/06
Guy D. Singer
Nathaniel B. Edmonds
Trial Attorneys


BRUCE M. SALAD
Chief, Southern Criminal Enforcement Section

_____          Date: January 3, 2006
Stephanie D. Evans
Trial Attorney
Tax Division
U.S. Department of Justice

13