## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **06cr001 (ESH)** |
| | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **JACK A. ABRAMOFF,** | : | |
| | : | |
| **Defendant.** | : | |

### Government's Sentencing Memorandum

The United States, by the undersigned attorneys, submits this memorandum in connection with the sentencing of Jack Abramoff.  Section I includes additional information about the Public Corruption, Fraud and Tax offenses Abramoff committed.  Section II concerns Abramoff's substantial assistance in this case and our motions to reduce his sentence pursuant to Sentencing Guidelines sections 3E1.1(b) (for timely acceptance of responsibility) and 5K1.1 (for substantial assistance).  Section III addresses two issues created by Abramoff's simultaneous guilty pleas, namely how to sentence Abramoff to concurrent time as well as criminal history points arising from the chance fact that he was sentenced in South Florida prior to being sentenced in this Court.  Section IV contains our sentencing recommendation.

### I.    SCOPE OF ABRAMOFF'S CRIMINAL CONDUCT

Although the plea agreement and factual basis lay out all the facts relevant to the applicable guidelines ranges,[1] the United States provides this additional information so that the

---

[1]The parties stipulated that the sentencing guidelines provided a reasonable sentence, which they will recommend be applied in this case.  Plea Agreement at ¶ 9.  Indeed, the plea agreement provides that, absent a breach of the agreement, neither party will "seek or advocate for or suggest in any way an adjustment or departure from the sentencing guidelines other than

Court may be better informed about the full scope of Abramoff's misconduct. This information was previously provided to the Probation Office, and it did not affect that Office's calculation of Abramoff's final offense level, a calculation which mirrors that set out in the plea agreement.

A.    Scope of the Public Corruption Offenses

Abramoff pled guilty to a conspiracy to deprive the public of the honest services of public officials as well as a substantive count of aiding and abetting the honest services fraud of Congressman Ney, Will Heaton, and Neil Volz. In essence, early on Abramoff developed a system of showering public officials with low-dollar-value gifts, inducing those officials to be receptive to requests for official action from Abramoff and his lobbying team. Abramoff's relationship with some of those officials became corrupt, while with others it did not. The co-conspirators who are identified in Abramoff's plea papers are Congressman Bob Ney ("Representative #1"), Tony Rudy ("Staffer A"), Neil Volz ("Staffer B"), and Michael Scanlon. The plea documents, however, were drafted broadly so that they would include conduct beyond that which was specifically identified in them. The convictions obtained since Abramoff entered his guilty plea underscore that there were more lobbyists and public officials involved in crimes with Abramoff than those identified in Abramoff's plea papers, a fact which supports the organizer/leader enhancement to which Abramoff stipulated in paragraph 11b of the plea agreement.

---

those set forth in this agreement . . . provided that the guidelines are calculated as set forth [in the agreement]. Id. at ¶ 12. The parties, however, are free to advocate for an appropriate sentence reduction based on substantial assistance to the government under any government motion pursuant to Rule 35 or U.S.S.G. § 5K1.1. Id. at ¶ 15.

### 1.    *Things of Value*

As stated, in dealing with government officials, Abramoff generally provided a stream of things of value to public officials in exchange for official actions and influence.  The government officials with whom he had corrupt relationships were almost universally federal government officials.  The things provided usually were items such as meals and drinks as well as tickets to sporting events and concerts.  Abramoff expended large sums to ensure that he had an ample supply of these items.  For example, in February 2002, Abramoff opened Signatures restaurant. The restaurant hemorrhaged money, in part because Abramoff regularly provided free or discounted meals and drinks to public officials (including as in-kind campaign contributions for fundraisers held at the restaurant), in addition to the food and drink that his lobbyists purchased at Signatures and billed back to their clients.  See e.g. United States v. Ney, 06cr272 (D.D.C.) Fact. Basis ¶ 9(b).  In addition, Abramoff used money provided by his clients and others to lease luxury box suites at D.C. area venues so that Abramoff would always be able to provide free tickets to public officials in order to garner official assistance for his clients and enhance his stature as a lobbyist.  The luxury suites cost hundreds of thousands of dollars each year, with total costs for suites at the MCI Center, FedEx Field, and Camden Yards exceeding $1,000,000 each year in 2001, 2002, and 2003.  Although the value of each individual ticket or meal varied from less than $20 to more than $1,000, the aggregate value of things given to specific public officials sometimes amounted to many thousands of dollars.  See e.g. Ney Information at ¶¶ 18, 19 (during an eight-month period in 2002, Abramoff and his lobbyists provided to Ney and his staff approximately $6,400 worth of meals and drinks and approximately $1,100 worth of concert tickets).

Occasionally, Abramoff spiked the flow of meals, drinks, and tickets with high-dollar-value items.  Abramoff's plea agreement outlines one example of how Abramoff used money provided by his clients to fund jobs for spouses of public officials.  See e.g. United States v. Rudy, 06cr082 (D.D.C.) Fact. Basis at 11(c) (describing payments totaling $50,000 to fund a job for his wife).  Abramoff also provided all-expenses-paid trips with little or no official purpose to overseas destinations like Scotland, the Commonwealth of the Northern Mariana Islands ("CNMI"), and Russia.  Among the most expensive were the three Scotland trips, which ranged in value from approximately $120,000 in 2000 to more than $150,000 each in 2002 and 2003 for all participants, including the lobbyist hosts.  There were other trips to U.S. destinations, too, and they included golfing, viewing sporting events, or visiting Abramoff's tribal clients.  For example, in January 2001, Abramoff funded a trip to the Super Bowl aboard a private jet for three high-ranking Congressional staffers.  Several other examples of trips are detailed in the plea documents of Abramoff's coconspirator Robert Ney.  See Ney, Fact. Basis at ¶9(a).  Abramoff also used contributions to non-profits to motivate the heads of those non-profits to assist him and his clients.  For example, Abramoff directed funds to a non-profit controlled by Italia Federici to entice and reward Federici for acting as a conduit of information and requests to Deputy Undersecretary of the Interior Department, Steven Griles, and Italia Federici of CREA.  A final category of things of value involved campaign contributions.  Abramoff strategically timed contributions, usually bundling significant amounts together, to try to influence and reward public officials.

Abramoff sometimes offered gifts and made requests for official action himself.  Most often, however, he used his junior lobbyists and their connections to dole out the things of value

and ask for and receive the official actions. He encouraged his lobbyists to lobby their former employers, though he was aware of the statutory post-employment lobbying ban. See 18 U.S.C. §207(e); Volz Fact. Basis. at ¶ 12. Abramoff was personally and directly involved in approving the things of value given to public officials, especially the tickets, jobs, fundraisers, and campaign contributions for officials from whom he wanted official action. Abramoff also attended some of the sporting events to which he had made the tickets available, and he often could be found at his restaurant, directing his restaurant staff and his lobbyists to provide free food and drinks.

### 2. *Official Action*

The types of official action sought included everything from meetings with clients that would boost Abramoff's apparent influence and power as a lobbyist to millions of dollars in appropriations, to other legislation or executive branch action, to letters or other communication pressuring executive branch officials to take action favorable to his clients. Often the legislative action was sought in ways least subject to public scrutiny. For example, Abramoff requested that Congressman Ney insert language into the Help America Vote Act during the conference committee proceedings to avoid extensive public debate or scrutiny of his amendment.

### 3. *Public Officials*

Since Scanlon and Abramoff pled guilty, twelve individuals have been prosecuted so far for engaging in or attempting to cover up this type of corruption. Of those, ten were public officials when they accepted such benefits, and two (Tony Rudy and Neil Volz) later became lobbyists with Abramoff and provided the same things of value. The public officials included the following:

- Tony Rudy, lobbyist and former deputy chief of staff to a leader of the U.S. House of Representatives, pled guilty on March 31, 2006 to one count of conspiring with Abramoff and others to commit honest services fraud, to commit mail and wire fraud, and to violate the federal one-year lobbying ban. United States v. Rudy, 06cr82 (D.D.C.). Rudy admitted that he corruptly accepted from Abramoff all-expenses-paid trips to Hilton Head, South Carolina, and Pebble Beach, California; numerous tickets, including the use of a box suite at Fed Ex Field to host a bachelor party; and the aforementioned $5,000 per month to fund a job for Rudy's wife.

- Neil Volz, lobbyist and former chief of staff to Congressman Ney, pled guilty on May 8, 2006, to one count of conspiring with Abramoff and others to commit honest services fraud and violate the federal one-year lobbying ban. United States v. Volz, 06cr119 (D.D.C.). Volz admitted that he corruptly accepted from Abramoff tickets for concerts and sporting events as well as regular meals and drinks.

- David Safavian, former chief of staff at the General Services Administration, was convicted by a jury on June 20, 2006, of one count of obstruction of justice and three counts of making false statements regarding Abramoff's work with GSA and Safavian's receipt from Abramoff of a reduced-price golf trip to Scotland in August 2002.[2] United States v. Safavian, 05cr370 (D.D.C.) (Judge Friedman);

- Roger Stillwell, former Department of Interior employee, pled guilty on August 11, 2006, to one misdemeanor count of making a false writing for failing to disclose on his annual financial disclosure statement tickets with a face value of nearly $500. United States v. Stillwell, 06mj300 (D.D.C.);

- U.S. Representative Robert W. Ney pled guilty on October 13, 2006, to one count of conspiring with Abramoff and others (to commit honest services fraud, make false statements, and violate the federal one-year lobbying ban) and one count of making false statements. United States v. Ney, 06cr272 (D.D.C.). Ney admitted or was charged with corruptly accepting from Abramoff foreign and domestic trips with total trip costs exceeding $170,000 (although Ney's pro-rata share of those costs would have been far lower); during an eight-month period in 2002, directly and indirectly receiving $6,400 worth of meals and drinks and $1,100 worth of concert tickets; accepting $32,000 in campaign contributions in exchange for his agreement to take various official actions; and receiving unreported in-kind campaign contributions.[3]

---

[2]In June 2008, Safavian's convictions were reversed, with some counts dismissed entirely and others remanded for a new trial.

[3]Ney also admitted to corruptly accepting thousands of dollars worth of gambling chips from a foreign businessman, and failing to accurately disclose his receipt of that money on his 2003 financial disclosure form.

- William Heaton, former chief of staff to Congressman Ney, pled guilty on February 26, 2007, to one count of conspiring with Abramoff and others to commit honest services fraud.  United States v. Heaton, 07cr42 (D.D.C.).  Heaton admitted corruptly accepting from Abramoff the same trips as his former boss Congressman Ney, namely foreign and domestic trips with total trip costs exceeding $170,000 (although Heaton's pro-rata share of those costs would have been far lower); and numerous tickets, meals, and drinks. Heaton also admitted to corruptly accepting thousands of dollars worth of gambling chips from the foreign businessman, and failing to accurately disclose his receipt of that money on his 2003 financial disclosure form.

- J. Steven Griles, former Deputy Secretary of the Department of the Interior, pled guilty on March 23, 2007, to one count of obstruction of a Senate inquiry. United States v. Griles, 07cr79 (D.D.C.).  Griles admitted repeatedly lying under oath in an effort to conceal the true nature of his relationship with Abramoff.

- Mark Zachares, former high-level Republican staffer at the U.S. House of Representatives Transportation and Infrastructure Committee, pled guilty on April 24, 2007, to one count of conspiring with Abramoff and others to commit honest services fraud.  United States v. Zachares, 07cr106 (D.D.C.).  Zachares admitted corruptly accepting from Abramoff a trip to play golf in Scotland in August 2003; $10,000 in payments; tickets totaling more than $30,000 to events at the MCI Center and FedEx Field; and numerous free meals, drinks, and rounds of golf.

- Robert Coughlin, II, a former Department of Justice employee, pled guilty on April 22, 2008, to one felony count of conflict of interest in connection with assistance he provided to Kevin Ring and Jack Abramoff in return for a stream of things of value such as sports and concert tickets, meals at upscale restaurants, and golf, which the Government has valued at more than $5,000.  United States v. Coughlin, 08cr111(D.D.C.).

- John Albaugh, former chief of staff for a former U.S. Representative, pled guilty on June 2, 2008 to one count of conspiring with a lobbyist working for Abramoff, to commit honest services fraud. United States v. Albaugh, 08cr157 (D.D.C.).  Albaugh admitted corruptly accepting from Ring meals, concert, sports, and other entertainment tickets valued at more than $4,000 while using his official position to assist Abramoff and his lobbying clients.

There are ongoing investigations focusing on Abramoff's relationships with other public officials.  To date, our investigations reveal only the same type of conduct which was outlined in Abramoff's plea documents.  In other words, the allegations are that the lobbyists provided a stream of things of value to public officials in exchange for a stream of official action.  The

things of value include the same types of things identified in Abramoff's plea papers, namely trips, tickets to sporting events and concerts, unreported in-kind campaign contributions, and employment for wives of members of Congress or staff. Abramoff's attorneys have agreed that, by contemporaneous sealed, *ex parte* pleading, we can provide specific information as to these concluded and ongoing grand jury investigations of other public officials.

### 4. Concealment

It was a priority for the officials and the lobbyists to conceal their relationship through non-disclosure or false disclosures in required filings and statements to ethics officials. For example, in several instances the public officials failed to accurately disclose, as required by law, the gifts that Abramoff and his lobbying team provided to them in the form of trips with little or no official purpose, meals, drinks and tickets to entertainment events. Abramoff also encouraged his lobbying team to conceal the identity of recipients of things of value on internal Greenberg Traurig reports to ensure that public officials could not later be identified from the records themselves.

In addition, as part of his efforts to conceal his activities, Abramoff occasionally failed to accurately report required information on Lobbying Disclosure Act ("LDA") forms filed with the U.S. Senate and House of Representatives. For example, one aspect of the corrupt relationship involving Congressman Ney was Abramoff's lobbying efforts on behalf of another client, which is referred to in Abramoff's plea agreement as a "provider of wireless telephone infrastructure." See Fact. Basis at ¶ 30d. Although Abramoff was first paid by this client in January 2001 and began actively lobbying Congressman Ney on behalf of this client in April 2001, neither he nor any other lobbyist filed an LDA report as required. Rather, the LDA report was first filed in

January 2003, a fact which served to obscure Abramoff's role in Congressman Ney's decision to award a lucrative license to the client for the installation of wireless infrastructure in the House of Representatives and concealed a lobbying ban violation by Volz. The investigation also developed information that Abramoff may have also failed to file reports under the Foreign Agent Registration Act for the purpose of obscuring any representation of foreign interests.

  B.  <u>Extent of the Fraud Offenses</u>

  As previously stated, the plea agreement and factual basis were drafted broadly to account for the full scope of Abramoff's conduct without detailing each particular transaction. After many months of further investigation, the United States remains confident that the plea agreement and factual basis reflect substantially all of the fraudulent conduct which we have found Abramoff to have engaged in, aside from the fraudulent conduct for which he was prosecuted in the Southern District of Florida. <u>See United States v. Kidan et al.</u>, 05-CR-60204 (SDFL).

  Chief among the fraud schemes charged against Abramoff is the private honest services fraud he and Michael Scanlon committed. In essence, Abramoff recommended to his clients that they hire Scanlon without revealing that Scanlon's profits were grossly inflated and included a huge kickback to Abramoff. In other words, after Abramoff was hired to develop a lobbying plan to accomplish his client's goals, he sometimes recommended strongly that the client obtain grass roots lobbying services and that the client hire Capital Campaign Strategies, LLC, ("CCS"), a grass roots lobbying company owned and operated by Scanlon. Abramoff knew that clients would rely on his advice, and they did so. Scanlon and Abramoff concealed from the clients that Abramoff would receive fifty percent of the net profits from those contracts.

Although lobbying and some grass roots advocacy services were rendered to the clients, Abramoff's clients were deprived of the advice of a neutral consultant, relying on Abramoff's advice which was tainted by his undisclosed financial conflict of interest as to whether the clients needed the services and whether CCS was the best company to perform the services at the best price.

As laid out in the factual basis, Abramoff and Scanlon committed this private honest services fraud against "Mississippi Tribe" (the Mississippi Band of Choctaw Indians), "Louisiana Tribe" (the Coushatta Tribe of Louisiana), and "Michigan Tribe" (the Saginaw Chippewa Tribe). See ¶¶ 7 - 25 of the factual basis; ¶¶ 3 and 4 of the plea agreement. The conduct involving "Texas Tribe #1" (the Tigua or Ysleta del Sur Pueblo) was a variant of this scheme in that Abramoff told the Tigua he would work for free if the tribe hired Scanlon's company. In fact, Abramoff and Scanlon had agreed that Abramoff would receive fifty percent of the net profits. With respect to the Tigua, Abramoff and Scanlon already represented the Louisiana Coushatta in that tribe's effort to close casinos in Texas, a direct conflict with the interests of the Tigua, who wanted to reopen the tribe's casino in El Paso. Abramoff did not disclose this conflict of interest to the Tigua, either.[4] Abramoff also committed private honest services fraud against his employer, Greenberg Traurig, when he directed a wireless company to pay lobbying fees due to Greenberg Traurig to Abramoff's non-profit, the Capital Athletic Foundation ("CAF").

_____

[4]Where Abramoff's interest in the profits of CCS was not disclosed to potential clients, there was no clear legal duty to disclose what Abramoff and Scanlon intended to do with their profits. There are other payments made to Abramoff by Scanlon pursuant to their secret arrangement, but these payments arise only from interactions before Abramoff was hired as the clients' lobbyist. Consequently, those payments were not charged as criminal law violations.

The other frauds in which Abramoff engaged, and to which he pled guilty, are traditional mail and wire frauds to deprive others of property using affirmative misstatements, each of which are set forth in the factual basis.  See ¶¶ 26-31 of the Factual Basis.  Occasionally, Abramoff was aided and abetted by others in those schemes, but he was at least equally culpable with his coconspirators, if not more culpable.  The factual basis and plea agreement contain descriptions of each of these private honest services frauds and property frauds, which are summarized below and for which Abramoff agreed that restitution was mandatory.[5]

| Victims - Private Honest Services Fraud | Amount |
| --- | --- |
| Mississippi Choctaw | $6,364,000 |
| Louisiana Coushatta | $11,450,000 |
| Saginaw Chippewa | $540,000 |
| Tigua | $1,850,000 |
| Tyco | $1,655,695 |
| Greenberg Traurig for diversion of $50,000 wireless client payment | $50,000 |

| Victims - Affirmative Misrepresentations | Amount |
| --- | --- |
| Pueblo of Sandia | $1,175,000 |
| Saginaw Chippewa | $25,000 |
| SPI Spirits | $25,000 |

|  | **Total** |
| --- | --- |
|  | $23,134,695 |

Although neither the amount nor the conduct affect Abramoff's sentencing guidelines, there is another fraud in which Abramoff engaged that is described in the plea documents of his

---

[5]Abramoff also agreed to report all financial transactions valued at $2,500 or more.  Plea Agreement at ¶ 5.  The PSR appears to reflect several sales of assets over this reporting amount which were not previously disclosed to the government.  Preliminary information from Abramoff's counsel indicates that these sales were of a car and other items, and they were  used to finance ordinary living expenses by Abramoff's family after Abramoff reported to prison, meaning that the government likely would have had no objection to them in any event.  Abramoff's counsel are preparing a more detailed scheduling of the disposition of any assets, and they should be prepared to account for those assets if material to the Court's restitution findings.

coconspirator but not specifically described in Abramoff's plea papers.  In about April 2002,

Tony Rudy and Abramoff advised one of their firm's clients, SPI Spirits, that it should make a

$20,000 contribution to a non-profit public policy group as part of its lobbying efforts.

Abramoff and Rudy failed to disclose that $8,000 of this money was paid to Rudy's wife through

a closely-held company Rudy and she controlled, Liberty Consulting.  See United States v.

Rudy, 06cr082 (D.D.C.) Fact. Basis at ¶ 16.

     We have uncovered evidence of additional fraud, although it is not specific enough to

warrant restitution.  For instance, Abramoff convinced the Pueblo of Sandia to hire Scanlon by,

in part, reducing Greenberg's proposed fee from $125,000 per month to $50,000 per month and

directing that the vast bulk of funds paid by the Sandia be paid to CCS.  When Greenberg's fees

were reduced, Greenberg effectively lost its share of the additional fees that might have been

paid by the Sandia to Abramoff depending on the outcome of their negotiations.  Another way

that Abramoff and his lobbyists may have defrauded Greenberg, although by an unknown

amount, was when those lobbyists working for Abramoff padded their hours in order to get

higher bonuses from Greenberg Traurig. Greenberg Traurig determined bonuses in part on the

number of hours a given associate lobbyist billed, meaning that the padded hours possibly

resulted in higher bonuses.

     Additionally, Abramoff and his lobbyists regularly shifted expenses from one client to

another or padded hours in order to make it appear that they performed more work than they

actually did, a fact which may have created a false impression about what the lobbyists were

actually doing for their non-retainer clients.  The net effect of this conduct, however, is

unknown.  Finally, another fraud committed by Abramoff involved $25,000 in payments made

by the Mississippi Band of Choctaw Indians to Liberty Consulting on behalf of then lobbyist

Tony Rudy; although Abramoff told the Choctaw that the periodic payments were to pay for

extra work performed by Rudy, Rudy performed little, if any, additional work.  Abramoff and

others often falsified invoices which obscured whether there was a legitimate business purpose

to a particular financial transaction or whether work was done in order to justify the associated

payments

        C.        Extent of the Tax Offenses

 The essence of Abramoff's tax evasion scheme was his illegal use during the tax years

2001 and 2002 of a non-profit entity that he created called Capital Athletic Foundation ("CAF").

For example, Abramoff used the non-profit to fund golf trips for public officials and co-workers.

Money used for a non-charitable purpose was taxable to Abramoff personally because it was

used for his benefit.[6]  Additionally, on at least one occasion, Abramoff had a client pay to CAF

lobbying fees which were actually owed to his employer, Greenberg Traurig LLP.  Abramoff

improperly deducted some of the funds provided to CAF to offset income.

       At the time of the plea in this case, the total tax due and owing on the amount of income

and funds of CAF that Abramoff misdirected in these ways during the years 2001 through 2003

was calculated to be $1,724,054.  Since that time, however, errors were discovered in the

computation of the tax that reduced the total intended tax loss to approximately $693,590.[7]

---

[6]We have uncovered no evidence sufficient to charge anyone besides Abramoff in this tax evasion scheme.

[7]The error in calculating the intended tax loss stemmed largely from a failure to give Abramoff credit for certain charitable deductions.  Essentially, when computing the tax loss at the time of Abramoff's plea agreement, CAF was treated as a for-profit entity controlled by Abramoff.  All income to CAF was attributed as income to Abramoff and contributions by

Although this lower tax loss affects the sentencing guidelines for the tax offense, it does not affect the total offense level calculated in the plea agreement in paragraph 11b. Under the rules for grouping of offenses under U.S.S.G. § 3D1.4, although the total offense level for tax offenses drops from 26 to 24, one half point is still added to the highest group (the fraud offenses) for a total of two points. In other words, the total offense level, after the various offenses are grouped together, remains a 31. As reflected in the final Presentence Report ("PSR"), the Probation Office concurred in this calculation of Abramoff's sentencing guidelines.

Additionally, although tax losses are not subject to mandatory restitution, a defendant can agree that tax due and owing be treated as restitution under 18 U.S.C. § 3661(a)(1). Abramoff did so agree at the time of his guilty plea. Since then, however, the government has determined that Abramoff may not owe any net taxes for 2001 through 2003 because he is entitled to apply losses from other businesses in later years against the taxes due on the income evaded using CAF. For example, in years including at least 2004 and 2005, Abramoff experienced significant losses in the operation and closing of his restaurants, which can be applied to offset his personal income tax in the earlier years 2001 through 2002. Accordingly, although there was an attempt to evade taxes in the years 2001 through 2002, there may be no tax to pay as restitution or otherwise for these years after taking into account operating losses and taxes already paid. The parties would prefer that the calculation of exactly what civil tax fines and penalties may be due be treated as a civil matter to be negotiated by Abramoff with the IRS.

---

Abramoff to CAF were disallowed as charitable deductions. However, Abramoff was still entitled to deduct any legitimate charitable contributions made through CAF. Accordingly, after crediting Abramoff for those legitimate charitable contributions made through CAF, the intended tax loss was reduced to approximately $693,590.

As a result of the issues discussed above, the parties are filing an amendment to the plea agreement which (1) corrects the tax loss, (2) corrects the guidelines calculation (but does not affect the final offense level), (3) strikes paragraph seven of the agreement, which is the paragraph requiring Abramoff to make restitution for his tax evasion, and (4) strikes the language of paragraph 6 of the plea agreement which requires Abramoff to file corrected tax returns with the IRS prior to sentencing.  The tax issues are complex and the fact that there has been no final resolution is not the fault of Abramoff.  The other requirements in paragraph six (regarding cooperation with the IRS, and waiver of the statute of limitations and venue) will remain unchanged.

## II.    ABRAMOFF'S COOPERATION

### A.    Motion to Reduce by One Level for Timely Acceptance of Responsibility

Abramoff began meeting with investigators months in advance of his January 2006 guilty plea, providing information and documents revealing his own misconduct and that of others. Those interviews assisted authorities in the investigation and prosecution of Abramoff's own misconduct, and the government moves to reduce Abramoff's offense level by one pursuant to U.S.S.G. §3E1.1(b) for timely acceptance of responsibility.  As calculated in Abramoff's PSR, the final offense level after this reduction is a level 31.

### B.    Motion to Reduce by Six Levels for Substantial Assistance

Further, Abramoff has fully complied with his obligation to cooperate under his plea agreements in both the Southern District of Florida and the District of Columbia.  Accordingly, for the reasons described below as well as in a contemporaneously filed *ex parte*, sealed addendum, the government moves pursuant to U.S.S.G. §5K1.1 to reduce Abramoff's offense

15

level by six levels to a final offense level of 25 due to his substantial assistance in the investigation and prosecution of others.  Although Abramoff's misconduct is an extremely serious matter to his private clients and to the integrity of - and public confidence in - government, his cooperation and that of others following his and Scanlon's pleas, has exposed significant misconduct by others in and out of public office and revealed to law enforcement officials and the public the manner and means used by government officials to game the system for private advantage in violation of criminal, regulatory, and ethical laws and rules.  In making its recommendation for this sentence reduction for Abramoff, the United States asks the Court to consider the following public information.

> 1.    *Abramoff's substantial assistance was especially important in four convictions.*

Abramoff deserves substantial credit for the following convictions by guilty plea:

- Tony Rudy (former deputy chief of staff to a leader in the U.S. House of Representatives).  On March 31, 2006, Rudy pled guilty to a multi-object conspiracy with Abramoff and others to commit honest services fraud, violate his one year lobbying ban, and defraud SPI Spirits and the Saginaw Chippewa each of $25,000, which was used to partially fund the August 2002 golf trip to Scotland.  Abramoff was debriefed multiple times regarding Rudy.  Among other things, he described how $50,000 paid to Rudy's wife through a non-profit was really money intended to support Rudy without regard to whether his wife performed any real service for the organization for which she purportedly worked.

- Neil Volz (former chief of staff to Congressman Bob Ney).  On May 10, 2006, Volz pled guilty to a multi-object conspiracy with Abramoff and others to commit honest services fraud and violate his one year lobbying ban.  Similar to Rudy, Volz admitted to acting corruptly while a Congressional staffer and also while a lobbyist working for Abramoff.  Abramoff was debriefed multiple times regarding Volz, Volz's former employer Congressman Ney, and Ney's office.  Abramoff suggested several areas of investigation that we had not previously discovered, and described several events that were not captured in the email traffic but would have been helpful had Volz gone to trial.

- J. Steven Griles (Deputy Secretary of the Department of Interior).  On March 23, 2007, Griles pled guilty to obstructing the Senate Indian Affairs Committee's inquiry into

16

Abramoff and his lobbying on behalf of Native American Indian tribes. Abramoff's cooperation was crucial to the successful prosecution of Griles. Among other things, Abramoff reviewed Griles' testimony before the Senate and pointed out falsehoods, Abramoff searched his emails for documents helpful in establishing the falsehoods, and Abramoff was extensively debriefed, including about (a) non-email contacts between him and Griles, and (b) the role of the intermediary, Italia Federici, and her non profit organization called Coalition of Republicans for Environmental Activists.

•     Mark Zachares was a high-ranking staffer on the House Transportation & Infrastructure Committee. On April 24, 2007, Zachares pled guilty to a conspiracy to commit honest services wire fraud. Abramoff (1) met with agents and attorneys in two extensive debriefing sessions; (2) reviewed his e-mails for relevant documents; and (3) provided information crucial to securing a search warrant of Zachares' home. The fact that Abramoff was cooperating and providing information was vital to securing Zachares' guilty plea to a corrupt relationship with Abramoff.

        2.     *Abramoff also played a role in securing the following five convictions.*

Abramoff's assistance was important directly and in procuring the cooperation of others in investigations that led to the following convictions by guilty plea:

•     Roger Stillwell (a long-time employee of the Department of Interior). On August 11, 2006, Stillwell pled guilty to one count of making a false sworn statement for his failure to disclose on his annual financial disclosure forms the tickets from Abramoff. Abramoff advised investigators that Stillwell gave Abramoff nonpublic information from the Department on matters of interest to Abramoff and his lobbying clients and Abramoff provided Stillwell with tickets to sporting events and concerts.

•     Robert Ney (former U.S. Representative for the 18th District of Ohio). On October 13, 2006, Congressman Ney pled guilty to a multi-object conspiracy to commit honest services fraud, make false statements, and cause Neil Volz to violate his one-year lobbying ban. Ney also pled guilty to one count of making false statements on his annual financial disclosure forms. Although Will Heaton and Neil Volz had much more day-to-day contact with Congressman Ney, Abramoff first suggested several areas of inquiry. For example, Abramoff first suggested that he had instructed his staff that Congressman Ney could eat and drink for free whenever he was at Signatures. Abramoff told the government that he and Tony Rudy met with Ney and asked for legislation helping their client, the Tigua Tribe, and that Abramoff subsequently had met with Ney at Signatures and told Ney that the Tribe was funding the August 2002 Scotland golf trip. Also, Abramoff was debriefed extensively about his relationship and dealings with Congressman Ney, both by investigators in the Southern District of Florida and by our agents in Washington, D.C.

- William Heaton (succeeded Neil Volz as Ney's chief of staff). On February 26, 2007, Heaton pled guilty to a conspiracy to commit honest services fraud with Abramoff, Ney, and others. Although Volz and Rudy had more contact with Heaton, Abramoff was also in a position to provide information and testimony about his observations of and participation in Heaton's misconduct.

- Robert Coughlin (former employee in the Legislative Affairs and Intergovernmental Affairs offices of the Department of Justice). On April 22, 2008, Coughlin pled guilty to willfully taking actions affecting a financial interest (18 U.S.C. § 208) for his undisclosed receipt of things of value from a lobbyist working for Abramoff in a case handled by the U.S. Attorney's Office in Maryland. Abramoff was debriefed regarding Coughlin. Even though Abramoff had few direct dealings with Coughlin, his information was helpful to the prosecution of Coughlin.

- John Albaugh (former chief of staff to a Member of the United States House of Representatives). On June 2, 2008, Albaugh pled guilty to a conspiracy to commit honest services fraud. Abramoff first suggested that agents look into the relationship between a lobbyist working for him and Albaugh and provided information regarding their involvement.

> ### 3.    *Abramoff also deserves some credit for two completed investigations*

- Abramoff cooperated in an investigation conducted by the DOJ Office of Inspector General into allegations that senior Justice Department officials refused to make Acting US Attorney Fred Black the permanent US Attorney for Guam and the CNMI, and ended his assignment as interim US Attorney in a corrupt agreement with Abramoff in part because Black had opened an investigation into corruption by Abramoff and supported legal positions opposed by Abramoff's clients. Abramoff provided emails, statements, and leads to other evidence in the OIG's investigation, which ultimately concluded that Black's claims were unfounded in a published report. See http://www.usdoj.gov/oig/special/s0606a/final.pdf (last visited August 20, 2008).

- David Safavian (former chief of staff at the General Services Administration). Although we decided to pursue criminal charges against Safavian before Abramoff began cooperating, Abramoff provided some information about the Scotland 2002 golf trip enjoyed by Safavian that was helpful in developing leads and further evidence used to prosecute Safavian.

> ### 4.    *Abramoff also deserves credit for several ongoing or completed investigations*

As mentioned previously, there remain several ongoing or completed investigations of

Abramoff and the relationships that he had with various public officials. Because Federal Rule

of Criminal Procedure 6(e) prevents us from publicly revealing details about closed grand jury

investigations, and because both Rule 6(e) and the law enforcement privilege preclude public

dissemination of information about ongoing investigations, those matters are not further

described here.  Rather, with the consent of Abramoff, the government is filing a sealed, *ex parte*

submission with the Court providing specifics regarding the ongoing or closed investigations and

describing Abramoff's role in those matters.

> 5.    *Abramoff's Cooperation Merits 6-Level Departure*

Applying the factors identified by the United States Sentencing Guidelines, the

cooperation of Abramoff merits a six-level downward departure.  See generally U.S.S.G. §

5K1.1 (identifying factors to be considered in determining the amount of departure to be granted

pursuant to a substantial assistance motion).  His statements to investigators have been truthful

and complete, accurately meshing with the other evidence we have obtained in our various cases

and investigations.  Likewise, his cooperation has been extensive in that he has been debriefed

dozens of times, and he has performed many hours of his own research to help investigators

locate important emails and documents.  As stated, Abramoff's cooperation led directly to the

guilty pleas of three high-ranking Congressional staffers (Rudy, Volz, and Zachares) as well as

one presidentially appointed, Senate confirmed executive branch official (Griles).  His

cooperation also was important to the prosecution of a former U.S. Congressman (Ney), another

former high-ranking Congressional staffer (Albaugh), and a former mid-level Department of

Justice official (Coughlin), among others.  By any measure, his cooperation has been both

significant and useful.  Finally, Abramoff's cooperation was timely.  He was the second figure to

plead guilty in this investigation, and he began debriefings with the government before he knew

that his coconspirator Scanlon was also cooperating.

## III.    ADDITIONAL MATTERS

There are two additional matters which might be relevant to the Court's sentencing of

Abramoff.  Accordingly, those issues are briefly addressed below.

### A.    Abramoff's Sentence in the Southern District of Florida

On January 4, 2006 - the day after Abramoff's guilty plea in this Court - Abramoff

appeared in the Southern District of Florida to enter a guilty plea in a separate fraud

investigation.  Specifically, Abramoff pled guilty to one count of conspiracy to commit mail and

wire fraud and one substantive count of wire fraud.  See United States v. Kidan et al., 05-60204

(S.D.Fl. 2006).  On March 29, 2006, the district court in the South Florida sentenced Abramoff

and his coconspirator Adam Kidan each to 70 months in prison.  On November 15, 2006,

Abramoff began serving his sentence in the South Florida case.

Abramoff's South Florida sentence may be important to this Court's sentencing

determination.  First, Abramoff is due to receive time off his sentence in South Florida.  On

August 27, 2008, the government filed a motion to reduce Abramoff's sentence from 70 to 45

months pursuant to Fed.R.Crim.P. 35 due to his substantial assistance in the cases investigated

and prosecuted in Washington, D.C.[8]  As of the filing of this memorandum, the South Florida

court has yet to rule on the government's unopposed Rule 35 motion.

---

[8]The typical practice of the U.S. Attorney's Office for the Southern District of Florida is
to seek a reduction of one-third for cooperating defendants.

Moreover, pursuant to paragraph 9 of the plea agreement, we recommend that any sentence imposed in this jurisdiction run concurrently with the sentence imposed in South Florida.  See 18 U.S.C. § 3584 (giving district courts discretion to impose concurrent or consecutive terms of imprisonment).  As explained below, to give effect to our agreement to recommend consecutive time, we further recommend that the Court's ultimate sentence give Abramoff credit for time already served in the South Florida case.

Although concededly not within our control, the parties' expectation was that Abramoff would be sentenced in both jurisdictions essentially contemporaneously following substantial completion of his cooperation.  The South Florida court, however, sentenced Abramoff earlier than expected, and Abramoff began serving his prison sentence for the South Florida case on November 15, 2006 while agents and prosecutors commuted to the prison to work with Abramoff on on-going investigations.  As a result, Abramoff will have served slightly less than 22 months in prison (and accrued slightly more than 3 months of good time) on the South Florida sentence before he is sentenced by this Court in Washington, D.C.  If this Court were to sentence Abramoff to a straight concurrent sentence now, then his sentence in D.C. would only run concurrently from the day it is imposed.  In other words, because of the 22-month delay between the imposition of sentence in South Florida and the imposition of sentence here, there are 25 months of the South Florida sentence that will not run concurrently with his D.C. sentence.

The only way to treat Abramoff's sentence in D.C. as running concurrently with the entirety of his sentence in South Florida - which was the intent of the plea agreement - is by further reducing his sentence in D.C. by the amount of time he has already served in South Florida.  The Bureau of Prisons will not follow a recommendation by the Court to have his

sentence in this case relate back to the beginning of the South Florida sentence, nor will BOP, in

its calculation of Abramoff's sentence in this case, somehow give him credit for the time already

served in South Florida.  Accordingly, we recommend that the Court reach its final sentence and

then give effect to the concurrent sentencing recommendation by further reducing Abramoff's

final sentence by the 25 months for which he has been credited in the South Florida case.  See

U.S.S.G. §5G1.3 (c) and App. Note 3(E) (to avoid confusion with BOP's exclusive authority to

grant credit for time served, the Sentencing Guidelines recommend that a sentencing court use a

downward departure rather than attempt to order the BOP to give a defendant credit for time

already served).

> B.    Calculating Abramoff's Criminal History

The chance order in which Abramoff is being sentenced (first in South Florida and then

in D.C.) has increased his total jail time.  As reflected in the PSR, Abramoff has no criminal

history other than the fraud case in South Florida.  Because he entered guilty pleas within one

day of each other in South Florida and D.C., but he was sentenced in South Florida before he is

being sentenced in D.C., Abramoff receives three criminal history points, meaning that he now

falls into Criminal History Category II.  If Abramoff had been sentenced first in D.C., then the

imposition of criminal history points on a concurrent sentence in the South Florida case would

have had no effect on the amount of jail time Abramoff ultimately serves because his crimes in

that jurisdiction resulted in a final offense level of 27.  In other words, whatever concurrent

sentence he received in South Florida would have been less than the minimum recommended by

the Sentencing Guidelines for the crimes committed in D.C. because a level 27, criminal history

category II sentence results in a range of 78-97 months whereas a level 31, criminal history

category I sentence results in a range of 108-135 months. Conversely, by virtue of the fact that Abramoff was first sentenced in South Florida, he has received criminal history points prior to his sentencing in D.C., a fact which increases his total jail exposure by more than a year (from a range of 108-135 months to a range of 121-151 months). The parties anticipated that such a problem might arise, and the government agreed to recommend a downward departure pursuant to U.S.S.G. § 4A1.3(b) (over representation of criminal history) in order to correct for this chance event. See Plea Agreement ¶11(d). Accordingly, we hereby move for a downward departure of one criminal history level, taking Abramoff back to the criminal history category which would have applied had he been sentenced first in D.C.

**IV.    SENTENCING RECOMMENDATION**

Considering the extent of Abramoff's cooperation as well as the factors identified in 18 U.S.C. § 3553(a), the government recommends a final sentence of 64 months incarceration, with credit given for the time Abramoff has already served. Such a sentence would mark approximately a forty percent reduction from the bottom range of 108 months. It is appropriate given Abramoff's extraordinary cooperation to date, cooperation which can be wholly or partially credited for the convictions of a Member of Congress, five high-level legislative branch officials, one high-level executive branch official, and two other mid to low-level public officials as well as on-going matters. Sixty-four months also is sufficiently severe to reflect the seriousness of Abramoff's conduct, appropriately punishing him for crimes that are egregious.

Additionally, the proposed sentencing recommendation of 64 months is appropriate in light of the sentences previously given to both cooperating defendants (Volz, Heaton, and

Federici) as well as those who have refused to cooperate (Griles, Ney, and Safavian).  Those

sentences were as follows:

| Defendant | Charge(s) | Guidelines Range | 5k Recommendation | Actual Sentence |
|---|---|---|---|---|
| Federici | 18 U.S.C. § 1505 (obstruction of Senate inquiry) 26 U.S.C. § 7201 (tax evasion) | Level 12 after acceptance (10-16 months in Zone C) | Level 9 (4-10 months in Zone B) with home confinement only | 4 years probation restitution for tax loss |
| Heaton | 18 U.S.C. § 371 (conspiracy to commit honest services fraud) | Level 15 after acceptance (18-24 months) | Level 9 (4-10 months in Zone B) with home confinement only | 2 years probation $5,000 fine |
| Volz | 18 U.S.C. § 371 (conspiracy to commit honest services and violate the one year lobbying ban) | Level 15 after acceptance (18-24 months) | Level 9 (4-10 months in zone B) with home confinement only | 2 years probation $2,000 fine |
| Griles | 18 U.S.C. § 1505 (obstruction of Senate inquiry) | Level 12 after acceptance (10-16 months in Zone C) | N/A | 10 months in jail $30,000 fine |
| Ney | 18 U.S.C. § 371 (conspiracy to commit honest services fraud, violate the one-year lobbying ban, and make false statements) 18 U.S.C. § 1001 (false statements) | Level 18 after acceptance (27-33 months) | N/A | 30 months in prison $6,000 fine |
| Safavian | 18 U.S.C. § 1505 3 counts of 18 U.S.C. § 1001 | Level 14 without acceptance (15-21 months) | N/A | 18 months in prison |
| Stillwell | 18 U.S.C. § 1018 | Level 6 (0-6 months) | N/A | 2 years probation $1,000 fine |

As reflected in the chart, the other cooperating defendants in this investigation have received sentences of probation. Although such a sentence would be woefully inadequate for Abramoff because of his fraud, tax, and corruption offenses, those low sentences do serve to illustrate the high value appropriately placed on cooperation by this Court as well as the government. Moreover, even Congressman Ney received a much lower sentence of 30 months - which was in accord with the Sentencing Guidelines' advisory sentencing range - notwithstanding the serious corruption crimes in violation of the public trust to which he pled (which involved both Abramoff-centered corruption and corruption with a Foreign Businessman) and his refusal to cooperate. As for the defendants yet to be sentenced, none faces the likelihood of a sentence as high as Abramoff. Even Michael Scanlon, whose conduct comes closest to matching that of Abramoff due in large part to the Sentencing Guidelines for the fraud offenses, is capped by a five-year statutory maximum before any consideration of his cooperation. In other words, regardless of the basis for comparison, a 64-month sentence likely will qualify as the longest sentence of any defendant in this investigation.

Accordingly, the government recommends that the Court impose a final sentence of incarceration on Abramoff of 64 months.

Respectfully submitted

WILLIAM M. WELCH II
Chief, Public Integrity Section

STEVEN A. TYRRELL
Chief, Fraud Section


    /s/ (Mary K. Butler)_____
Mary K. Butler
M. Kendall Day
Nathaniel B. Edmonds
Trial Attorneys
Criminal Division
U.S. Department of Justice


Dated this 27th day of August, 2008.

**CERTIFICATE OF SERVICE**

I, M. Kendall Day, hereby certify that electronic notice of the instant filing was delivered to all counsel of record by the CM-ECF system on August 27, 2008.