**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| **UNITED STATES OF AMERICA** | : | **06cr001 (ESH)** |
| | : | **(corrected copy)** |
| **v.** | : | |
| | : | |
| **JACK A. ABRAMOFF** | : | |
| | : | |
| | : | |
| | : | |

## JACK ABRAMOFF'S MEMORANDUM IN AID OF SENTENCING

Abbe David Lowell, Esq.(#358651)
Pamela J. Marple, Esq. (#462921)
Christopher D. Man, Esq. (#453553)
MCDERMOTT WILL & EMERY LLP
600 13th Street, N.W.
Washington, D.C.  20005
(202) 756-8000

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

I.      STATEMENT OF FACTS ................................................................................ 6

        A.      Fraud Claims - Capital Campaign Strategies LLC and
                GrassRoots International ...................................................................... 6

        B.      Fraud Claims - Capital Athletic Foundation ........................................ 9

        C.      Corruption of Public Officials ............................................................ 10

        D.      Tax Evasion ......................................................................................... 11

        E.      Southern District of Florida ................................................................ 12

II.     PERSONAL HISTORY .................................................................................. 14

        A.      Background .......................................................................................... 14

        B.      Charitable Activities

                1.      Support of Jewish Schools ...................................................... 16

                2.      Welcoming Others into the Community and Their Home ....... 19

                3.      Mentoring and Helping Other Children .................................. 21

                4.      Kosher Restaurant -- Stacks ................................................... 21

                5.      Other Support for Families and Individuals ........................... 22

        C.      Husband and Father ............................................................................ 25

        D.      Incarceration ....................................................................................... 25

III.    THE EFFECTS OF INCARCERATION ON MR. ABRAMOFF AND THE
        ABRAMOFF FAMILY .................................................................................... 26

IV.     A SENTENCE SUBSTANTIALLY BELOW WHAT WOULD HAVE BEEN
        REQUIRED BY MANDATORY GUIDELINES AND BELOW THAT BEING
        REQUESTED BY THE GOVERNMENT IS APPROPRIATE IN THIS CASE ............ 32

        A.      Acceptance of Responsibility and Cooperation ................................. 34

i

**TABLE OF CONTENTS**

**Page**

B.    A Longer Sentence Would Produce A Sentencing Disparity ............................. 38

C.    Family Circumstances and Prior Good Works.................................................... 40

D.    No Risk of Recidivism...................................................................................... 41

E.    Lengthy Incarceration Does Not Strengthen Deterrence ................................... 42

CONCLUSION ................................................................................................................ 43

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page**

Koon v. United States, 518 U.S. 81 (1996) ..................................................... 38

United States v. Beamon, 373 F.Supp.2d 878 (E.D. Wisc. 2005) ................... 40

United States v. Bisanti, 414 F.3d 168 (1st Cir. 2005).................................... 40

United States v. Booker, 125 S. Ct. 738 (2005)............................................... 32

United States v. Garcia, 414 F.3d 201 (2d Cir. 2005)..................................... 40

United States v. Malley, 307 F.3d 1032 (9th Cir. 2002) .................................. 38

United States v. Nellum, No. 2:04-CR-30-PS, 2005 WL 300073
    (N.D. Ind. Feb. 3, 2005)............................................................................. 40

United States v. Smith, 359 F.Supp.2d 771 (E.D. Wisc. 2005)........................ 40

## FEDERAL STATUTES

18 U.S.C. § 371 ................................................................................................ 6

18 U.S.C. § 2 .................................................................................................... 6

18 U.S.C. § 1346 .............................................................................................. 6

18 U.S.C. § 7201 .............................................................................................. 6

18 U.S.C. § 3553(a)................................................................................... 33, 39

28 U.S.C. § 991(b)(1)(B)................................................................................ 39

## MISCELLANEOUS

John Braithwaite, Crime, Shame and Reintegration (1989)............................ 43

John S. Martin, Jr., <u>Let Judges Do Their Job</u>, N.Y. Times (June 24, 2003) (2003 WLNR 5657759).  ............................................................................................... 41

Sally S. Simpson, <u>Corporate-Crime Deterrence and Corporate Control-Policies: Views from the Inside</u>, in <u>White-Collar Crime Reconsidered</u> (1992)........................ 43

Elizabeth Szockyj, <u>Imprisoning White Collar Criminals?</u>, 23 S. Ill. U. L. J. 495 (1999) ................................................................................. 42

U.S.S.C., <u>Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines</u> (2004)................................................................. 41-42

David Weisburd et al., <u>Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes</u> (1995) .............................................................................. 42

## INTRODUCTION

This memorandum and the attached exhibits are submitted on behalf of Jack Abramoff to assist the Court in sentencing and to support the Government's request for a sentence lower than the now advisory Guideline range. While Mr. Abramoff hopes this Court will agree with the Government's recommendation for such a below-Guideline sentence (the government recommends 40% off the low end range), based on the factors he identifies (especially his acceptance of responsibility and truly extraordinary cooperation) and this Court's sentences in related cases, he requests a greater reduction than the Government is recommending (one that matches the 50 - 65% reduction being sought in Florida). The purpose of this submission, as is typical of sentencing memoranda, is to provide information about a defendant that may be relevant and useful to the Court in making a sentencing decision.

We appreciate the opportunity to make this submission particularly because media attention regarding Mr. Abramoff – from newspaper editorials to late night comic monologues – has made him into a caricature and has distorted the picture of a man, who like all men, is more than sum of his tragic mistakes. This Memorandum – relying on over 350 letters[1] – provides first-hand experiences with Mr. Abramoff and reveals

---

[1]    To avoid burdening the Court with review of each letter, the most important aspects of those letters are briefly addressed within this Memorandum. In fairness to those who submitted letters and to provide the Court with the original source material should it want to review them, all letters of support are included in appendices. Letters dated from 2006 that were originally submitted to Judge Huck in United States v. Abramoff, No. 05-60204-CR-Huck (Mar. 24, 2006) are submitted as Appendix A because they remain relevant to this Court's consideration of Mr. Abramoff's background and character. Letters dated in 2008 that are addressed to Your Honor are included in Appendix B. For the Court's convenience, we have placed an "*" in the table of each appendix identifying those letters that may be of particular interest to the Court. As is explained in more detail below, supra at 31, at the request of Mr. and Mrs. Abramoff, and in an effort to prevent their children from being exposed to further embarrassment and public scrutiny, we have withheld certain letters containing personal information concerning the children, but would like to find a way for the Court to review these while protecting the children's privacy.

important information about Mr. Abramoff's acceptance of responsibility, cooperation and character that we believe is relevant to the Court's decision.

As large a figure of wrongdoing that he has been painted in the media, Mr. Abramoff is a lesser known but equally large figure in matters of family, faith, generosity and remorse. He has dedicated himself to his wife of 22 years, Pam, and their five children, Levi, age 20; Alex, age 19; Daniel, age 17; and twin daughters Sarah and Livia, age 15; who are bearing the brunt of his protracted incarceration. While the world knows a good deal about his offenses, it is not widely known that he is a man whose generosity toward others, both in terms of his time and money, often has been extraordinary. This is the paradox of Jack Abramoff – on one hand, a great father, husband, son, friend, community activist, observant religious man, and supporter of charities, and, on the other hand, the man who could mislead and defraud partners and clients and commit the other serious crimes to which he has pled guilty.

Mr. Abramoff's life cannot be summed up in a single word. He is someone, as Rabbi Kalman Winter explained, who was "driven in a material world [yet] sought to find some balance and channel his considerable energy and creativity for a more noble purpose." (Rabbi Winter Ltr. of 3/20/06.) As detailed below, the same Jack Abramoff who sought in his profession to acquire a great deal of money also is the man who gave most of that money away to charitable and community projects and to individuals outside his family. (N. Berris Ltr. of 5/27/08 (noting Mr. Abramoff "has given most of his assets to various charities").) In fact, during the few years when he was receiving considerable income, Mr. Abramoff gave the majority of it (more than 50%) to projects such as opening and helping run schools for Jewish children; opening and running a kosher restaurant; providing room and board and tuition to under-privileged children;

donating property to synagogues; and engaging in often anonymous acts of kindness directed at those around him.  Mr. Abramoff did not even pay off his own home mortgage during that time.  Ironically for a man who has been called "greedy" in the press, he finds that he and his family are now virtually without any remaining financial resources to live their lives.  The debts he has incurred, even beyond any obligations for restitution, will mean that he will struggle to make a living the remaining days of his life.

It is easy to read the public record and see a man who was interested in taking, but the complete record, including the accounts of the overwhelming letters of support submitted with this Memorandum, show a more complete picture of a man who has led a life of giving that has had a powerful and lasting effect on those around him.  As Mr. Abramoff's Rabbi and friend of twenty years, Rabbi (and law professor at the University of Maryland) Yitzcha Breitowitz shares, "[t]he Jack Abramoff I know, like all of us, has flaws to be sure but he is a person of good motivation and generous heart; a man of vision and commitment; an individual who genuinely wanted to make a difference for the better in his community and in the lives of others who tragically lost his bearing . . . ."  (Rabbi Breitowitz Ltr.)

Mr. Abramoff knows he lost his bearing.  Rabbi David Lapin, who knows Mr. Abramoff better than almost anyone and has counseled him for years, explains that "hardly ever before have I seen a person undergo so much deep soul searching, remorse, and personal transformation as has Mr. Abramoff in the past months.  He has not become bitter at all – only humble and very, very sad and sorry for the actions he took and the far-reaching impact they have had." (Rabbi Lapin Ltr. of 3/14/06).[2]

---

[2]    Others have expressed similar views.  (See, e.g., M. Melancon Ltr. of 3/17/06 (Mr. Abramoff "is anxious to cooperate and make tangible and moral amends . . . . he has never once expressed bitterness of

Rabbi Daniel Kermaier, who has known Mr. Abramoff twenty years, writes that

Mr. Abramoff has "shown tremendous remorse and has been shaken to the core by this

ordeal." (Rabbi D. Kermaier Ltr. of 3/20/06.)  Rabbi Kermaier adds:

> as a rabbi I have had the opportunity to meet and be
> professionally involved with helping people who have
> made mistakes and are looking to redirect themselves.  I
> have a keen appreciation for who is sincere and who isn't
> sincere.  And I can unequivocally state that Jack Abramoff
> has sincerely changed.  Not just by trying to reverse the
> damage he has done by cooperating with the government
> in their investigation of government corruption but also in
> his mindset.  He has mentally put an end to his past
> behaviors and is eager to set straight that which he skewed
> by his past misdeeds.

(Id.)  Rabbi Stephen Baars agrees, writing that "Jack's apology is for me as sincere as

they come."  (Rabbi Baars Ltr. of 3/18/06.)  Similarly, a Benedictine Priest, Father John

Giuliani, recognizes Mr. Abramoff's "profound religious convictions," and advises the

Court that Mr. Abramoff's "'fall from grace' has awakened his conscience not only to

the depth of his crimes, but also and importantly to a reformed life contributing anew to

our society."  (Father Giuliani Ltr.)

Understanding Mr. Abramoff's religious observance is essential to understanding

the course that Mr. Abramoff now follows.  Professor and Rabbi Michael Barclay, a

long-time friend of Mr. Abramoff and a Professor of Ethics and Theology, explains that

Mr. Abramoff is in the process of what the Hebrew call "tshuvah," which means

"reconciliation" and refers to the process a Jew goes through to remedy a sin or, in

Hebrew, "heit." (Prof. Barclay Ltr. of 3/13/06.)  He explains:  "It is a multi-stepped

process, which involves recognizing what one has done; apologizing for doing it; fixing

_____

anger, only remorse"); Dr. Rabin Ltr. of 3/13/06 (describing Mr. Abramoff as a "chastened observant Jew
ultimately responsible to his Maker, and a man who seeks desperately to atone").)

what you did to the best of your ability; making a commitment not to do it again; and then, when the opportunity comes up, not to do the same 'heit' again." (<u>Id.</u>) Professor Barclay explains that Mr. Abramoff "has recognized that he did something wrong, has apologized profusely publicly, and is doing what he can to rectify whatever 'heits' he made by cooperating fully with the government and agencies." (<u>Id.</u>) As the person who knows Mr. Abramoff the best – his wife, Pam – explains:

> Religion plays a critical role in Jack's life . . . . The obvious disparity between his religious teachings and the wrongs he committed has caused Jack to do serious soul searching. He is keenly aware that he has created pain and caused shame and he is tormented by that. There is not a day that goes by that Jack does not express remorse for his past actions. He is truly regretful of his lapses in judgment. I know that Jack intends to make right his wrongs in any way he can and hopes that he may be able to influence others not to make the mistakes he made.

(P. Abramoff Ltr. of 3/17/06.)

Rabbi Breitowitz urges the Court not to "dismiss these expressions as 'crocodile tears.'" (Rabbi Breitowitz Ltr. at 3.) He emphasizes that "Jack's contrition is not an artifice to effect a reduction of sentence; it is a fundamental expression of his deep seated religious faith." (<u>Id.</u> at 4.)[3]

These expressions by people who have known a man for a lifetime describe a more accurate picture than the cartoon snapshots presented in the whirlwind of the media. Mr. Abramoff looks forward to making restitution to his victims and taking other actions which may benefit them to further atone for his wrongs, and he looks forward to

---

[3]    Rabbi Breitowitz further explains that at the core of Judaism is a directive to "behave in such a way as to bring glory to the name of G-d and to the people of Israel. Jack knows that his behavior has brought disgrace to both and that fills him with a deep, painful genuine remorse." (Rabbi Breitowitz Ltr. at 4.) He concludes that Mr. Abramoff "has learned his lesson – he is a changed man who will not go down this path again." (<u>Id.</u>)

being integrated back into society again so that he can complete the process of demonstrating that he will not commit his sins again.

## I.    STATEMENT OF FACTS

Soon after he met with lawyers and media reports began to emerge, Mr. Abramoff asked his lawyers to approach the Department of Justice ("DOJ") to resolve his issues.  He began cooperating with DOJ even before he had any agreement.  Then, as a result of initiating this course of action, on January 3, 2006, Mr. Abramoff pled guilty to an Information that was filed that day charging him with one count of conspiracy (18 U.S.C. § 371), one count of honest services fraud of a public official (18 U.S.C. §§ 2 and 1346) and one count of tax evasion (26 U.S.C. § 7201).  The next day, he flew to Florida to enter a plea there, also as part of his initiated resolution of all issues.

### A.    Fraud Claims – Capital Campaign Strategies LLC and GrassRoots International

While cooperating before his plea, Mr. Abramoff readily admitted his wrongdoing and sought an agreement where he could plead guilty and begin making amends.  Those wrongdoings are set forth in the plea agreement and its supporting factual basis, and Mr. Abramoff continues to recognize and admit these violations.

Without deflecting at all from the responsibility Mr. Abramoff has taken and continues to take for his conduct, it is appropriate to note here, in light of the enormous public attention given to this case, that the public record often has mischaracterized and, at times, conflated his offenses.  For example, not included in the public reports is the hard and successful work that Mr. Abramoff actually did for his clients, including Native American tribes.  In the fraud issues, his offense was not that he failed to provide the work he said he would or that he was not successful in obtaining benefits for his clients, which often were valued in the millions of dollars.  His offense, to which he has pled

guilty and for which he is paying a heavy price, was his failure to inform these clients that he was receiving a good deal (typically 50%) of the proceeds the clients were paying consultants Mr. Abramoff recommended they hire. This was not right and it was fraud, but it was not the crimes (e.g., taking their money and not obtaining any benefits) for which he often is cited. Ironically, perhaps some of his successes resulted from his close relationships with various government officials (some of which were completely proper and some of which were not). Nevertheless, Mr. Abramoff did not fail to achieve the results his clients wanted.

The chain of events began primarily in 2001, when Michael Scanlon formed Capital Campaign Strategies LLC ("CCS"), which provided grass roots work, public relations services, and election support. Mr. Abramoff recommended that his clients hire CCS to perform those grass roots services and CCS then paid Mr. Abramoff approximately 50% of the net profits for those clients. Later, in 2003, Mr. Abramoff formed GrassRoots Interactive ("GRI) to provide the same types of services as CCS. The Information alleged that CCS and GRI charged fees that were higher than the standard rates of their peer companies and that Mr. Abramoff committed fraud by failing to disclose his financial relationship with CCS and GRI to his clients. Mr. Abramoff admits and pled guilty to that offense.

This conduct was unquestionably wrong and illegal. His clients had the right to know how the funds they were paying were being split as that is how Scanlon and GRI's services often came about. What is seldom mentioned, however, is that the clients, including Native American Tribes, with one notable exception,[4] were satisfied at the

---

[4]     Discussion about the Tigua tribe (a.k.a. "Texas Tribe #1") is contained in Paragraphs 20 - 22 of the Factual Statement supporting Mr. Abramoff's plea agreement and page 10 of the Government's Memorandum. This situation is far more complicated than presented in that statement. While not

time with the benefits they were receiving for the fees they agreed to. And, even though some clients have used (and may in these proceedings use) Mr. Abramoff's demise to re-write history to seek the return of fees and for other reasons, the truth is that Mr. Abramoff obtained results. The financial benefits to his clients were often tremendous when compared to the fees – irrespective of whether there was a lack of disclosure concerning CCS and GRI. For example, his work on behalf of various Indian tribes yielded results that were critical to their economy by preventing some clients' casinos from being closed, preventing rival casinos from opening, and by preventing taxes on gaming profits (as high as 30% in some instances) from being imposed. Another example concerned tribal lands. While tribes would fight for years to obtain just a few acres of tribal land at a time, Mr. Abramoff helped one tribe receive nearly an entire mountain the tribe deemed an important part of its heritage. He helped another tribes obtain $16 million to build a jail, and other tribes obtain numerous other social welfare benefits. The benefits to the clients is measured in the hundreds of millions of dollars, which is likely why the clients agreed to hire Mr. Abramoff and his recommended consultants at the stated price.

Similar benefits were obtained for Mr. Abramoff's corporate clients. For example, while Mr. Abramoff failed to give disinterested advice and disclose his relationship with GRI to one client that was charged not quite $2 million in fees by GRI, Mr. Abramoff twice succeeded in preventing retroactive tax legislation from being enacted that would have cost that company billions of dollars. To be sure, Mr. Abramoff committed various serious crimes by failing to disclose or misstating his financial

---

disavowing the improper methods he used, his work was motivated by their interests, although it was interrupted by the outbreak of the investigation.

interest in CCS and GRI to his clients. For this offense, he has pled guilty, started to make amends, and is bound to pay restitution of millions of dollars (even after many of his former clients have gotten their fees back).

But, while his clients did not understand the financial arrangements behind what they were paying, they did know the cost of hiring his law firm and the consultants that were recommended and they decided that the price quoted was worth the benefits they hoped to receive (and actually did receive). While this far from excuses Mr. Abramoff's conduct, on either his failure to disclose or on creating certain relationships in Washington that became corrupt, it demonstrates one example of how misinformation has become a part of the story of what Mr. Abramoff did and did not do.

### B.    Fraud Claims – Capital Athletic Foundation

In 1999, Mr. Abramoff founded the Capital Athletic Foundation ("CAF"), which was a charitable organization that primarily funded the development of a school for Orthodox Jewish children. The Information charged that, while an employee of a law firm with a duty to act in that firm's best interest, Mr. Abramoff did work for clients in exchange for payments being made to CAF rather than the law firm. Mr. Abramoff pled guilty to this offense.

While, again, not deflecting from the responsibility that Mr. Abramoff accepts for his illegal conduct, one issue not addressed in the press is the common practice of law firm partners having causes and organizations for which they ask their colleagues and clients to contribute. In the zone where a professional is not charging a client all that he or she could but asks for a client to help a third party, Mr. Abramoff crossed way over the line. Once more, there is the painful paradox of Mr. Abramoff's actions. He took these actions for CAF, not for personal gain, wealth, or a higher standard of living. He

did these wrongs and then funded charitable and religious institutions. CAF paid roughly 80% of its income to actual 501(c)(3) charities. These facts do not excuse the bad conduct; they just demonstrate that the measure of Mr. Abramoff and his offenses for purposes of his judgment day are more complex than many believe.

### C.    Corruption of Public Officials

This, perhaps, is the most complicated area of Mr. Abramoff's wrongdoing. In politics and especially in Washington, there are all kinds of practices that include a lobbyist helping a public official before whom a lobbyist's client's interests is or might be pending. Giving large and lawful contributions, raising similar large and lawful contributions from others (e.g. bundling), giving funds to an official's political party, hiring a public official's recommended candidate for a real job or working a network to get that person a real job, arranging for a public official to speak with honoraria, arranging a public official's reimbursed fact-finding trip, finding a way to take a public official out to events by estimating the "face value" of a ticket or meal to fall below gift ceilings are just some of the ways this town works every day.

As with the other areas of his conduct, Mr. Abramoff took a practice that was tolerated as falling within the law and stretched it out of bounds so that it became clearly illegal. But here too, many have lumped all wrongdoing concerning lobbyists into the same category. As reprehensible as Mr. Abramoff's actions were, they were not of the magnitude some have reported. Other news of the last few years has included allegations that public officials were handed stacks of cash from those seeking to improperly influence them and hiding that cash in freezers, or public officials accepting a government contractor renovating their houses or accepting appliances, cars and boats.

These types of arrangements bear no resemblance to what is deemed permissible under the rules.

Most of the allegations against Mr. Abramoff involve his giving away meals at the restaurant he owned or box seats to entertainment or sporting events. To be sure, Mr. Abramoff pushed the line even further by providing more extravagant benefits, such as the large golf trip to Scotland to various public officials, but even that was supposed to fall into the category of trips that included official business (even if the official business was an appendage to give the trip the appearance of legitimacy). Nevertheless, to read the press about Mr. Abramoff, a person might not know the difference between what he did and did not do.

### D.    Tax Evasion

As with his other actions, Mr. Abramoff took what could have been mere aggressive tax avoidance and crossed the line to illegal tax evasion. But, the tax charges are a good example of the stampede that occurred around his case. Initially, the officials doing the tax calculations took the sternest position they could, finding almost any transaction to have been non-reporting or under-reporting of income. Faced with the vast charges in this case and in the Southern District of Florida, Mr. Abramoff pled guilty to tax evasion and tried initially to set the record straight of what were legitimate categories and which ones were wrong. The momentum of the time made it impossible to have anyone give him the benefit of any doubt.

Finally, this year, as time has passed and the parties were trying to get prepared for proceedings in this Court and in Florida, it was possible to have the tax issues reviewed again. Now, both the Government and Mr. Abramoff agree that the amount of tax evasion alleged was far too high. The Information alleged that between 2001 and

2003, Mr. Abramoff misused various charities he had established and evaded taxes of $1,724,054. As the PSR now reflects, that number was too high by well over a million dollars, and the actual amount was $693,590. (PSR at ¶ 63.)[5]

While that figure is still large and no less improper, it should be viewed in the context that Mr. Abramoff paid $5,370,677 in taxes during those years. Moreover, because Mr. Abramoff substantially overpaid his taxes in other years and is entitled to a refund that exceeds his liability (amount is still being determined), the Government agrees no restitution is warranted for this conduct. While Mr. Abramoff has pled guilty to tax evasion for 2002, the fact that he has so substantially overpaid his taxes in subsequent years should reflect that Mr. Abramoff does not pose a continuing threat of tax evasion. It also demonstrates how the real facts can be buried with what has become the sometimes exaggerated myth of his wrongdoing. He did far enough things wrong that some can not even hear of the work or other activities that he did right, which creates an unfair trap and burden that merits consideration here.

E.    **Southern District of Florida**

When Mr. Abramoff asked that he resolve any issue the law enforcement community had with him, that included the questions raised about his and a business partner's dealings in Florida. As a result of his decision to cooperate and plead guilty, at roughly the same time Mr. Abramoff signed a plea agreement with respect to this case, he also signed a plea agreement with respect to proceedings before the Southern District of Florida. Rather than defer the sentencing until after Mr. Abramoff's cooperation was

---

[5]    What will be filed as an amended plea agreement between the Government and Mr. Abramoff does not charge tax evasion in 2003. In addition, in correcting the PSR, Probation correctly stated the agreed upon amount of tax evasion as $693,590 in Paragraph 63, but erroneously used a different figure of $753,000 in footnote 2 at page 4.

substantially complete, the Florida Court went forward with sentencing without considering his cooperation and sentenced Mr. Abramoff to 70 months of incarceration and ordered him to pay $21,701,015.45 in restitution. The court noted that the parties could file a Rule 35 motion within a year of sentencing to address Mr. Abramoff's cooperation. The parties filed such a motion, which has been supplemented on the same day as this filing – August 27, 2008. The federal court in Florida just recently reduced the sentence of Mr. Abramoff's co-defendant business partner from the same 70 months that was imposed on Mr. Abramoff to a 50% reduction of 35 months based upon his cooperation in one case. State prosecutors with whom Mr. Abramoff's Florida co-defendant worked asked for an even greater reduction (to 24 months). Mr. Abramoff's extensive cooperation merits no less.

 Mr. Abramoff entered prison on November 15, 2006, and, by the time of his D.C. sentencing, will have spent more than 21 months in prison. The Government agreed in the plea agreement to recommend that this Court's sentence run concurrently with the Florida sentence. (Plea Agreement ¶ 9.) Likewise, the Government also agreed that none of the conduct at issue in the Florida case be deemed relevant conduct for purposes of the Sentencing Guidelines in this case. (Id.) One of the problems with the two jurisdictions inability to coordinate his plea, sentencing, sentence reduction or other events into one plea was the possibility that the Guidelines (mandatory when the negotiations were started) would overstate Mr. Abramoff's Criminal History. This was because of the possibility that, due solely to timing, the subsequent case could view the initial case as a prior conviction and thereby move Mr. Abramoff into a higher Criminal History category (as noted in the PSR). Consequently, the parties agreed to note this issue and resolve it with a joint request for an additional departure (using mandatory

Guideline day language at the time) to make sure that result did not occur. Mr. Abramoff's plea agreement leaves it up to this Court to asses Mr. Abramoff's Criminal History Category, but the Government has specifically agreed to recommend a further downward departure placing Mr. Abramoff in Criminal History Category I if the Court finds the Florida conviction otherwise would place him in Criminal History Category II. (Plea Agreement ¶ 11.d.)

## II.    PERSONAL HISTORY

Most pertinent to this Court's sentencing are the facts surrounding his decision to plead guilty, his cooperation, his conduct since the publicity about the case occurred, the impact his actions and further incarceration have had on him and his family, and the sentences given to others in the cases Mr. Abramoff has helped the Government make. These topics are addressed in Section III and IV. Nevertheless, some background is necessary to explain why Mr. Abramoff ended up where he is – in front of this Court.

### A.    Background

Any review of Mr. Abramoff's life for purposes of sentencing should consider that Mr. Abramoff's drive came from, among others, the financial conditions he knew his family had faced. His father's family was so poor that his father developed rickets from malnutrition, and it was firmly impressed upon a young Jack Abramoff by his parents the importance of hard work so that the family never face such dire conditions again. Jack Abramoff was committed to providing for his own family, including his parents, so they would not know that sort of poverty again.

To understand Jack Abramoff, one also has to understand his conversion to Orthodox Judaism. He used some of the money he made working odd jobs to buy books about Judaism and he taught himself Hebrew. By age thirteen, young Jack Abramoff

14

realized that in order for him to be true to his faith, he needed to try to practice Orthodox Judaism and became the first in his family to do so.

To understand Mr. Abramoff's motivation in finding funds to support a Jewish school in the community, open a kosher restaurant, support Jewish causes, and provide support for the State of Israel, it is important to understand how Mr. Abramoff lost sight of using the right means to achieve what were noble goals.

It also is helpful in assessing the life of Jack Abramoff to understand his passion for politics. During his senior year, Mr. Abramoff joined the College Republicans. As Nicolas Fuhrman explained: "In college, when most young men his age were experimenting with recreational drugs, drinking to excess and attending tailgate parties, Jack set out to change the world." (N. Fuhrman Ltr. of 3/20/06.) Mr. Abramoff revived the Massachusetts College Republicans and helped pull off something nobody thought seriously possible – Massachusetts voted for Republican President Ronald Reagan in 1980, the first Republican presidential candidate to carry the state since Eisenhower. Both the state and national Republican Party leadership credited this amazing feat in part to Mr. Abramoff and his College Republicans. He was bitten by the political bug and went on to Washington as National Chairman of the College Republicans.

His political successes were widely hailed, including by President Reagan who asked Mr. Abramoff to become Executive Director for his grassroots lobbying organization, Citizens for America. Congressman Dana Rohrabacher was at the White House at the time, and writes that Mr. Abramoff was a "selfless patriot" whose "effort on behalf of those fighting Communist regimes was significant and appreciated." (Rep. Rohrabacher Ltr. of 3/13/06.) Mr. Abramoff impressed those around him by his

extraordinary "concern for 'the least of his brethren'" and genuine desire "to make a positive contribution to the nation he loves so much."  (C. Gerow Ltr. of 3/15/06.)

Upon leaving Citizens for America, Mr. Abramoff worked with his father's real estate company and decided to enter the motion picture production field.  This was short-lived and he decided to do what he liked best – he went back to Washington to be part of the government process.  Preston Gates approached Mr. Abramoff about joining the firm's lobbying practice.  Mr. Abramoff lobbied for numerous and varied causes, and volunteered his services free of charge for others, particularly charities and individuals of modest means.

Eventually, Mr. Abramoff moved his practice to Greenberg Traurig, where he thought his practice could grow and thrive.  While building his lobbying practice, Mr. Abramoff's income dramatically increased, as did his charitable giving and work.  But Mr. Abramoff and his family did not change their lifestyles much and continued to live basically the same as they had before.  He donated a significant amount to charity and started projectsthat would benefit their community.  These conditions, however, set him on a course which would eventually lead to his dramatic downfall.  He would learn that the ends do not justify the means, no matter how charitable those ends might be.

**B.    <u>Charitable Activities</u>**

The most common theme to the letters that have been submitted on Mr. Abramoff's behalf have been from those who write about Mr. Abramoff's generous conduct through his years.

**1.    Support of Jewish Schools**

Among the charities, Mr. Abramoff is best known for supporting Jewish schools to which he gave literally millions of dollars.  As Allen Rothberg explains:  "Jewish survival is dependent on Jewish education.  Mr. Abramoff, through providing and

16

promulgating Jewish education to those who may have otherwise been unable to obtain it, no doubt has rescued many generations of Jews to come." (A. Rothberg Ltr. of 3/13/06.) Indeed, through his foundation and sponsorship of Jewish schools, Mr. Abramoff "helped hundreds if not thousands of Jewish families by his untold efforts in improving Jewish education in the greater Washington-Baltimore area." (H. and B. Kramer Ltr. of 3/16/06; see Dr. Saltzman Ltr. of 3/17/06 ("I do know that thousands of people have benefited from his generosity.").)

Torah School of Greater Washington

In 1994, Mr. Abramoff united other parents in founding the Torah School of Greater Washington to provide religious education to elementary school children. More than 80 children enrolled the first year – twelve years ago – and that number has grown to more than 200 students per year today. (S. Katz Ltr. of 3/15/06.) Mr. Abramoff was the first President of the school's Board of Directors. He took a full-time leave from his occupation to spend the time setting up the school, including finding teachers, buying a building and obtaining the necessary permits. Sam Garfield, a current Board Member of the Torah School, notes that the "institution owes its very existence to Mr. Jack Abramoff." (S. Garfield Ltr.) He explains: "There were many times when our school had accumulated such a large deficit that it brought us to the brink of closure, Jack stepped in and saved the day."[6]

---

[6]    These sentiments are echoed in numerous letters. (Id.; see S. and P. Jaffe Ltr. of 3/25/06 ("without the financial support of the Abramoff's, the Torah School of Greater Washington might not be in existence today"); R. and J. Sasoon Ltr. of 3/16/06 (attesting to first-hand knowledge as the school's then-accountant that "that there were countless times that without the Abramoff's financial support, the school would have floundered"); L. Taskel Ltr. of 3/21/06 (another Torah School accountant reaching the same conclusion).) Scott Hillman, a co-founder of the Torah School, explains the significance of this accomplishment: "Hundreds of children owe [Jack Abramoff] a great debt of gratitude for the quality Jewish education they have received." (S. Hillman Ltr. of 3/16/06.); see also (H. and B. Kramer Ltr. of 3/16/06; (Rep. Baldwin Ltr. of 3/13/06 ("I have no doubt that the school he founded has changed the lives of hundreds of kids.").)

One area where the Torah School has prompted the most improvement is in providing assistance to children with learning disabilities. Several of the Abramoff children have learning disabilities, so it was of the utmost importance to Mr. Abramoff that children with learning disabilities have an environment where they can receive the special help they need and obtain the Jewish education their families hope to instill. (See P. Abramoff Ltr. of 3/17/06; M. and L. Kramer Ltr. of 3/13/06.)

<u>Yeshiva School and Eshkol Academy</u>

The Yeshiva School of Greater Washington was a high school that had been in existence for about 35 years before Mr. Abramoff's children attended, but needed new parent leadership. (See S. Katz Ltr. of 3/15/06.) Mr. Abramoff became the President and, in addition, personally housed "children who could not afford to attend the Yeshiva and help[ed] them with tuition." (D. Litwack Ltr. of 3/20/06.)

Mr. Abramoff then left the Yeshiva School to create his personal dream, a new school called Eshkol Academy – a school that would provide Jewish education and top-notch athletic and extracurricular programs. (See J. Hercenberg Ltr. of 3/19/06 (explaining that the Torah School and Eshkol Academy "were founded by [Jack Abramoff] almost single-handedly").)[7] As Dr. Moshe Bleich explains, "Jewish schools

---

[7]    Mr. Abramoff supported other schools around the country as well. Among them, Deborah and Pinchus Laufer have written to describe his support for a Jewish school for girls, Olameinu, (D. and P. Laufer Ltr. of 3/19/06) and Brian Caplan, Executive Vice President of Weinberg Academy, writes that Mr. Abramoff has been incredibly supportive of his Jewish school for children with learning disabilities (B. Caplan Ltr. of 3/15/06.) Indeed, Dr. Michael Milgraum reveals that Mr. Abramoff anonymously donated $400,000 to the Weinberg Academy. (Dr. Milgraum Ltr. of 3/20/06.) Without this money, the school would not have a campus to serve its 240 children with special educational needs. (M. Hoffman Ltr. of 3/17/06.) In addition, Allen Rothberg writes that Mr. Abramoff "was greatly helpful to my son-in-law, a rabbi who has established an ongoing yeshiva in the Philadelphia area." (A. Rothberg Ltr. of 3/13/06.)

that provide a dual curriculum in Judaic and secular studies often lack the resources to provide a quality extracurricular program as well." (Dr. Bleich Ltr. of 3/19/06.)[8]

The school's principal, Rabbi Yehuda Oratz, explains that the "amount of time, effort and especially the personal sacrifices [Mr. Abramoff] made for the school is truly astonishing." (Rabbi Oratz Ltr.; see D. Berman Ltr. of 3/13/06.) The school's headmaster, Michael Reches, writes that Mr. Abramoff's "commitment to the school which he founded amazed me: not just the tremendous amount of financial support to keep it going, but the endless amount of personal time he gave on a daily basis to make sure that all the students (not just his children) were given the best Jewish and General education possible." (M. Reches Ltr. of 3/20/06.) Sunny Hercenberg notes that "[i]t was well known that [Mr. Abramoff] was personally giving many scholarships to students who could not otherwise afford to attend the school." (S. Hercenberg Lt. of 3/19/06; see S. Lebovic Ltr.; L. Lebovic Ltr. of 3/19/06; B. Miller Ltr. of 3/20/06; E. Miller Ltr. of 3/20/06.)

Unfortunately, Mr. Abramoff's fall took his job and income with him, and Eshkol Academy was not able to sustain itself without his financial support. Regrettably, "[s]ince Eshkol's closing, a program of this quality has not been replicated at least in the greater Washington area." (Dr. Bleich Ltr. of 3/19/06.)

## 2.    Welcoming Others into the Community and Their Home

Many of Mr. Abramoff's friends and neighbors have written to explain that the "Abramoffs always opened their home with warmth and hospitality. Whether it was a

---

[8]    Dr. Bleich adds that, "Jack's dream was to elevate both the quality of the level of Jewish education as well as providing a rich variety of extracurricular activities including a strong athletic program." (Id.; see D. Butler Ltr. of 3/21/06; N. Lewin Ltr. of 3/15/06.) The school provided "education for ALL the youth including those that had various learning disabilities and were woefully underserved." (Dr. Bleich Ltr. of 3/19/06.)

19

family that was relocating or an underprivileged boarder student from abroad, they

provided for strangers naturally.  The Abramoff home was always bustling with activity,

usually related to providing some act of kindness to someone somewhere." (A. Lerner

Ltr. of 3/13/06.)

The President of Mr. Abramoff's synagogue, Frederick Mailman, explains:

"Whether a new family in the community needed temporary quarters, a weekend guest

needed a friendly environment and a good home-cooked meal, or a community member

needed a simple favor the Abramoffs have always been there to lend their help."  (F.

Mailman Ltr. of 3/20/06; see E. Teitelbaum Ltr. of 3/21/06 ("They have opened their

home to host out-of-towners in need of a place to stay, friends and strangers in need of a

warm meal, and to local charities looking to host an event on their behalf.").)  Even after

all of the negative publicity, his job loss and his pleas of guilty, Mr. Abramoff continued

to invite appreciative strangers into his home who, like Jeremy Vallerand, do not find "a

hardened criminal, or an evil man" but see "a loving dad with his children, instilling

notions of faith, morality, and family." (J. Vallerand Ltr. of 3/15/06.)

Ever since Mr. and Mrs. Abramoff were married 20 years ago, they provided

room and board for children who needed a place to stay while getting a Jewish

education.  (See L. Malnik Ltr. of 3/12/06; A. and J. Kermaier Ltr. of 3/16/06.)  Even

after they had their own five children, they had up to another five children living with

them.  (See N. Sunkin Ltr. of 3/15/06 (explaining that when he visited Mr. Abramoff two

and a half years ago "his house was filled with students attending the school that Jack

was sponsoring.  Five boys from the school were living in his home, so that they could

attend the school"); R. Nadler Ltr. of 3/15/06 (same).)  In all, 18 different children have

lived with the Abramoffs while attending school. Each of these children was treated by the Abramoffs "like one of their own children." (J. and L. Dunkin Ltr. of 3/19/06.)[9]

### 3.    Mentoring and Helping Other Children

Alan and Judy Kermaier explain that "Jack has been a mentor to many young men in the community and inspired them to go on to accept communal leadership roles themselves." (A. and J. Kermaier Ltr. of 3/16/06).[10] Likewise, Rabbi Menachem Youlus has emphasized that Mr. Abramoff had a profound effect upon him and countless other children that grew up in the same community.[11]

### 4.    Kosher Restaurant – Stacks

Stanley Goldschmidt, a lawyer Mr. Abramoff retained to assist his restaurants, writes that Mr. Abramoff's "main purpose in starting one restaurant – Stacks (not Signatures) – was not profit motivated, but was to ensure that professionals and others who maintain a kosher diet (along with visitors to our nation's capit[o]l) would have a first class kosher place to dine in the heart of Washington." (M. Goldschmidt Ltr. of

---

[9]    Devorah Lapin, who will "forever" consider herself part of the Abramoff family, writes that "having Jack Abramoff as a surrogate dad for two years during high school was one of the most important events in my life." (D. Lapin Ltr. of 3/20/06.) She explains: " Jack was one of the most generous individuals I have crossed paths with, and watching his generosity spread to so many taught me a significant amount about the giving person I hope to one day become. One thing that I consistently noticed in Jack's giving to others was how the receiving individual was never made to feel embarrassed or ashamed of having asked for the help nor receiving it. Jack has this incredible ability to make the people around him feel like truly valued individuals no matter what their circumstances were." (Id.)

[10]    The Kermaiers were grateful that their "own son was the beneficiary of Jack's tutelage when he was in high school eighteen years ago." (Id.) Others have written that "Mr. Abramoff has often helped young people by being open to counseling them on job opportunities, and professional direction." (B. Siegel Ltr. of 3/15/06; see A. Ladesman Ltr. of 3/15/06 (Jack Abramoff "has helped many young people by finding them jobs or steering them to meaningful careers.").) For example, Issac Szanzer writes that the "lessons [Mr. Abramoff] taught me have had a tremendous impact on my life that remain with me as an adult, husband, and father of three." (I. Szanzer Ltr. of 3/18/06.)

[11]    Rabbi Youlus writes: "How many young men and boys would have been lost to the streets without him? How many charities & schools would have had to close their doors long ago? How many children would never have made anything out of themselves without his mentoring? I know one. Me!" (Rabbi Youlus Ltr. of 3/21/06.)

3/16/06.)  David Butler, President of The Jewish Federation of Greater Washington,

explains that "the absence of a kosher restaurant in downtown Washington DC was a

problem" that Stacks helped rectify.  (D. Butler Ltr. of 3/21/06.)  Shari Hillman explains:

"Many of the social rituals that are so important to building business relationships are

closed to those who keep kosher, because they can't eat out in non-kosher restaurants.

At his restaurant, Stacks, Jack created a place where observant Jewish professionals

could have lunch or dinner with clients, colleagues, and friends."  (S. Hillman Ltr. of

3/16/06.)  Mr. Butler adds, "Mr. Abramoff's willingness to keep the restaurants going

even when not turning a profit was another act of selflessness and generosity by him

from which many benefited."  (D. Butler Ltr. of 3/21/06.)  Nathan Lewin, a prominent

Washington, D.C. attorney and professor, too was particularly impressed that Mr.

Abramoff would continue Stacks "at great personal financial sacrifice just so that Jews

would have a place where they could dine in comfort."  (N. Lewin Ltr. of 3/15/06.)

### 5.    Other Support for Families and Individuals

Jared and Livia Dunkin have written to explain that "Jack was the person in the

community to go to for advice, help, monetary loans or assistance."  (J. and L. Dunkin

Ltr. of 3/19/06.)  As Hyam Singer writes, Mr. Abramoff "has without reservation helped

many friends, myself included, in times of financial need."  (H. Singer Ltr. of 3/15/06;

see W. Severe Ltr. of 3/20/06 (same).)  Mr. Singer was not alone.  Jerrod and Sunny

Hercenberg recount the time Mr. Abramoff sent $10,000 to a Rabbi the day after he

learned the Rabbi had been overwhelmed with medical bills for a daughter who had been

seriously injured in a car accident,  (J. Hercenberg Ltr. of 3/19/06; S. Hercenberg Ltr. of

3/19/06); Dr. Michael Milgraum explains that he loaned a family of six the full down-

payment money they needed to buy a house (Dr. Milgraum Ltr. of 3/20/06) and Michael

Hoffman describes how Mr. Abramoff paid off $40,000 in debts for a needy family and

paid for the Bar Mitzvah of another needy family's child (M. Hoffman Ltr. of 3/17/06).

Rabbi Yitzchak Charner explains that such generosity was not uncommon for

Mr. Abramoff: "In my position as Headmaster of the Torah School, I know of and hear

about numerous needy families and individuals. Whenever the Abramoffs were

approached to help these people, they gave generously – but on the condition of

anonymity." (Rabbi Charner Ltr. of 3/16/06; see also S. Goldschmidt Ltr. of 3/16/06

(attesting that Mr. Abramoff has "assisted individuals financially on an anonymous

basis").) Jeffrey Klein, a former treasurer of the Torah School, also writes:

> During my tenure as treasurer there were a few unfortunate occasions
> where a school family was struck with dire circumstances – a fire that
> uprooted a large family from their home, a serious illness, or a loss of a
> job. As the treasurer of the school at the time I would receive a call from
> the Abramoff's that they will help cover the tuition bill for that family.
> The families in question never even knew who specifically had helped
> them out – they just got a call from the school letting them know that
> their tuition was covered until they got back on their feet. Only I knew
> who helped make it possible. That is the ultimate form of charity –
> lending a hand in such a manner that the recipient does not even know the
> source of the assistance.

(J. Klein Ltr. of 3/16/06.)[12]

While the media took pictures of and reported on politicians who frequented Mr.

Abramoff's restaurant, no one reported that Mr. Abramoff also used the restaurant to

meet with and paid for the meals of people who came to discuss "help with a mortgage

---

[12]     Ari Lerner explains that Mr. Abramoff was careful to make the "financial assistance given
inconspicuously as to not humiliate the recipient. I personally know that scores of indigent families were
assisted in this way by Mr. Abramoff. In these instances, not only did he provide for them materially, he
allowed them to maintain their dignity." (A. Lerner Ltr. of 3/13/06.) Dr. Howard Sabrin writes that Mr.
Abramoff overheard him being told by a man with cerebral palsy, who had a wife with emotional
problems and a severely retarded child, that he needed a new $2,500 hearing aide, but could not afford it.
(Dr. Sabrin Ltr. of 3/13/06.) Mr. Abramoff bought the hearing aid for the man, upon the condition that the
man not be told the source of the donation. (Id.) It was common for Mr. Abramoff to "give generously
and quietly, with no fanfare and limelight, and definitely selflessly." (J. Mallman Ltr. of 3/19/06.)

payment, or someone's needing a new job to keep their career afloat, or to work through issues they might have been having with their spouse that they wanted Jack's advice in working out." (M. Warner Ltr. of 3/16/06.) He explains: "People of all walks in D.C. came to Jack because he was the person to go to – not for political favors or cutting corners or whatever else has been said – but because everyone knew that this was someone who simply had the intellect, kindness of spirit and disposition to impact people in a way that bettered them, their circumstances, and their overall outlook on work and life." (Id.)

Mr. Abramoff also went out of his way to stand up for victims of discrimination. Bishop Nedd explains that before he became an Anglican Bishop or even a Priest, he had been discriminated against by mutual acquaintances he shared with Mr. Abramoff because he is black. (Bishop Nedd Ltr. of 3/17/06.) Bishop Nedd writes that Mr. Abramoff not only condemned their behavior but he also offered to pay the Bishop's legal bills and to stand by him through any legal proceedings. (Id.) Although Bishop Nedd did not take legal action, he was moved by Mr. Abramoff's generosity and the strength of his convictions. (Id.)

Similarly, Stacy Lynn Knoell explains that Mr. Abramoff stood by her when she was the victim of sexual harassment at Greenberg Traurig. (S. Knoell Ltr. of 3/15/06.) She explains that she was an executive assistant to a partner at the firm who was harassing her, and that Mr. Abramoff intervened on her behalf when he learned of the situation. Mr. Abramoff spoke with firm management and had her moved on to his team to ensure that the harassment would end. Ms. Knoell explained that Mr. Abramoff's "respect for women was well-known in the firm" and that, during the time they worked together, "he always treated me with respect." (Id.; see also C. Thomas Ltr. of 3/20/06

(describing the year she worked with Mr. Abramoff at the law firm by saying, "[i]n an environment where affairs run rampant and moral crookedness is not-so-well disguised, Jack was a pillar of honesty and integrity (in my eyes, and in the eyes of many people that I worked with).")[13]

### C.    Husband and Father

Whatever faults Mr. Abramoff may have, nobody questions that he has been an extraordinary husband and father.  (See, e.g., C. De La Guardia Ltr.; see also R. Abramoff Ltr. of 5/20/08 (Jack "has always been a very compassionate and loving brother to me and uncle to my children.  He is an exemplary family man who is very much involved with the lives if his five children.").)  Dr. Randi Ettner explains that, "[a]s a clinical psychologist, I have spent 25 years studying human behavior.  I rarely see fathers who are as devoted to their children, and who demonstrate this devotion.  Jack Abramoff is such a father: a model parent."  (Dr. Ettner Ltr. of 3/13/06)

### D.    Incarceration

During Mr. Abramoff's 21 months in prison, he not only continued to cooperate with the Government on an extensive basis, but he has sought to better the lives of those within the prison.  As Father John Giuliani, who has stayed in constant contact with Mr. Abramoff during his incarceration, has observed:  "I am deeply impressed by Jack's

---

[13]       Mr. Abramoff has done a litany of other generous things for the people in his life, including: donating a home he bought in South Africa to his synagogue when he left (E. Kerbel Ltr. of 8/10/08); helping set up a clothing exchange in the community (I. Miller. Ltr. of 3/15/06); throwing a wedding party for a friend's daughter who was recently afflicted with multiple sclerosis (Dr. Wachs Ltr. of 3/14/06), a wedding party for a friend's son (J. and T. Saunders Ltr. of 3/20/06) and an Orthodox wedding reception for another friend's daughter (Dr. Silved Ltr. of 3/18/06); helping people find employment (M. Katz Ltr. of 3/20/06); comforting friends upon the death of their loved ones (M. Snyder Ltr. of 3/16/06; M. Epstein Ltr.); supporting friends who had a baby with Downs Syndrome (I. and C. Klein Ltr. of 3/21/06); setting up matching funds for a variety of charitable projects (R. Klein Ltr. of 3/16/06); taking the time to meet with handicapped children and to go out of his way "to make them feel 'normal' and loved" (M. Lapin Ltr.); and Mr. Abramoff has devoted hundreds of hours to opening a Jewish Museum in Washington, D.C. (M. Fischer Ltr. of 3/16/06) and to helping orphans in the Congo (Y. Ingila Ltr. of 3/14/06).

religious sensitivities and his commitment to the Jewish tradition of prayer, repentance and acceptance of punishment for crimes. Evidence of this practice is his desire and ability of assisting others in the detention center." (Father Giuliani Ltr. of 7/5/08.) He has been active not only in working to keep Jewish traditions alive within the prison walls, but has worked to help educate inmates. Mr. Abramoff currently is teaching a Motion Picture Theory class, and he has taught Parenting from a Distance (March 2007), Modern Marvels (July 2007), Cinema Studies (November 2007 and March 2008), and Holocaust in Films (July 2008). (PSR ¶ 125.)

## III.    THE EFFECTS OF INCARCERATION ON MR. ABRAMOFF AND THE ABRAMOFF FAMILY

Mr. Abramoff entered prison on November 15, 2006, and the consequences for his family have been devastating. There really is no question that the greatest hardship incarceration has imposed has not fallen upon Mr. Abramoff, but upon his wife and their five children. This is a common theme of the letters of support. Dr. Frank Zieziula, a Professor of Counseling at Gallaudet University, concurs and emphasizes that Mr. Abramoff is "an excellent father" and shares Dr. Ettner's concern that Mr. Abramoff's "absence, upon incarceration, will have a very negative impact on their development. I am professionally convinced of this." (Dr. Zieziula Ltr. of 3/20/06; see B. Caplan Ltr. of 3/15/06 (same).) Indeed, friends and family members explain that "his wife and children need him now more than ever." (J. and E. Alexander Ltr. of 3/15/06; see E. Taskel Ltr. of 3/19/06.) The Abramoff children's numerous principals, teachers, tutors and guidance counselors have expressed similar concern with the impact Mr. Abramoff's incarceration is having on his children's well-being and their future. (See Rabbi Hexter Ltr. of 3/17/06; J. Oshry Ltr. of 3/21/06; G. Lafkovitz Ltr. of 3/21/06; G. Weisman Ltr. of

3/21/06; B. Atlas Ltr. of 3/19/06; C. Felder Ltr. of 3/20/06; J. and B. Prince Ltr. of 3/12/06; D. Gradon Ltr. of 3/21/06.)

The children's friends agree that Mr. Abramoff's incarceration is hard on his children. (H. Broder Ltr.; see M. Lebovic Ltr. of 3/19/06.) A steady theme of those writing the Court today is that "although Mr. Abramoff would be the one in jail, it is his five young children who will really suffer." (B. Friedrich Ltr.) Indeed, as Rabbi Oratz observed "it will be his family, his wife and his five beautiful children who will suffer most." (Rabbi Oratz Ltr.) The Rabbi explains, "I fear most for his young impressionable children having to grow up without a father." (Id.; see also D. Grayson Ltr. ("Since his incarceration, there has been an obvious deterioration of the Abramoff family."). These concerns are not misplaced, and counsel can provide further detail if requested by the Court, in proceedings that protect the family's privacy.

Levi Abramoff writes: "I will never forget the morning my family drove to Cumberland with him to drop him off. I will never forget watching him as he was escorted into the facility, the doors closing behind him and all that we were left with was a lot of tears of sorrow." (L. Abramoff Ltr.)[14] Their son Daniel, age 17, succinctly put it: "[w]hen Dad does time, we do time . . . " and that is no doubt true. (D. Abramoff Ltr.) Mrs. Abramoff writes: "The past 20 months have been a difficult struggle, attempting to raise our children by myself without my husband. I have done the best that I can under the circumstances, but our children need Jack in their lives on a daily basis to

---

[14]    Mr. Abramoff was in Los Angeles with his youngest daughter, Sarah, when he was arrested. Fortunately, Mr. Abramoff's brother, Robert, was able to pick Sarah up and take her home so that she was not taken by Family Services. It is hard to imagine how horrifying that experience was for Sarah. Robert Abramoff describes watching Sarah's reaction to her father leaving for jail as "crushing." (R. Abramoff Ltr. of 5/20/08.)

thrive." (P. Abramoff Ltr.) Each member of the family has made a personal plea to Your Honor to show their husband and father as much leniency as possible.

While the Sentencing Guidelines treat all years as equal, that is not the reality for parents or their children. Through their father's awful mistakes (no fault of their own), the Abramoff children have been robbed of part of their childhood and the benefit of having a loving father guide them through their adolescence. To be sure, the responsibility for that falls squarely and tragically on Mr. Abramoff, but the price he and they have paid is extraordinarily high and cannot be measured simply in the amount of months he has been in jail. For the Abramoff children, these have been crucial months. And they cannot get that time back.

All of the children were minors living at home when the investigation of Mr. Abramoff became public in 2004 and when he was incarcerated in 2006. When the story hit the press, Mr. Abramoff became not only famous, but infamous virtually over night. This man who his children loved and idolized was being demonized in the press, and every harsh word spoken about their father tore into their souls. It was impossible to hide their eyes and ears from these attacks, as they came in newspapers, magazines, news programs, and pot shots were even taken at him during televised award shows and by late night comics. Their suffering had been spun into jokes, and their last name transformed into a pejorative adjective.

Making matters worse, the Abramoff family could not avoid the press by simply turning off the television – cameras were set up in their front yard, media followed them and, at times, would overreach by intruding into the children's privacy. Nor could the children just withdraw inside their home. They had to go to school, where all of their

classmates had seen the same news, heard the same jokes and they had become the subject of gossip.

The toll of seeing their father vilified on a daily basis in the press, and the fear of the fate that awaits their family has taken a serious toll on the Abramoff children. Dr. Randi Ettner, a clinical psychologist who has been working with the children explains that "as Mr. Abramoff's difficulties escalated, and humiliation came daily with the morning news, [Levi] and the other four children began to suffer, as well. These young people are innocent victims of a steady barrage of ridicule, and they are being traumatized in subtle and obvious ways." (Dr. Ettner Ltr. of 3/13/06.) They are constantly reminded of their fate by the daily public assault on their father's name, including overhearing strangers' insensitivity and callousness when the word "Abramoff" is mentioned. Whether it be a visit to the grocery store, where Mrs. Abramoff presents her credit card and receives queries as to whether she is related to the "evil lobbyist" by the same name, whether it be in front of the television for a respite from the onslaught only to hear George Clooney attack their father at The Golden Globe Awards, or whether it is having to endure prying questions – and sometimes outright taunts – of other children at school, the Abramoff family has had to endure pain most children cannot even imagine. (See, e.g., S. Abramoff Ltr.) To a family that observes a faith in which a person's name includes the name of his or her father (e.g., Daniel, son of Jack Abramoff), the Court can only imagine the pain that this event has caused when one of the family's beloved sons feels such humiliation among his peers that he has sometimes claimed a different family name, just to avoid the awkward conversations that inevitably follow the mention of the word "Abramoff?" (D. Abramoff Ltr.)

As Mr. Abramoff's lawyers who want to put the most complete case for leniency forward, we were going to provide more specifics about the toll the current sentence and a long future sentence is having on the Abramoff family. But Mr. Abramoff and his wife have precluded us from addressing the details of what his children are going through in an open and public record for fear that it would further jeopardize their well-being, lead to even additional taunts and ridicule, and hurt them even more deeply. In the proceedings before Judge Huck, the family and others submitted letters that detailed what they were going through and those facts were addressed in Mr. Abramoff's sentencing memorandum, and doing so was traumatizing for the family. Their most personal pain and hardships became very public. Cruel people mocked the children and the family. Mr. Abramoff is cognizant of the fact that Your Honor cannot easily weigh mitigating facts of which the Court has not been apprised, but Mr. Abramoff is more concerned about what has been written about his family already and would rather risk more time served than further risk any additional harm to his children.[15]

These years also have been especially difficult for the Abramoff family in other ways. Mrs. Abramoff lost her own mother during this ordeal, and she has struggled to balance a job and care for her five children grieving over their father's absence. There is no doubt that she has done the best that she can, but she has grown despondent with the sense that has not been good enough. The stress has caused her to loose a great deal of weight, her blood pressure has escalated and the only hope she has for a return to normalcy is the return of her husband. As Devorah Grayson writes: "Despite Pam's

---

[15]    As Mr. Abramoff's attorneys, we hope the choice is not that stark. If the Court is inclined, we would appreciate the opportunity to briefly – in just a couple of minutes – address some of these important issues in a manner that can protect the family.

courageous efforts, the absence of a father is noticeable in the suffering that the children

endure." (D. Grayson Ltr.)[16]

Particularly devastating for Mr. Abramoff, was that his mother – who had been

very ill leading up to Mr. Abramoff's incarceration – died while he was in prison. She

lived a long life, but Mr. Abramoff cannot help but wonder whether her worrying about

his incarceration and the effect on his family hastened her death, and he finds it hard

every day to live with the fact that because of his actions, her final years were sad ones.

Even worse was the fact that Jack could not attend his mother's funeral or follow

the Jewish rituals that are required when a parent dies. For someone as devout as Mr.

Abramoff, this has been "a very, very severe blow to him." (R. Sheinbein Ltr. of

5/23/08.). As Rabbi Charner explains:

> One of his lowest times occurred last summer when his mother passed
> away. He was not unable [sic] to attend her funeral, nor was he able to
> visit his father to comfort him. In addition, during the year of mourning,
> Mr. Abramoff was not able to recite, in the synagogue, the Jewish
> mourning prayer. The purpose of this prayer is to elevate the soul of the
> deceased and is said by a surviving son.

(Rabbi Charber Ltr. of 7/25/08 at 2.) Adam Rishe adds: "I visited Jack while he was

sitting Shiva, the initial Jewish mourning period of one week, when his mother passed

away. I had never seen him in such dismay. He had a special relationship with his

mother, and he could not even attend her funeral. There is no way to describe the pain of

such a thing." (A. Rishe Ltr, of 7/9/08.) Nathan Low writes that not being able to attend

---

[16]    With Mr. Abramoff in prison, Pam Abramoff has become the sole bread-winner in addition to
becoming what is tantamount to a single parent. Since her husband's incarceration, she has been
struggling to save money where possible (buying used clothes), sought unconventional ways of
supplementing her income (renting a room to boarders), and has sold off her family's antiques and other
assets. This has been overwhelming for her. As she is responsible for handling Mr. Abramoff's financial
affairs, Mrs. Abramoff now is preparing a list of all financial transactions exceeding $2,500 to file with the
Government, in accordance with Mr. Abramoff's plea agreement. With all she has been doing, she was
unaware that this was a responsibility she had to do.

his mother's funeral, or comfort his father, "has added the equivalent of years of

suffering to Jack's sentence."  (N. Low. Ltr.; <u>see</u> Dr. Miller Ltr. (same).)

**IV.    A SENTENCE SUBSTANTIALLY BELOW WHAT WOULD HAVE
        BEEN REQUIRED BY MANDATORY GUIDELINES AND BELOW
        THAT BEING REQUESTED BY THE GOVERNMENT IS
        <u>APPROPRIATE IN THIS CASE</u>**

The Government has recommended a 40% reduction from the low end of the

Guideline range as their estimate of what addresses his cooperation and other issues.

Mr. Abramoff appreciates the support for a lower sentence, but believes that the

Government's requested reduction is not sufficient based on all of the relevant factors.

The United States Supreme Court's decision in <u>United States v. Booker</u>, 125 S.

Ct. 738 (2005), requires sentencing courts to impose their sentences in accordance with

the statutory requirements of 18 U.S.C. § 3553(a).  Ultimately, the sentence imposed

should be "sufficient, but not greater than necessary" to satisfy the objectives of

providing "just punishment for the offense," adequately deterring criminal conduct,

protecting "the public from further crimes of the defendant," and providing the

defendant with rehabilitation.  <u>Id.</u>

In this case, given the era in which Mr. Abramoff's cooperation was negotiated

(before recent Supreme Court cases on sentencing and court discretion), the Government

and Mr. Abramoff have agreed to, and suggested, an advisory Sentencing Guideline

range of 108 - 135 months to be coupled with a downward departure based on his

substantial cooperation (and other adjustments to address criminal history and

concurrency if needed).  Both parties also have agreed that the departure should be made

from the bottom of that Guideline range.  For the compelling reasons set forth herein,

had such a recommendation not been made between the Government and Mr. Abramoff,

the various other sentencing factors would have supported a sentence actually below the

applicable Guidelines without reference to any cooperation and a reduction on Rule 5K1.

   Based on Mr. Abramoff's truly extraordinary cooperation in terms of the

number of cases with which he has assisted, the time he has worked (and will continue to

work), the Government's successes in the cases in which he has cooperated, his

immediate acceptance of responsibility, and the impact his decision to plead guilty and

cooperate has had on lobbying and ethics reform, a greater reduction than recommended

by the Government is warranted.  This Court should be informed by whatever sentence

reduction occurs in Florida (should it occur before the time of the D.C. proceeding), but

Mr. Abramoff believes that if the Florida Court imposes a 35 to 43-month sentence, the

same sentence should be imposed in this case.[17]  His speedy acceptance and cooperation

have played a significant part in the Government's assessment and understanding of

possibilities for change in public integrity rules and enforcement.  Further, his

cooperation has lasted and consumed nearly four years of his life and continues today

(and will continue in the future).  His cooperation has not endeared him to many,

including those at the correctional facility where he is located.  His cooperation has

involved more than 3,000 hours of his time, including interviews with approximately

100 Government officials, as well as searches and reviews of well over 500,000

documents.  Finally, his cooperation to date has had a more than substantial effect of

assisting in the efficient and productive cases against at least twelve other individuals,

with additional cases requiring further assistance now and into the future.

---

[17]      As the Government notes in its Sentencing Memorandum at pages 20-21, the only way to ensure
that this Court's sentence runs concurrently with the Florida court's sentence is for this Court to reduce the
sentence it imposes by the amount of time Mr. Abramoff already has spent in jail and by the amount of
good time he has accumulated.  Accordingly, Mr. Abramoff asks that, after it determine the appropriate

### A.  Acceptance Of Responsibility and Cooperation

The requested sentence reduction is justified because of Mr. Abramoff's extraordinary acceptance of responsibility and his truly extraordinary cooperation.  After the articles about his conduct were written, Mr. Abramoff had his attorneys contact DOJ seeking a meeting to make clear that he intended to cooperate, provide information and documents, and convey his understanding of the facts.  Both in Washington and Florida, his attorneys spoke and met with prosecutors and agents, and exchanged information and documents, so that a resolution of the cases could be achieved.

That process was not an easy task.  First, the speed with which Mr. Abramoff went from being a prominent lobbyist to the center of a scandal and separated from his law firm was dramatic and a difficult one in which to make such decisions.  Second, collecting and responding to document requests and subpoenas from DOJ as well as Congress was time consuming and expensive.  Third, there were numerous agencies and offices and attorneys and agents with which to coordinate and who all needed to understand and investigate the issues before any resolution could be offered.

In this environment, however, Mr. Abramoff was persistent in his instructions that his attorneys provide documents and seek a resolution with DOJ.   During that time, Mr. Abramoff provided attorney proffers of information with little or no protection in return.  He offered to toll any statutes of limitation if law enforcement needed that extra time.  He began providing information and cooperation long before there were any agreements with the Government about how, if at all, his cooperation might affect his plea or sentence.  For much of 2004 and for the entire year of 2005, Mr. Abramoff

_____

sentence, it reduce that sentence by 25 months to account for the time Mr. Abramoff already has spent in prison and the good time he has acquired.

focused on responding to various investigations and assisting his attorneys in providing documents and information to the Government.  He made his "job" his cooperation.

When the Government had satisfied itself that it had done a sufficient investigation to discuss resolution, Mr. Abramoff was eager to discuss all facts and issues with DOJ and accept a plea agreement.  He reached a plea agreement in January of 2006 without attempting to gain any delay or strategic advantage by engaging in any sort of motions practice.

From the time Mr. Abramoff signed his plea agreement until he went to prison in November of 2006, cooperation became even more than a full-time job, spending many long days with Government attorneys and agents going over details of dozens of events. Mr. Abramoff easily spent in excess of 50 hours per week meeting with Government officials and doing the necessary homework, rather than spending the time with his family in advance of incarceration.  The amount of work required was driven by the expansive nature of the Government's investigation as well as by the Government's desire for Mr. Abramoff to conduct numerous searches of his more than 500,000 emails and compile documents and provide other information, based on subject matter.  Mr. Abramoff took work for the Government home and worked at night as well.  For example, he would often pour hours into electronic searches, compile folders of information and forward that information late at night to his attorneys to provide to DOJ. Mr. Abramoff would then meet with a variety of Government officials for hours at a time going over the emails, documents, and Mr. Abramoff's memory of a variety of topics.  During this year, Mr. Abramoff always made himself available to the Government (at his own expense) to answer questions and review documents and was consistent in his completion of all requested tasks.

There was a very real cost to Mr. Abramoff in making this commitment.  Mr. Abramoff was headed to prison, where he would be leaving his wife and five minor children behind.  His cooperation prevented him from spending the sort of quality time with his family before this now-long period of incarceration began.

After his incarceration, Mr. Abramoff has continued to cooperate with the Government by reviewing documents and his emails in a secured location and meeting with officials who continue with their investigation.  This process has continued during his incarceration, upon Mr. Abramoff's insistence, despite some difficulties that he has faced as a result.  Counsel for Mr. Abramoff can describe some of the concerns Mr. Abramoff's cooperation has caused while incarcerated if the Court desires, but doing so publicly could cause even more issues.

In sum, over the past four years, Mr. Abramoff has spent more than 3,000 hours cooperating.  And in doing so, he has met with approximately 100 Government officials from the FBI; the Public Integrity and Fraud Sections of the Criminal Division, the Tax Division and of the Inspector General's Office of the Department of Justice; the Inspector General of the Department of the Interior; the State Department; and even the Attorney General of Guam.  As the Government attests, Mr. Abramoff's cooperation has led to numerous plea bargains and convictions, and more are sure to come.  This far exceeds the cooperation given by any sort of typical cooperator.  Indeed, it must place Mr. Abramoff near the top of all Government cooperators.

This speedy acceptance of responsibility and massive four-year cooperation effort demonstrates Mr. Abramoff's remorse and desire to make amends is genuine.  He is following his religious mandate to repent and remedy those he harmed, and has been working to right his wrongs, as attested to also by those who have known him for years.

36

As the Government has stated in its own sentencing memorandum, this speedy acceptance and cooperation also had an impact on the Government's ability to prosecute individuals, assess the failures of aspects of our public integrity rules, and promote better understanding and reform. While Mr. Abramoff does not claim that his actions to go public and expose his conduct and some of the other excesses in lobbying and in Washington were the sole reasons for the many changes in congressional and agency ethics rules that have occurred, he certainly was the catalyst for those changes. Indeed, the former head of the Public Integrity Section of the Criminal Division of the Justice Department and now a federal judge who oversaw the plea negotiations has said that Mr. Abramoff's decision to admit his wrongdoing, expose the wrongdoing of others, and shed light on the gray and darker areas of lobbying and government misconduct was a "watershed" moment in the way ethics rules will be written and corruption cases will be made.[18] Mr. Abramoff could have fought his own battle and taken the risks of conviction without doing more. But, as Justice Department officials have noted, he readily made a different decision with an impact that some have compared to the reforms made after Watergate or the Keating Five scandals in Washington.

Mr. Abramoff has given his last four years to the Government, dedicating himself to accepting and taking responsibility for his violations of law, and cooperating fully and in a truly extraordinary manner with the Government in a way that has had significant

---

[18]     By immediately choosing to cooperate, not only did Mr. Abramoff free up the Department's investigatory resources, but he identified significant weaknesses in then-existing ethics laws, areas in which the spirit of the ethics laws were being circumvented, and ways in which the short-comings in the existing ethics laws could be changed. Without Mr. Abramoff's timely cooperation and assistance in identifying the myriad of ways the then-existing ethics laws were being violated both in fact and in principle, there is good reason to question whether ethics reform would have come about either as quickly or as comprehensively as it has. The former head of the Public Integrity Section, Noel Hillman, is now Judge Hillman of the United States District Court for New Jersey. In accordance with Code of Conduct for United States Judges, Canon 2B, commentary (2004), this Court could ask for more detailed information on the impact of Mr. Abramoff's decision to cooperate if it decided it would be helpful.

impact. Considering these factors, he believes the requested sentence is warranted. <u>See, e.g.</u>, <u>United States v. Malley</u>, 307 F.3d 1032, 1033 (9th Cir. 2002).

**B.    A Longer Sentence Would Produce A Sentencing Disparity**

While justice should be individualized for each defendant, there should not be sentencing disparities between similarly situated defendants. <u>See, e.g.</u>, <u>Koon v. United States</u>, 518 U.S. 81, 113 (1996) ("The goal of the Sentencing Commission is, of course, to reduce unjustified disparities and so reach toward the evenhandedness and neutrality that are the distinguishing marks of any principled system of justice."); 28 U.S.C. § 991(b)(1)(B) (explaining that part of the Sentencing Commission's purpose was "avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct"); 18 U.S.C. § 3553(a)(6) (explaining that sentences should "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

Other members of the schemes Mr. Abramoff brought to light and has admitted have received sentences lower than the Guidelines would recommend for Mr. Abramoff. Congressman Ney – who as a Congressman the law could hold to a higher standard than a lobbyist – received a 30-month sentence, and already has <u>completed</u> both his time in prison and in a half-way house. He is now a free man. Although not an elected official, Mr. Abramoff obviously had a duty to follow the law and he breached that duty in numerous and serious ways, but it would be excessive to impose a sentence more than twice as long on Mr. Abramoff than on Congressman Ney. That is particular the case when it was through Mr. Abramoff's cooperation that Congressman Ney – and countless others have been and will be – forced to answer for their wrongdoing.

The Government's request that Mr. Abramoff be afforded only a 40% reduction for his cooperation and receive a 64-month sentence also appears unfair when compared to the sentence it seeks for Mr. Abramoff's co-defendant, Michael Scanlon. While Mr. Scanlon has not yet been sentenced, his sentence is capped at 60 months by his plea agreement and through his cooperation – cooperation which no doubt has been substantial, but no where near as extensive as Mr. Abramoff's – his sentence likely will be reduced substantially. There certainly are reasons to sentence one defendant differently from another, but whatever the differences between none support the disparity that likely would result if Mr. Abramoff received a 64 month sentence and Mr. Scanlon were to receive an appropriate reduction from 60 months for his cooperation.

This Court has had the difficult task of finding the right balance in sentencing others related to this proceeding, and Mr. Abramoff asks that the Court strike the right balance here. While this Court has not hesitated to impose heavier sentences than the Government has recommended when a defendant has been a public official or has not fully accepted responsibility for his actions, the Court often has imposed a sentence less hash than the Government has recommended when the defendant – like Mr. Abramoff – has accepted responsibility and cooperated. For example, when the Government sought home confinement for Neil Volz and William Heaton because of their cooperation, this Court deemed probation sufficient instead. And, while there are many defendants still awaiting sentencing, those defendants who have been sentenced to imprisonment so far have not received sentences as severe as the 64 months that would result under the Government's recommendation here: Congressman Ney (30 months); David Safavian (18 months, but vacated); Steve Griles (10 months); Italia Federici (60 days in a halfway house); and Jared Carpenter (45 days in a halfway house). Admittedly, Mr. Abramoff's

conduct was more egregious than that of many of these defendants, but he already has served 21 months and a sentence that Mr. Abramoff is seeking would be higher (perhaps as much as 40 - 50% higher) than what this Court imposed on Congressman Ney and even higher than that imposed on others in related cases.  The Government states that under their recommendation, Mr. Abramoff will have the longest incarceration of anyone already sentenced and likely to be sentenced in the future.  If that is the goal, it still would be true with the sentence Mr. Abramoff is seeking.

### C.    Family Circumstances and Prior Good Works

It is widely recognized that if this case was determined "under § 3553(a), the history and characteristics of the defendant, including his family ties, [would be] pertinent to crafting an appropriate sentence."  United States v. Nellum, No. 2:04-CR-30-PS, 2005 WL 300073, at *4 (N.D. Ind. Feb. 3, 2005); see, e.g., United States v. Garcia, 414 F.3d 201, 228 n. 19 (2d Cir. 2005); United States v. Bisanti, 414 F.3d 168, 173 (1st Cir. 2005).  While this case starts with the low end of the advisory Guidelines, reduced by Mr. Abramoff's cooperation under 5K1, reference to this factor for determining how much of a 5K1 reduction is warranted can still be helpful to the Court.

Many courts when applying the full context of § 3553 have reduced sentences for defendants who were devoted to and supported their families, even under circumstances that are far less compelling than Mr. Abramoff's.  See, e.g., United States v. Smith, 359 F. Supp. 2d 771, 776, 782 (E.D. Wisc. 2005) (reducing defendant's sentence by half, even after a 15-level downward departure on other grounds – because he had been married several years, supports his children, cares for his mother and obtained letters as to his good character from his pastor and others); United States v. Beamon, 373 F. Supp. 2d 878, 887 (E.D. Wisc. 2005) (considering "Defendant's admirable service as a mentor

to young men, his assistance to his ill father, and his positive influence on younger family members merited some consideration.").

As seen in the letters of support, Mr. Abramoff is considered by many to be dedicated to his family and his community. Conversely, his large family – comprised of five children – will continue to suffer greatly by Mr. Abramoff's continued incarceration. In looking to compare sentence of others in the related cases and in determining whether it is the Government's or Mr. Abramoff's suggested reduction that should apply, it is entirely proper for the Court to consider the punishment a longer sentence will have on Mr. Abramoff and his family. As John Martin, former U.S. Attorney and later District Judge for the Southern District of New York, observed in retiring from the bench:

> Every sentence imposed affects a human life and, in most cases, the lives of several innocent family members who suffer as a result of a defendant's incarceration. For a judge to be deprived of the ability to consider all of the factors that go into formulating a just sentence is completely at odds with the sentencing philosophy that has been a hallmark of the American system of justice.

John S. Martin, Jr., Let Judges Do Their Job, N.Y. Times, at A31 (June 24, 2003) (2003 WLNR 5657759).

### D.    No Risk of Recidivism

In addition to the fact that Mr. Abramoff has acknowledged his mistakes and is determined never to repeat them, the Court should take added comfort in knowing the statistical evidence of that is on his side. Mr. Abramoff is a first-time offender, which strongly suggests that he does not pose a major threat of recidivism. According to recent U.S. Sentencing Commission analysis, defendants who are in Criminal History Category I, like Mr. Abramoff, have the lowest rate of recidivism of all offenders – 13.8% within two-years of release. See U.S.S.C., Measuring Recidivism:  The Criminal History

41

Computation of the Federal Sentencing Guidelines, at 6 (2004). Looking at its data, the

Sentencing Commission suggested that "[p]ossible sentence reductions for 'first

offenders' are supported by the recidivism data and would recognize their lower re-

offending rates." Id. at 15. The Commission's finding coupled with this Court's

discretion is yet another factor supporting leniency.[19]

### E.    Lengthy Incarceration Does Not Strengthen Deterrence

Protracted incarceration in not necessary because it would not enhance deterrence

for white collar offenders. Studies of white collar offenders from before the enactment

of the sentencing guidelines have shown no difference in recidivism patterns between

offenders who received jail time and those sentenced to probation. See David Weisburd

et al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes,

33 Criminology 587 (1995). These studies show "no significant difference in recidivism

between white-collar offenders sentenced to prison and similar offenders who did not

receive a prison sentence" and are consistent with the findings of earlier criminological

studies dating back to the 1970s. See Elizabeth Szockyj, Imprisoning White Collar

Criminals?, 23 S. Ill. Univ. L. J. 485, 495 (1999). Rather than longer sentences, it

appears to be "the criminal process itself – charge, trial, conviction, and sentencing –

---

[19]    Other factors also suggest that Mr. Abramoff is not likely to recidivate, including his age, stable home life, steady employment history and education level. The Sentencing Commission explains that "[r]ecidivism rates decline consistently as age increases," and has suggested that if age were incorporated into the criminal history score, it would strengthen the predictive power of the Guidelines in identifying a risk of recidivism. Id. at 16. Mr. Abramoff at, 47, is past the age where the Sentencing Commission stops to even break down the decline in recidivism rates by age by the time he is released from prison. As a married man, Mr. Abramoff's likelihood of recidivism also is substantially lower than it would be for most defendants, id. at 12, and is likely to be particularly lower in his case, as he celebrates his 21st wedding anniversary this year. Of course, one of the greatest factors precluding recidivism, which was not accounted for by the Sentencing Commission, is that – given Mr. Abramoff's notoriety – nobody would give him the opportunity to commit these crimes again. The Sentencing Commission also found lower recidivism rates by defendants with a history of stable employment, who are well-educated and are first-time offenders with no history of illicit drug use in the year preceding the arrest id. at 29. Mr. Abramoff has a law degree from Georgetown and he has been steadily employed his whole life. All of these factors would make the statistical likelihood of recidivism for Mr, Abramoff to be less than 1%.

[that] has the greatest impact on the offender, and the period of imprisonment adds little by way of deterrence." Id. See, e.g., John Braithwaite, Crime, Shame and Reintegration 69 (1989) ("It would seem that sanctions imposed by relatives, friends or a personally relevant collectivity have more effect on criminal behavior than sanctions imposed by a remote legal authority."); Sally S. Simpson, Corporate-Crime Deterrence and Corporate Control-Policies: Views from the Inside, in White-Collar Crime Reconsidered 298 (Kip Schlegel & David Weisburd eds., 1992).

It is doubtful that any potential white collar criminal in America could look at what has happened to Mr. Abramoff already – his public humiliation, his tens of millions of dollars of judgments and restitution, the impact on him and his family, the loss of everything he has held dear, and what will still be his long sentence after the Court accounts for the time he has served and any additional time it imposes and not want to do all they can to avoid his fate.

## **CONCLUSION**

Mr. Abramoff asks the Court to consider the permissible factors, the extraordinary cooperation, and the other sentences it has imposed and accept the Government's recommendation for a lower sentence but impose a sentence informed by the reduction he receives in Florida (but no more than the 35 - 43 months that will likely result from those proceedings) and, according to the plea agreement, allow that sentence to run concurrently with the sentence already imposed in the Southern District of Florida.

Respectfully submitted,


Abbe David Lowell, Esq.(#358651)
Pamela J. Marple, Esq. (#462921)
Christopher D. Man, Esq. (#453553)
MCDERMOTT WILL & EMERY LLP
600 13th Street, N.W.
Washington, D.C.  2005
(202) 756-8000