1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2      ---------------------------X

3      UNITED STATES OF AMERICA      Criminal Case No. 06-001

4                  v.

5      JACK ABRAMOFF,

6                          Defendant

7      ---------------------------X        Washington, D.C.
                                           Thursday, September 4, 2008
8                                          2:05PM.

9                    TRANSCRIPT OF SENTENCING
                BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
10                   UNITED STATES DISTRICT JUDGE

11     APPEARANCES:

12     For the Government: Mary K. Butler, Esquire
                           Nathaniel Edmonds, Esquire
13                         U.S. DEPARTMENT OF JUSTICE
                           Public Integrity Section
14                         1400 New York Avenue, NW
                           Washington, DC 20005
15                         (202) 616-7529

16

17
       For the Defendant:  Abbe David Lowell, Esquire
18                         Pamela Marple, Esquire
                           MCDERMOTT WILL & EMERY, LLP
19                         600 Thirteenth Street, NW
                           Washington, DC 20005-3096
20                         (202) 756-8001

21

22     Court Reporter:            Lisa Walker Griffith, RPR
                                  U.S. District Courthouse
23                                Room 6507
                                  Washington, D.C.  20001
24                                (202) 354-3247

25     Proceedings recorded by mechanical stenography, transcript
       produced by computer.

1                    **P R O C E E D I N G S**

2

3              THE DEPUTY CLERK:  This is criminal case 06-001.

4    United States of America versus Jack Abramoff.

5              I'm going to ask counsel to please come forward and

6    identify themselves for the record.

7              MS. BUTLER:  Good afternoon, Your Honor, Mary Butler

8    for the United States, and with me is my colleague Nate

9    Edmonds from the Fraud Section, Stephanie Evans from the Tax

10   Division, and representatives of the major investigative

11   agencies; Leanna Saler from the FBI, Patrick Murphy from the

12   Department of Interior Inspector General's office and

13   Christine Morrison from the IRS Criminal Investigation

14   Division.

15             THE COURT:  Good afternoon.

16             MR. LOWELL:  Good afternoon, Your Honor, Abbe Lowell

17   on behalf of Mr. Abramoff.  At counsel's table is Pamela

18   Marple and Christopher Mann.  Mr. Abramoff of course is here.

19             THE COURT:  Good afternoon.

20             Good afternoon, ladies and gentlemen.

21             Now, we have a couple of preliminary matters before

22   we address the lawyers and their arguments.  First, a motion

23   has been filed by the parties to accept the stipulated

24   amendment, it's number 32.

25             Has Mr. Abramoff signed the new portions of the plea

1    agreement?

2            MR. LOWELL:  Your Honor, may I address you from

3    here?  Can you hear me?

4            THE COURT:  Is it all right for the reporter?

5            MR. LOWELL:  Yes, he has, and I have, and we've

6    signed it.  And Ms. Butler has the signed papers.

7            THE COURT:  Okay.  If you would submit those to

8    Ms. Franklin.

9            This will now constitute an amendment of the plea

10   agreement apparently as to tax losses.  It's been determined

11   that there is no criminal tax loss for 2003, and there's been

12   a correction regarding the calculations for the years '01 and

13   '02.  Previously it was thought to be around 1.7 million, and

14   now it's $693,590.  And it's my understanding, Ms. Butler,

15   that this difference has no effect on the guideline

16   calculation.

17           MS. BUTLER:  That is correct, Your Honor.

18           THE COURT:  Also, you've agreed that restitution

19   will not be ordered by this Court, but will be determined

20   within civil proceedings.

21           MS. BUTLER:  Yes, Your Honor, with regard to tax due

22   now.

23           THE COURT:  Okay.  All right.  So we will do that.

24   And that also has an effect on the presentence report insofar

25   as the figure $69,590 will appear, I think it will probably be

1    page 20 and page four, note two.  And the only other

2    correction I'm aware of in the presentence report will be, it

3    should be Count III as reflected on page 26, referring to the

4    Florida conviction.

5           Ms. Butler, are you aware of any other changes or

6    corrections needed in the presentence report?

7           MS. BUTLER:  No, Your Honor.

8           THE COURT:  Mr. Lowell, have you reviewed the

9    presentence report with your client?

10          MR. LOWELL:  We have, Your Honor.

11          THE COURT:  And are you aware of any changes,

12   corrections in the presentence report?

13          MR. LOWELL:  None other than those that you've just

14   listed.

15          THE COURT:  Okay.

16          The other thing I would like to make clear to all

17   who are here, I have received many letters.  Counsel filed

18   350-some letters, letters were sent to me directly from

19   members of the community, from victims and other individuals

20   who had an interest or wanted to express their views.

21          All letters have been put, now that we have deleted

22   any personal identification such as addresses or phone

23   numbers, we've endeavored to put them on the public pleadings

24   file so that they're available to everyone.  The Court has

25   thoroughly reviewed these letters and considered them.

1          The Court obviously has a presentence report which

2     will be important to its consideration, and has the only other

3     information, other than the pleadings by the parties, is a

4     sealed pleading by the government setting forth other types of

5     cooperation which has been provided by Mr. Abramoff to date,

6     which is not public, covered by grand jury secrecy proceeding.

7     That pleading is not available to the public, nor can it be.

8          We also have informed or the government has

9     fulfilled its obligations to inform victims as defined by

10    statute under Section 3771.  These are people directly and

11    proximately harmed as a result of the commission of the

12    offense here, and it's my understanding that several of those

13    victims are availing themselves of the opportunity to address

14    the Court, which we will entertain in a few moments.

15         Now, if I may, the presentence report, counsel,

16    indicates a criminal history of two and a guideline range of

17    121 to 151 months, the offense level being a 31.  I understand

18    that there are requests for departures, but first before we

19    reach that, are there any objections to those calculations?

20         MS. BUTLER:  Not from the government, Your Honor.

21         MR. LOWELL:  There is sort of, Your Honor, in the

22    sense that we have tried to structure Mr. Abramoff's plea and

23    acceptance in two jurisdictions so that they would run the way

24    that everybody intended.  So by not having a simultaneous

25    moment in time where both pleas could be entered

1   simultaneously, you end up with, as the probation officer did,

2   the possibility that we envisioned could occur, where you

3   would have a second category of criminal history as opposed to

4   the first.  So, in a sense, there's no disagreement that if

5   you calculate it in that fashion, that would be the criminal

6   history leading to that range, were we to be using strictly

7   the guidelines.

8          But we have put forward also, as you know, the

9   explanation as to why that occurred, that it's not truly a

10  real secondary criminal history, and that we have envisioned a

11  means by which that could be addressed.  I know you knew that,

12  but I wanted to make sure that I said it.

13         THE COURT:  Well, just for the record, and I will

14  let both of you argue about the departure; there's been a

15  request to the Court to depart under the guidelines 4A1.3, on

16  the grounds that it is over stating his criminal history to

17  have a criminal history of two as opposed to one.

18         One way or another, there would have been a criminal

19  history of two, as long as this Court or the court in Florida

20  did not undertake to sentence all at the same time.  I asked

21  our probation folks to look at that question, if he had pled

22  here to both offenses or had been sentenced here for both.

23  And it turns out, because of the way the guidelines, you would

24  be using the '03 guidelines, he would be -- it really does not

25  significantly change.  He would have a guideline offense of 34

1    with a range of 151 to 188.  So the fortuity of having two

2    jurisdictions involved here as a practical matter, doesn't

3    actually change it very much.

4            I'll hear the government on this, but I'm not quite

5    clear on the applicability of 4A1.3.

6            MS. BUTLER:  Your Honor, the way that the parties

7    analyzed the possible problem at the time of the negotiating

8    the plea agreement, was that there was venue, clear venue in

9    both districts for these offenses.  And the chance fact that

10   he would be sentenced in Florida before he would be sentenced

11   here would mean, as we laid out in our sentencing papers, that

12   if he, if he were sentenced here first on this offense, he

13   would face additional jail exposure; whereas if he were

14   sentenced in Florida first, he would not.  So the question is

15   whether -- how it moves across the guideline table as opposed

16   to up and down.  And we laid out that analysis in our

17   sentencing paper.

18           We believe because he was resolving his offenses at

19   the same time, that the effect of additional punishment for

20   having resolved them both -- having pled guilty at the same

21   time, but the sentencings having been uncoordinated, could be

22   addressed by a motion that said that if his guidelines are --

23   if his criminal history guidelines are adjusted because of the

24   timing of the sentencings, that we would make a motion to

25   advise the Court that we thought it over represented his

1   criminal history, and to ask the Court to downwardly depart to

2   a level 31, if that happened.  I don't know if I can answer

3   the Court's concern any further.

4          THE COURT:  What concerns me is that we are treating

5   these two offenses, the one in Florida and the one here, as

6   really representing similar kind of conduct.  And in my view

7   it is quite distinction, they're very, very different.  And

8   that generally speaking, when they're separate and distinct,

9   the criminal history somewhere reflects that.

10         As I said, had he been sentenced here for both, the

11  offense level would have gone up, not the criminal history,

12  but the offense level, so that -- I have some difficulty

13  seeing how you're cabining this departure into 4A1, other than

14  I understand that you were -- part of your plea was to try to

15  treat these things as concurrently as possible.

16         MS. BUTLER:  Yes, Your Honor.  And because we,

17  although we're one justice department, we weren't able to

18  consolidate the matters in one district.  And so we knew at

19  the time that we were negotiating these agreements, that there

20  would be two agreements and there would be two sentencings.

21  We hoped they would be relatively -- the sentencings would be

22  relatively simultaneous.

23         If this Court had sentenced on the charges here

24  first, and then South Florida had sentenced, he would have

25  criminal history from this case, but his guidelines, even with

1   increased criminal history, would still be below his exposure

2   here in D.C.

3        THE COURT:  Again, you're assuming that it would be

4   concurrent.  You're operating assumption is that the two

5   courts would operate concurrently.  Already, the judge in

6   Florida ruled two years ago.

7        MS. BUTLER:  That's right.

8        THE COURT:  The Court is not inclined to lower the

9   criminal history.  I don't think that the guidelines argue for

10  it here.  In my view, what I really have in front of me is a

11  Florida matter that is being treated by a Florida judge.  He's

12  already sentenced to 70 months, and we'll consider a reduction

13  certainly to take account of Mr. Abramoff's cooperation.  But

14  the fair way, I think both from the Court's point of view and

15  the public's point of view, is to treat these in some way for

16  me to consider what is a fair sentence under the factors for

17  this event only.  So the Court will not downwardly depart on

18  the criminal history.

19       Mr. Lowell, did you want to make a further argument

20  on that?

21       MR. LOWELL:  Not so much an argument, Judge, but I

22  do want to lay out part of the record and do it incredibly

23  briefly.

24       The way you approach that point is dead-on right,

25  but what it doesn't take into consideration is the assumptions

1    that led to a bargained-for exchange and the assumptions that

2    went into a plea agreement, the parties working as best as

3    they could under the circumstances.

4         I don't state that they are not two different

5    jurisdictions.  But I do state that it should not penalize --

6    and it may not, and I'll get to that in a second --

7    Mr. Abramoff for the fact that two different jurisdictions

8    chose not to coordinate as well as they could.  He should not

9    be subject to worse consideration for that turn of events.

10        For example, had we consolidated in one

11   jurisdiction, as Ms. Butler said, for which there was

12   jurisdiction, that would have influenced, not just the result,

13   but how we got to the result; the negotiations over what would

14   be the loss figure, what would be the add-on figures, all of

15   that is taken up.

16        It's not as if you can take the decisions that were

17   made after the fundamental decision of similarity were created

18   and say okay, I'm jettisoning the idea that this should be

19   seen as one sort of event, but I'll take all the results of

20   that to the detriment of the defendant.  That wouldn't be in

21   keeping with the spirit or, in fact, the words that we used in

22   the agreement.

23        Having said that though, Judge, there are a couple

24   of issues.  First is, you know, this has been a moving target

25   that you known better than I, in terms of what governs

1    sentences.  We talk in terms of guidelines and we talk in

2    terms of departures and we talk in terms of those kinds of

3    considerations because we began discussing all of this in an

4    era in which that was the case and which was mandatory, et

5    cetera.  You are now luckily able to build a sentence from the

6    ground up, rather than worrying about taking one brick from

7    the top of the building and taking it down.

8         So at the end of the day, what I know you said and I

9    think the government concurs, we're trying to find the correct

10   sentence under all the considerations.  I rose to take this

11   three or four minutes because what I don't hope will happen is

12   because, for example, the government made its recommendation

13   to you under 5K1.

14        They did that on an assumption.  They did it on the

15   assumption of comparing sentences that you have meted out,

16   that which Mr. Abramoff has done, and a range of guidelines

17   that started with 108, for example, at the low end of a

18   category criminal one.  We then figured out, was that a fair

19   sentence under all the circumstances, and they came to the

20   decision it was.  That was not a calculation based on criminal

21   history two; it was based on criminal history one.

22        So I raise all of that now, but I'll say it again

23   when it's appropriate in the context of the sentencing, just

24   because I don't want the fact that we had assumptions and

25   considerations to just go by the wayside.

1          You can reach the achieved result that we intended

2    by the vehicle of going through a downward departure, to use

3    that phraseology, for a criminal history, or do it by taking

4    whatever the range and figuring out a fair sentence from the

5    ground up, and doing it with the factors that the government

6    has asked you to consider, as long as you understand where we

7    were coming from and what we were trying to achieve.  And I

8    think you used the phrase as concurrently as possible.  Then I

9    think that that's fair.

10          But again, let me conclude with something I said

11   before.  This is somebody who you will hear and you've read,

12   is somebody who is a cooperating witness.  And the working

13   assumption was that he should not be worse off for being such

14   a witness than he would be if he had picked a different course

15   and a different result.

16          So making them concurrent, having it try to be

17   sentenced all at the same time; in fact, we were able to get

18   the pleas within 24 hours of each other.  But we weren't able

19   to convince the other jurisdiction that we should withhold

20   sentencing.  It is just another way of getting to the bottom

21   line.  And I don't know that I helped to clarify it, but I

22   hope I have.

23          THE COURT:  Well, I don't know if you've clarified

24   it.  It's clear from the plea agreement, everybody recognized

25   that it was the Court's and -- rightly recognized that it was

1    the Court's determination of what the criminal history would

2    be.  This was understood to be at least a possibility.  I

3    don't think that certainly you couldn't, nor did you bind me

4    to excluding the criminal history two.  That was understood.

5           To me, where we are, and I will I'm sure say this

6    again, is that I believe I do have discretion both because the

7    guidelines are advisory, but I must determine, for purposes of

8    the sentence, what is the starting point under the guidelines.

9    I have no choice about that.

10           And second of all, the Court has both discretion to

11    vary and/or to depart under 5K.  And there is another

12    departure that the government has asked for here that we will

13    get to in a little while.  But for my purposes, the Court is

14    finding, for the reasons stated, that the criminal history is

15    two and it is not nearly a fortuity.  I mean, this conduct is

16    separate, distinction, and the guideline range is 121 to 151.

17           Obviously, given the cooperation here, I'm well

18    aware that there will be substantial departure for

19    cooperation.  But it is not, in my view, the way to get there,

20    to talk about some difference in the guidelines that are based

21    on some other factors that I don't really think are borne out

22    by the facts, frankly.  So the Court does make that

23    calculation for purposes of at least this is where we start.

24           I have been told by the government that there are

25    some victims who have chosen to come and asked to address the

1    Court.  And I will be happy to hear from them.  If they would

2    identify themselves and come forward.

3        MS. BUTLER:  Your Honor, Mr. Bernard Sprague,

4    representing the tribal counsel of the Saginaw, Chippewa tribe

5    of Mount Pleasant, Michigan, is here to address the Court.

6        THE COURT:  Sir, if you would come up first, and you

7    can go to the mic, if you would, and give us your name spell

8    it for us.  Your letters have been put on the public file,

9    sir.

10        MR. SPRAGUE:  Thank you, Your Honor.  My name is

11    Bernie Sprague; I'm with the Saginaw, Chippewa Tribe out of

12    Mount Pleasant, Michigan.

13        MS. BUTLER:  And so the Court is clear, Mr. Sprague

14    is representing the tribal counsel instead of the tribal

15    chief, Mr. Cantu.

16        THE COURT:  Okay.  I think the letter came from

17    Mr. Cantu; is that correct?

18        MR. SPRAGUE:  Yes, that is correct, Your Honor.

19        THE COURT:  All right.  Mr. Sprague, the Court will

20    certainly hear from you.

21        MR. SPRAGUE:  Okay.  Well, thank you for allowing me

22    to be here today on behalf of the Saginaw Chippewa Indian

23    tribe, over 3,000 members.  It has been a long time coming

24    this day.  It has been a real, real rough time for the tribe

25    since we've been introduced to Mr. Abramoff and his friend,

1    Mr. Scanlon, in the scheme and the scam that they ran on our

2    tribe, with no regard for our people, our government.  It just

3    totally destroyed our tribe while he was there and ever since

4    he has left.  It has been a real struggle for us to keep it

5    together.

6         But I want to read a statement, prepared statement.

7    And I may add a few words if the Court will have the time to

8    do that.  But since I am here as a current, duly-elected

9    member of the tribal counsel, representing the Saginaw

10   Chippewa Indian tribe of Michigan, and to request on behalf of

11   our tribe that this Court impose the maximum sentence on the

12   defendant in this case, Jack Abramoff.

13        As a member of the tribal counsel in 2002 when

14   Mr. Abramoff worked for the tribe as a lobbyist with the

15   Greenberg Traurig firm, I became concerned at that time or the

16   lack of transparency concerning the work supposedly being

17   performed by Mr. Abramoff.

18        It quickly became apparent to me what the United

19   States Senate Indian Affairs Committee subsequently found in

20   its investigation of Abramoff's activities, that Mr. Abramoff

21   had used unethical and deceptive means to involve himself in

22   an internal tribal election that would later provide the

23   foundation for a calculated scheme to defraud our tribe out of

24   millions of dollars.  He also engaged in unethical and illegal

25   behavior in his representation of the tribe that continues to

1    have grave repercussions to this tribe and its community.

2            Your Honor, I understand that a number of people

3    have sent letters in support of Mr. Abramoff.  As a husband

4    and a father of two children, I know the pain and suffering

5    that the family must be going through.  I, along with many

6    families, many children on the Saginaw Chippewa reservation,

7    have suffered a lot of pain and agony.

8            THE COURT:  How large is your tribe, sir?

9            MR. SPRAGUE:  We have 3,000-plus members, Your

10   Honor.

11           At the time of -- or actually during

12   Mr. Abramoff's -- when he was working for our tribe, like I

13   said, I was a member of the tribal council.  But during

14   Mr. Abramoff's term -- or during my term, I was trying to get

15   information on just exactly what Mr. Abramoff and Mr. Scanlon

16   was doing for our tribe, because we were paying them millions

17   of dollars.  And I was seeing no reports.  I couldn't get any

18   reports.  At the direction of Mr. Abramoff, from Mr. Scanlon,

19   information was not to be shared with our council members,

20   just those that he helped elect, just those that he felt he

21   could continue to scam.

22           He found out that I was elected, I won a special

23   election, and he wanted to know right away, was I on his team

24   or was I against him.  He needed to know.  Well, he found out

25   in a hurry that I was elected to serve the members of our

1   tribe.  I don't work for anybody else.  And I will not be

2   bought for any type of promises to make me a better person, to

3   make me more popular or richer or anything in that regard.

4          And Mr. Abramoff found out that there was only one

5   way to deal with me, and that was to get me out of office as

6   soon as he could.  And so that's what him and his associates

7   within the tribal council did.  I lost my seat on the tribal

8   council, I lost my job working with the tribe, working with

9   the children of our tribe.  The children of our tribe lost

10  activities themselves because my job was vacant, there was no

11  one there to carry on my duties.

12         But Mr. Abramoff, he didn't care anything about

13  that.  He didn't care anything about the children of the

14  tribe.  He didn't care anything about my children, about my

15  job, about my reputation.  All he was worried about was Jack,

16  Jack has got to get that next big check.  Constantly, where is

17  my next check, where is my next check.  That was the only

18  thing on his mind, was Mr. Abramoff and his money that he felt

19  he had coming.

20         Let me get back to my statement here.  This is

21  really hard for me because I was one of a few that was willing

22  to challenge Mr. Abramoff.  I was told not to mess with Jack

23  Abramoff, he is very powerful in Washington.  He had a lot of

24  good friends, a lot of high-powered friends.  I should not

25  mess with Mr. Abramoff.

1          But Mr. Abramoff was messing with the Saginaw

2     Chippewa tribe and its members.  And I took an oath to defend

3     the members of our tribe against all.  And so I ignored the

4     warnings, and we're here today because Mr. Abramoff was

5     exposed for what he was and what he was doing.  And to this

6     day, the Saginaw Chippewa tribe has not received any apology

7     in any form from Mr. Abramoff; verbal, in writing, from him,

8     from his attorney, from anyone.  It's like we don't exist.  He

9     apologizes to everyone else, except for the Saginaw Chippewa

10    tribe and the other tribes across the country that he

11    defrauded.  It's like we don't exist.  We don't matter to him.

12          The only thing that matters to him is his

13    surroundings, people close to him, people he respects.  He

14    will apologize to those folks.  But to the Indian tribes who

15    he used many, many names to describe, he has no -- he has

16    never, ever apologized to any of us.

17          So I just want to say that it is important for this

18    Court to know the long-term impact of Mr. Abramoff's crimes

19    have had on our tribe and on Indian tribes across the country.

20    It is not just about the money that he stole, or the complete

21    disregard and disrespect he has shown for Indian people.  His

22    actions have caused a dark stain, not only on all the tribes

23    who hired him, but on Indian country as on whole.

24          Since Mr. Abramoff finally admitted his crimes, we

25    have witnessed Indian tribes from across the country being

1    shunned from involvement in the legislative and political

2    process.  We have had political donations returned because of

3    this.  Our tribe has been asked not to attend meetings or

4    participate in I certain legislative strategy sessions because

5    we were or are an Abramoff tribe.  Thank you, Jack.

6         Just a few weeks ago, there was a vote on the floor

7    of the house of representatives, involving a bill that had

8    significant consequences for our tribe.  During the debate on

9    this bill, several senior members of Congress referred to our

10   tribe as the Abramoff tribe, and urged members to vote against

11   the interest of our tribe, based solely upon the fact that

12   Mr. Abramoff worked for our tribe.  Time and time again, we

13   have seen our name -- our tribe's name dragged through the mud

14   because of Mr. Abramoff.  This has been -- it is very unfair

15   to the tribe to be treated this way.

16        THE COURT:  Mr. Sprague, I must say, there are

17   people from your tribe who I take it do not agree with your

18   position.  I mean, I have received letters.  It is not a

19   consensus among all tribe members; is that fair to say?

20        MR. SPRAGUE:  That is correct.

21        THE COURT:  Have you replaced the people who were on

22   the council during the time that Mr. Abramoff worked for you?

23   Has the leadership changed since then?

24        MR. SPRAGUE:  Yes, it has.  Your Honor, yes, it has.

25        THE COURT:  All right.  Well, if you want to finish

1    up your remarks.

2              MR. SPRAGUE:  I just have a few more, if that's

3    okay?

4              THE COURT:  Yes.

5              MR. SPRAGUE:  I do not know Mr. Abramoff personally;

6    I only know him from a short tenure with our tribe.  But

7    perhaps I do know the real Jack Abramoff, the person who

8    threatened me for asking questions, the person who lied

9    repeatedly to my face on his involvement with Michael Scanlon,

10   and the person who has done so much damage to the tribe.

11             Your Honor, I believe it is important to look at the

12   behavior of Mr. Abramoff once his crimes became public.  What

13   did Mr. Abramoff do when the Washington Post article was

14   published and his crimes were thrust into the spotlight?

15             It is this answer that I think shows the true

16   character of Jack Abramoff.  When Mr. Abramoff's crimes were

17   first exposed, his first reaction, his gut instincts, were not

18   to step forward to apologize and accept responsibility; there

19   was no remorse, no sorrow, no self reflection, no redemption.

20   There was no letter to the tribes, cooperation with the Senate

21   committee on Indian affairs.  There was nothing to suggest

22   that his character was to finally confess to his deceptions

23   and crimes.  No, that was not the Jack Abramoff we you knew.

24             Mr. Abramoff's instincts were to attack his critics

25   and go after our tribal leadership.  The fact is, Mr. Abramoff

1    immediately began to find a recall -- to fund a recall drive

2    against the tribal council members who exposed and opposed

3    him.  And I was one of those individuals that was targeted by

4    Mr. Abramoff, and had some very nasty letters sent,

5    threatening letters sent, giving me seven days to resign my

6    seat on the tribal council or I would be exposed to the media

7    and I would be prosecuted in federal court, if I did not step

8    down within seven days.

9           And I went to my family and I asked my family, what

10   do you think I should do?  I don't want to hurt the family,

11   but I know all these accusations are wrong, they have no

12   merit.  So my family told me to stay, stay, stay in your seat,

13   you were elected; if they have anything, they have to bring it

14   to Court.  They would have to expose themselves and their

15   evidence.  So I stayed, and lo and behold, there was no action

16   taken after seven days.

17          But the threat was there in writing.  It wasn't

18   signed by anyone, they don't have the guts to do that.  But

19   they did have the guts to make the threat.  So we know why

20   that threat was made.

21          Mr. Abramoff's instincts were to attack his critics

22   and go after the tribal leadership.  He sent thousands of

23   dollars and other resources to people who were in cahoots with

24   him, to try to recall tribal members.  He then drafted letters

25   to the Washington Post that were signed by a few tribal

1    members to support him.  He tried to get his cronies to get

2    Senator McCain to back down from his investigation.  He then

3    proceeded to thrash Senator McCain's efforts all along the

4    way.  So when the opportunity to come forward and put an end

5    to all of this, Mr. Abramoff chose the road of recklessness

6    and destruction.

7              This is the person who stole from our tribe and

8    attacked our way of life.  Was he a generous man?  Yes, he was

9    a generous man, but it wasn't his money he was being generous

10   with.  It was not money that he earned.  It was money that he

11   stole and he knew he had no right to keep it.

12             Now, with our money, he flew on private jets and

13   spent millions of dollars to live a lavish lifestyle.  When I

14   think of the Indian children that have been hurt around this

15   country because of his actions, I cringe when I hear people

16   talk about Jack Abramoff's generosity.  It is easy to make

17   those statements when it is not your money that was stolen.

18   It was not your tribe that was defrauded, and it was not your

19   family that was under attack.  The record of Jack Abramoff was

20   hardly one that deserves to be rewarded by this Court.

21             It is indeed said that a few members of our tribe

22   who were showered with gifts from Mr. Abramoff continued to

23   support him.  They're a small minority who worked with

24   Mr. Abramoff in our internal elections.  These individuals are

25   not elected representatives, but all that has been disclosed

1    and all that Mr. Abramoff has admitted to, it is incredible

2    that they continue to support this man.  So that's why I don't

3    understand it myself and neither do many of our other tribal

4    members.

5         THE COURT:  Mr. Sprague, I have letters from your

6    chief as well that have gone into the public record.  And I

7    think that out of fairness to the other victims who may want

8    to address the Court, you should wrap up your remarks, please.

9         MR. SPRAGUE:  Okay.  I just want to thank the Court

10   for allowing me to speak.  And I came here today to ask the

11   Court to impose the maximum sentence on Mr. Abramoff for

12   his -- all his wrongdoings to our tribe and all the hurt and

13   harm he has done to our tribe.  And I thank the Court very

14   much for allowing me to speak.

15        THE COURT:  Thank you for attending, sir.

16        MS. BUTLER:  Your Honor, present here today is

17   Mr. David Sickey, who is the vice chairman of the Coushatta

18   Tribe of Louisiana.  He will address the Court instead of the

19   chairman who is currently dealing with the effects of the

20   hurricane.

21        THE COURT:  All right.  Mr. Sickey, Kevin Sickey, is

22   it?  Is he here?

23        MS. BUTLER:  This is Mr. David Sickey, the vice

24   chair.

25        THE COURT:  Okay.  I do have a letter from Mr. Kevin

1    Sickey, who is the chairman of the Coushatta Tribe of

2    Louisiana.  If you would like to come forward.  Are you his

3    brother?

4            MR. SICKEY:  Yes, Your Honor.

5            THE COURT:  All right.

6            MS. BUTLER:  Your Honor, we made available the

7    opportunity for the chairman to listen to the remarks.  There

8    has been some unfortunate emergency on the reservation and

9    he's not able to participate, but he asked his vice chairman

10   in his stead.

11           THE COURT:  Okay.

12           MR. SICKEY:  That is correct.

13           The chairman, Chairman Kevin Sickey regrets that he

14   could not attend today's unprecedented sentencing due to the

15   Hurricane Gustav that passed just directly over the tribe.

16           I definitely want to thank you Your Honor for giving

17   us this opportunity.  I think this event is unprecedented in

18   the history of this country's native citizens.  This event,

19   this scandal, however you want to frame it, will forever be

20   seared in the history of this country's native citizens,

21   including the members of my tribe, all 841 members of my

22   tribe.

23           THE COURT:  Where is your tribal located in

24   Louisiana?

25           MR. SICKEY:  My tribe is located in the southwest

1    region of Louisiana.

2              THE COURT:  Okay.

3              MR. SICKEY:  Once again, my name is David Sickey,

4    I'm the officially elected vice chairman of the Coushatta

5    Tribe of Louisiana.  I speak for the members of my council,

6    the chairman, Kevin Sickey, secretary, Tee LaBuff, council

7    members Pratt Doucet and Verlis Williams.

8              Now, our own tribe owns and runs the Coushatta

9    Casino Resort.  We are not a rich tribe as many people are apt

10   to believe.  A lot of the money and resources that are

11   generated from our gaming operation is diverted back,

12   reinvested back into the communities.  A lot of Indian

13   members, Native American members, as well as non-Indian

14   neighbors benefit from the tribe's generosity.

15             A large number of our tribal members depend on

16   tribal funds for their health, education and welfare.  In

17   2001, the tribe was negotiating a contentious compact renewal

18   with the State of Louisiana.  The compact was necessary to

19   keep the doors open at the tribe's casino.  That uncertainty,

20   when combined with the unsophisticated nature of the former

21   council, made the tribe an easy target for Jack Abramoff.  He

22   convinced the tribal council that he could help renew the

23   compact under terms favorable to the tribe, if we would employ

24   his team for the task, and if we were willing to pay for

25   whatever services he deemed necessary and recommended.  We had

1    no reason to doubt his credibility, as he came from one of the

2    largest law firms in the United States.

3            After the compact, the State renewed the compact,

4    Abramoff came up with more creative ways to create fear of

5    outside attacks, and he also cultivated dependency on him and

6    his team, which include Michael Scanlon and the lawyers at

7    Greenberg Traurig.  The budgets that Abramoff and Mike Scanlon

8    sent to the tribe became ever larger and more involved, as did

9    the services he promised to provide and the results he

10   promised to achieve.

11           When a former member began asking questions about

12   the projects, Abramoff and Scanlon hired a private

13   investigator to gather information on him.  Abramoff tried to

14   quiet and discredit anyone who attempted to derail his gravy

15   train.  Jack Abramoff abused the trust placed in him and the

16   trust placed in his employer, Greenberg Traurig.  It became

17   clear after his downfall, Abramoff and his team did not

18   provide the services which they were paid.

19           While we have agreed to the restitution amount

20   negotiated by the DOJ, that amount relates only to the crimes

21   for which he pleaded guilty, and that amount of money does not

22   reflect the harm that Abramoff has caused the Coushatta

23   people.  The money paid to Abramoff and the people and

24   entities associated with him exceeds $32 million.

25           While Jack Abramoff has cooperated with the Justice

1    Department, which now seeks a lesser sentence according to

2    news reports, he has not participated in the tribe's civil

3    proceeding against him.  Abramoff claims to be representing

4    himself in that case, and he has not answered discovery

5    requests or otherwise participated in that case.  He has not

6    returned one dollar of Coushatta money, and he claims to be

7    destitute.  For these reasons, we do not expect him to pay any

8    of the promised restitution.  Please do not give him any

9    benefit of this restitution promised in his sentencing, until

10   that restitution is paid.

11        The Coushatta Tribe of Louisiana is fully aware that

12   his sentence is in your discretion, Your Honor.  We

13   respectfully ask the Court to take into account the damage he

14   has caused the Coushatta people, and the fact that he has not

15   returned any of our money since his crimes came to light in

16   2004.

17        After Abramoff's schemes became public, elected

18   Congressional officials began to return donations to the

19   Coushatta Tribe.  It became a sin to accept donations from the

20   Coushatta Tribe of Louisiana.  The influence and recognition

21   that Jack Abramoff promised has just -- has become just the

22   opposite.  And through no fault of our own, we have become

23   political pariahs.

24        We remind you of the real harm caused by Jack

25   Abramoff's greed and crimes.  This nation's people were

1    defrauded out of large amounts of money, and that otherwise

2    would have been used to educate and care for our tribal

3    members.  The money paid to Jack Abramoff and his team did not

4    result in any real value to the tribe; rather, it was used for

5    such things as funding a private school, as well as for other

6    pet projects of Jack Abramoff's.  The money that should have

7    been used to house and educate our tribe people, were spent by

8    Abramoff to fund an expensive and exclusive restaurant, buying

9    him more personal power at our expense.

10           Your Honor, in sum, this country's native citizens

11   and the undisputed possessors of the soil from time immemorial

12   is enough.  The tragic history of this country's native

13   citizens is documented over the centuries since first contact

14   with Europeans.  Let us not forget that.  Long after your

15   gavel has hit, I will walk out the front of these doors and

16   continue to protect as my solemn obligation, my people from

17   enemies, domestic and foreign.  It is my solemn obligation to

18   do that.  And I will continue to do that.  I want to make that

19   very, very clear to other opportunists who are waiting, who

20   are out there, who may be out there.

21           Please give Jack Abramoff a sentence that reflects

22   the enormity of his crimes, and which takes into account his

23   failure to return the money he stole from the Coushatta

24   people.  Thank you so much.

25           THE COURT:  Thank you, Mr. Sickey.  And your

1    brother's letter will also be in the public file.   And I

2    appreciate you coming from Louisiana, I know it probably was

3    not easy to even get here.   Thank you.

4              Ms. Butler, is there anything further?

5              MS. BUTLER:   Well, Your Honor, there is another

6    representative from the Saginaw Chippewa Tribe.   I didn't know

7    if you wanted her to speak now?

8              THE COURT:   Was this Ms. Jackson?

9              MS. BUTLER:   Yes.

10             THE COURT:   I think that Mr. Lowell perhaps will ask

11   her to speak; is that correct?

12             MR. LOWELL:   Yes, that's fine.   Let's proceed in

13   that fashion.

14             THE COURT:   I think where we should go first is to

15   hear from the government.   I know that Ms. Jackson takes a

16   different point of view than Mr. Sprague, and is not really

17   appearing as a victim within the meaning of the law.   So I

18   think that we should proceed, unless there's someone else that

19   has responded to the government's request with respect to,

20   they're required by law to notify victims and to provide them

21   the opportunity both to write and/or be heard.   I understand

22   that you have -- that has been done.

23             MS. BUTLER:   Yes, Your Honor.   We have no other

24   victims at this.

25             THE COURT:   At this time the, I will hear from the

1    government, and then turn to Mr. Lowell and Ms. Jackson, if

2    she wishes, and Mr. Abramoff obviously.

3         MS. BUTLER:  Yes, Your Honor.  The record of

4    Mr. Abramoff's offenses is set out in great detail, both in

5    the plea agreement and the factual basis and in our sentencing

6    memorandum, as well as the presentence investigation report.

7    And, Your Honor, we asked this Court, as we have in our

8    sentencing memorandum, to impose a sentence in this case at 64

9    months in prison with restitution in the amount of

10   $23,134,695.  We asked this Court to waive a fine in light of

11   his assets, and so that all available resources are applied to

12   make restitution to victims in this case.

13        As agreed in the plea agreement we negotiated, we

14   also ask you to impose a sentence to run concurrently with the

15   sentence imposed in the Southern District of Florida, and to

16   fashion the sentence in imposing it in a manner that gives him

17   credit for the time he has already served in his Southern

18   District of Florida sentence.

19        THE COURT:  So what is the bottom line from the

20   government?  I think that both the public and I should

21   understand that if you are giving credit, so to speak, by a

22   downward departure under the guidelines for what has happened

23   in Florida, you are asking the Court to impose a sentence of

24   39 months; is that effectively what you're --

25        MS. BUTLER:  That is effectively the sentence.

1          THE COURT:  Thirty-nine months going forward from

2    today?

3          MS. BUTLER:  That's right.  And so the total

4    sentence he would serve would be effectively 64 months.  And

5    then, of course, whatever Bureau of Prisons adjustments apply

6    to that sentence.

7          THE COURT:  So you calculate, just for purposes of

8    clarity, of 25 months served for Florida, that includes credit

9    for good time, credit and the 22 months, and adding that to

10   the 39, comes up to your 64.

11         MS. BUTLER:  That's right, Your Honor.

12         THE COURT:  But effectively, if you could address

13   one question the Court has, which is that under the law,

14   whether you depart under 5G1, the question is what is a

15   reasonable incremental punishment for the instant offense, the

16   one before me.  That's what -- and you're saying 39 months, I

17   guess, but I would like you to explain to me why you think

18   that.

19         MS. BUTLER:  Your Honor, we believe that the offense

20   conduct warrants a level 31 offense level.  And we believe

21   that because of his substantial assistance to the government,

22   that he should be given -- the Court should recognize his

23   substantial assistance and depart downward to impose the

24   effect of a sentence which would be 64 months.  And we believe

25   that's a reasonable sentence in light of both the seriousness

1   of his offenses and the seriousness of the government's

2   responsibility to carry out the investigation and to hold

3   responsible other persons who were involved in the same

4   misconduct.  So we balanced both the need for punishment,

5   rehabilitation and deterrence, and the need to fulfill our

6   obligation to continue this investigation and hold others

7   responsible.

8          So we ask the Court to start at offense level 31,

9   and to downwardly depart to impose a sentence that is

10  effectively 64 months.

11         THE COURT:  Well, it's not effectively 64 months

12  because 22 has been served somewhere else on another sentence.

13  That's why I get confused by the way you are presenting it.

14         MS. BUTLER:  Your Honor, it's because we believed at

15  the time -- we committed at the time to ask each Court to

16  impose these sentences as concurrently as possible.  And the

17  way to give effect to our recommendation of concurrency, in

18  light of the fact that the Southern District decided to impose

19  sentence before his cooperation was substantially complete,

20  the only way to give effect to our recommendation to

21  concurrency is to ask this Court to impose a sentence, it

22  would be of 39 months, but the effect would be that he would

23  serve 64 months.  And, of course, that would be a 64-month

24  sentence for both offenses, or for both cases because there

25  are several offenses.

1          THE COURT:  Basically, allocating 22 to Florida and

2     39 here, or 25 to Florida --

3          MS. BUTLER:  Well, he will still continue to serve

4     more than the 22 months on the Florida sentence.  It would

5     just be concurrently from now forward.

6          Your Honor, certainly the sentences can be viewed as

7     being served separately.  I think the government's view was

8     that at the time that two plea agreements were negotiated with

9     two different Districts, in the hope that the sentences would

10    be at approximately the same time in both jurisdictions, that

11    there would be concurrency given in the punishment.  And so

12    we're trying to give effect to that, and the only way to do

13    that now, given that he's already served -- begun serving the

14    Florida sentence, is to make the request that we make.

15         We still believe that that additional time which the

16    Court would impose, which is 39 months, but would mean that in

17    total the defendant serves a 64-month sentence, is reasonable.

18    And it's reasonable both because of the seriousness of his

19    crimes and the importance of his cooperation in the ongoing

20    investigations.

21         I don't know if I have addressed the Court's concern

22    on that point, but we detail in our --

23         THE COURT:  The government did control the structure

24    of this.  I've never understood why it is that in some way or

25    another you're saying to me that the judge down there -- you

1    could have come up with one plea agreement.  The United States

2    government doesn't have to have two plea agreements.

3           MS. BUTLER:  The government had no control over the

4    timing of the sentencings because that, of course, was in the

5    Court's control.  But with regard to whether there was one

6    plea agreement in Florida or one plea agreement here in the

7    District of Columbia, it's true that the executive branch had

8    some control over that.  There were -- we were not able to

9    negotiate that agreement.  But it's true that the executive

10    branch could have forced the issue if it deemed necessary.

11           The U. S. attorney in the Southern District

12    obviously could have said it's okay, you can bring your

13    charges -- my charges in the District of Columbia; or the

14    Justice Department could have said it's okay, you can bring

15    our charges in the Southern District of Florida.  But that's

16    not what we were able to negotiate at the time.

17           THE COURT:  Between you and the U. S. Attorney's

18    Office, you're right.

19           MS. BUTLER:  I appreciate that, Your Honor.

20           THE COURT:  Okay.  So anything further you wish to

21    say about why your proposal is fair and reasonable?

22           MS. BUTLER:  Yes, Your Honor.  As the Court knows,

23    because we laid it out in some detail in the sentencing memo

24    which we filed publicly, this defendant accepted

25    responsibility in a timely manner.

1          This defendant has spent a huge number of hours

2     preparing to meet with agents to identify important evidence,

3     but also to be debriefed.  He has been debriefed by a number

4     of different organizations, federal investigative agencies,

5     investigating mostly offenses related to the FBI's main case

6     here, but also on some unrelated matters.

7          He has helped us enormously in ferreting out from a

8     huge database of allegations, what really is criminal and the

9     responsibility of the Justice Department, and what really is

10    perhaps an issue of an ethical or administrative violation, or

11    it is nothing.  And that help alone saved the government

12    countless resources because of our responsibility to get to

13    the bottom of the allegations, no matter what the source.

14         At the same time, this defendant we believe his

15    assistance has led directly and indirectly to the successful

16    prosecutions of nine people and the prosecution and retrial

17    that is pending for another.  These people were not -- were

18    both high-level government officials in the executive branch

19    and in the legislature, and middle level.

20         There's no reason to think that Mr. Abramoff has

21    held back from cooperating with the government with regard to

22    some of the most powerful of the people that he had unlawful

23    relationships with.  And that really is an important measure

24    of the thorough and forthcoming cooperation he has provided.

25         At the same time, Your Honor, we need, in making the

1   recommendation that we do, to send a message to Mr. Abramoff,

2   but also to our other cooperators in this investigation, many

3   of whom this Court has already sentenced.

4           But if you fulfill your part of the bargain as the

5   defendant, and cooperate with the United States, you hold back

6   from putting the Government to the burden of completing its

7   investigation entirely and putting on its proof.

8           If you take a risk and enter into an agreement which

9   is a standard sort of plea agreement that the department

10  makes, but that requires you to give up all kinds of ability

11  to argue about what is a reasonable sentence, to attempt to

12  persuade the Court that your role was different in some of the

13  offenses, if you accept that type of strong agreement and take

14  the risks, as the defendant did in this case, that he would

15  serve that sentence or something approximating it because the

16  Court would impose the sentence.  And it would be in the

17  government's exclusive discretion whether the cooperation that

18  he provided was sufficient to warrant any reduction.

19          If you take those risks, as Mr. Abramoff did, and

20  you fulfill your part of the bargain, as Mr. Abramoff has,

21  then the government will advise the Court and will stand

22  before the Court and ask that your sentence be reduced to

23  appoint which the government believes reasonably balances your

24  offenses as well as the need for cooperation, to expose -- to

25  hold responsible everyone involved in the misconduct.

1              In this case, the prosecutors and the agents have

2    found the defendant, who has accepted responsibility, who did

3    so in a timely fashion, who has given us complete cooperation

4    in terms of helping us find relevant documents, helping us

5    develop -- prosecutor people who became cooperating defendants

6    and are assisting us in ongoing negotiation, and, Your Honor,

7    we found a person who agrees that he will continue to standby

8    by his obligation to cooperate with the government.  And so

9    we're here upholding our part of the bargain.

10             I don't know whether Your Honor wants to address

11   some of the suggestions about Mr. Abramoff's conduct with

12   regard to the tribal clients who have addressed the Court

13   today, but I can say that there was -- we are not in a

14   position to say that Mr. Abramoff was responsible for threats

15   to Mr. Sprague or other members of the tribal council.

16             I don't dispute that threats may have been made, but

17   we're not in a position to say that Mr. Abramoff was the

18   author or the cause of those threats.  But I don't dispute for

19   a moment, Mr. Sprague's sense that he was -- that he felt

20   threatened.

21             So, Your Honor, I guess, in essence, I'm saying that

22   there are no surprises that flow from the testimony that we're

23   hearing from the victims today.  We've taken that into

24   account, and we ask the Court to impose a sentence of

25   effectively 64 months.

1        THE COURT:  When you say effectively, I'm not sure I

2   can agree with that, but we can leave that for later.

3        Mr. Lowell, I'm happy for you to address the Court,

4   or Ms. Jackson, whichever order you wish.

5        MR. LOWELL:  How would you proceed?  I think maybe

6   it makes sense to let Ms. Jackson, who's come a long way, to

7   speak first.

8        THE COURT:  Fine.

9        MR. LOWELL:  Then I would like to speak second, and

10  then Mr. Abramoff would like the occasion to address the

11  Court, if it pleases you.

12       THE COURT:  Sure.  I have read, I have never

13  received so many letters before.  I believe there were over

14  350, including Mr. Abramoff's letter.  But by all means, we

15  will hear from Ms. Jackson and then from your client.

16       MR. LOWELL:  Thank you, Your Honor.

17       THE COURT:  Good afternoon.  If you could give us

18  your name, please, and identify yourself.

19       MS. JACKSON:  Good afternoon, Your Honor.  My name

20  is Delores Jackson, and I am a member of the Saginaw Chippewa

21  Indian Tribe of Michigan.  And I was wondering if you could

22  kind of bare with me, a couple of months ago I had a serious

23  illness and it left me with Bell's Palsy, so my words might be

24  slurred a little bit.  And I feel that I had to be here today,

25  so I'll start with my statement.

1          THE COURT:  We can understand you.  You'll be fine.

2          MS. JACKSON:  Thank you.

3          I thank the Courts very much for allowing me to

4     speak at this important hearing.  I am here with other fellow

5     members of the Saginaw Chippewa Indian Tribe of Michigan.  We

6     request to speak here today because we want to make sure that

7     the Courts know that there is another side to the stories

8     being told.  I'm not all -- not all Native Americans clients

9     think they were robbed or cheated by Mr. Abramoff.  I can't

10    speak for all tribes, but our larger truth should be told.

11         What I want to say is that there were many conflicts

12    within my tribe that caused some members of the tribe to

13    benefit from attacking Mr. Abramoff.  I was a member of the

14    tribal council, and I can tell you he obtained results that we

15    asked of him.  For example, he obtained federal appropriations

16    in the millions of dollars that we never had before.  We were

17    able to build an elder center that helped to this day the

18    elders in our tribe.  We are able to obtain -- we were able to

19    obtain money for school and highways.  We even got money for a

20    behavioral health program.

21         Mr. Abramoff also stopped casinos that were

22    competing with us, which was the real reason some in our tribe

23    opposed him.  Some in our tribe had family members who wanted

24    those casinos.  Some in our tribes were gaining personally

25    from those casinos, even though they directly hurt our tribe.

1    Those members did not want me and others on the council to

2    stick up for the tribe's real interests.

3             So the reasons some in our tribe continue to --

4    excuse me, Your Honor.  So the reasons some in our tribe

5    continue to -- can I redo this because I want to say this

6    right?

7             THE COURT:  Yes.

8             MS. JACKSON:  Those members did not want me and

9    others on the council to stick up for the tribe's real

10   interests.  So the reasons some in our tribe continued attack

11   must be questioned.  And it was those same people who gained

12   control of the tribe's government and fueled the Senate

13   investigation.

14            Also, it is not the so-called lobbyists' fees that

15   motivate the problem with Mr. Abramoff.  The fees that went to

16   Mr. Abramoff were to do all the things I talk about and more.

17   Not only did the tribe benefit from Mr. Abramoff's actions,

18   the tribe has gotten all of the money back from his law firm

19   over the past two years.  They don't mention that.  It makes

20   it even more clear that it is not the fees that the other

21   tribe members fear, it is other issues within the tribe.

22   Actually, the other thing nobody talks about is the fees the

23   tribe has paid its current lobbyists.  Those current fees are

24   more than what Mr. Abramoff got charged.

25            Also, those fees are going directly to lobbyists who

1    work with people on the Senate investigation.  People have not

2    talked about these things.  The things that everybody does

3    want to talk about is the e-mails.  We want to say that as

4    Native Americans, we understood Mr. Abramoff to be fighting

5    for us.  Those e-mail remarks were made about our opposition

6    inside the tribe, they were not made about all Native

7    Americans or because our oppositions were Native Americans.

8    We have always thought those e-mails -- Mr. Abramoff fighting

9    for us and against people inside the tribe who were opposing

10   the good things we were getting done.

11          For today, Your Honor, we just want to talk about

12   the truth.  We want to let you know that, in our opinion, the

13   truth is larger and has been overlooked.  For whatever

14   happens, and we cannot know everything, Mr. Abramoff is

15   someone who supported the tribe's goals and not the goals of

16   some individuals.

17          We remain today appreciative of his efforts.  We

18   remain today his friends who hope that the Courts will

19   consider our worth in making their decision.

20          THE COURT:  Thank you, Ms. Jackson.

21          MS. JACKSON:  Thank you.

22          THE COURT:  Mr. Lowell?

23          MR. LOWELL:  May it please the Court, I want to be

24   as completely responsive to the Court.  And I also need to

25   balance two difficult tasks.  On the one hand, I don't want

1    and I will not repeat what we've submitted, and I want to use

2    the Court's time wisely.

3          On the other, I have an obligation to make sure that

4    I have presented the complete record on which for you to make

5    this decision on a very important day in my client's life.

6          Indeed, Your Honor, as I was preparing to come, I

7    realized that this has to be one of the four or five most

8    important days in Jack Abramoff's life or any person's, after

9    their marriage, the birth of their children, or the passing of

10   their parents.  And put into those terms, I am daunted by the

11   task of trying to put together into perspective all the

12   factors that go into a person's sentence; the bad, and the

13   good, the past and the future, the crime and the contrition,

14   the wrongs and the good someone has done, and of course the

15   punishment and the rehabilitation.

16         And as hard as that would be in any case that any

17   lawyer stands in fronts of you to try to do, I think it is

18   nearly impossible in this one because more than any that I

19   have ever seen, this is a case in which the myth of Jack

20   Abramoff can overtake the actual man.  But it's the actual man

21   who is in court today to be sentenced.

22         Perhaps I can give you two small short anecdotes

23   that flesh this out.  I was recently in a Kosher restaurant; I

24   overheard a couple on line talking.  They had read that Jack

25   was going to be sentenced today, and the woman turned to the

1    man and said, I hope he stays in jail forever.  I am sure they

2    were not former clients.  I don't think they knew that I was

3    his lawyer.  And I was so startled by the excess in her

4    statement, that I didn't know what to think or say, and I

5    didn't.  And as I was driving home, the only thought that I

6    did have was I was glad that she was in the restaurant and not

7    sitting on the bench today.

8         The second event happened this morning when I was

9    with Jack's family; Pam, his wife; Lavy (ph), one of his sons;

10   Alex, Daniel, Sara and Olivia, who are in court today.  We

11   were talking about the proceedings and I was explaining what

12   was going to happen and how it was going to work.  And I was

13   explaining, and they were talking about the press coverage.

14   And one of them said to their mom, Mom, do you think Dad will

15   ever be referred to as if his first name was not Disgraced

16   Lobbyist?  It was one of those moments that you didn't know

17   whether to laugh or to cry.

18        And both stories, Your Honor, reflect the hard part

19   of this moment; trying to put the wrongs Jack did into some

20   accurate perspective and to seek some balance as any man

21   deserves when he is being judged.  As Your Honor knows, a

22   person's life is more than a moment, it's a entire reel of

23   film.  And what we tried to do in the papers that we've

24   submitted is to give you more than a few frames and more than

25   the snapshots that have been presented.  And hopefully, that

1    might lead to a little happier ending.

2            So, Judge, in what I hope will not be inadequate, I

3    will do the best I can to present a little fuller picture.

4    Let me start with the offenses committed.  I don't have to

5    dwell on those crimes.  Jack has never run away from admitting

6    what he did, and we've described them in great detail in our

7    plea agreement that was signed two years-plus ago, and our

8    recent sentencing memorandum, and the Justice Department and

9    probation officer has set them out as well.  They are not to

10   be minimized.  And they involve lying to clients about the

11   money that was being paid to, defrauding his legal partners

12   about how clients were paying him, conspiring with public

13   officials to give them gifts for their official actions, and

14   cheating on his taxes.

15           But as bad as they are, they're not all that he has

16   been accused of, or reported, or even stated today.  Take the

17   two tribes who have come forward, the Louisiana Coushatta and

18   the Saginaw Chippewa.

19           The Coushatta paid in all the law firms and all the

20   consultants, according to the statistics that we've been able

21   to compile, I think now $11 million over four years that they

22   say they should not have paid.  And Chippewa, $540,000 over

23   two years.  There is no allegation that they didn't know that

24   they were paying these fees to get a certain result, only that

25   Jack was not honest with them as to how that money was being

1    split, and that money that was being paid to others, he was

2    getting a piece of.  That was wrong.  In act, it was illegal.

3          But, Judge, that's an example of how the myth can

4    overtake the fact, and it can be confusing on this very

5    important day.  Because, for example, in the letter that you

6    received from the Coushatta and in the statements that were

7    made on their behalf today, they stated that they were not

8    well off, they state that they were abused.  They state that

9    Mr. Abramoff did not provide the services that he said.  And

10   they failed to point out that Jack did what they asked him to

11   do.

12         He got their casino license renewed over the fierce

13   opposition of people in the state.  They failed to mention

14   that he prevented the competition from commercial riverboat

15   casinos in other Native American tribes.  They failed to

16   mention that their gambling revenues that Jack helped them

17   save are $400 million a year.  And that over the time that

18   Jack helped them, that amounts to billions of dollars.  And

19   that in the 841 members of that tribe, that amounts to revenue

20   of $500,000 per tribe member, per year, for every year that

21   Jack helped them.

22         And for the Chippewa who write and they say that he

23   had, quote, no regard for the people is what Mr. Sprague said,

24   and he totally destroyed the tribe, they didn't point out that

25   Jack prevented five rival casinos from opening, helped them

1    obtain several millions of dollars in appropriations for

2    senior centers, hospitals, drug treatment programs, nor did

3    they point out that the revenue that Jack helped them save,

4    accounting for the lack of competition, was even more than the

5    $400 million dollars of the Coushatta.  And that his efforts

6    over the years amount to, again, billions of dollars.  And

7    while they have 2800 or so members of their tribe, that would

8    amount to a quarter of a million dollars for every tribe

9    member for every year that Jack helped them.

10             I'm not suggesting that these former clients are not

11    real victims.  They are.  Jack has addressed, and he will

12    address the harm that he did to them.  And I points this out

13    because the wrongdoing he did is serious enough without them

14    or others, for whatever motives today, rewriting history or

15    making claims that are not true.

16             With all due respect for the feelings that he has,

17    Mr. Sprague is wrong.  Mr. Abramoff apologized to him and all

18    of his other clients the day he appeared in this courthouse

19    and took the plea of guilty.  He has stated it publicly on

20    occasions.  And while we cannot address the wrongs that these

21    tribes and other Native Americans have had happen to them for

22    centuries, Mr. Abramoff has been trying as hard as a person

23    can to make amends for what he did.

24             And as we pointed out in our sentencing memorandum,

25    Your Honor, none of the improper action with the public

1   officials were justifiable or excusable, even if they were not

2   the stacks of money hidden in the freezer or the renovations

3   on houses and cars and yachts that you read about.  But for

4   those who have reported on Mr. Abramoff and what he did and

5   what he didn't do, sitting out there mostly today, you would

6   never know the difference.  And as now you have read in the

7   sentencing memo and in the amendment to the plea we signed

8   this morning, the rush to judge Jack Abramoff even more

9   harshly caused the miscalculation by more than a million

10  dollars of the taxes he allegedly did admit to evade.

11          Again, Your Honor, he did bad.  He did very bad.

12  But not as bad as people think, like the couple in the

13  restaurant who were talking about him.  And why am I pointing

14  it out?  Please, please, don't mistake the reason.  It is not

15  to run from the wrongs he did, but today, this most critical

16  day in the life of Jack and his family, Jack is here to make

17  an accounting of his actions, those that he did wrong and

18  those that were not.  And in your review, and in the reporting

19  of the day and the talk about this day after it ends, an

20  accurate record is all we have to ensure that the proper

21  punishment is given, and not punishment for a person who does

22  not exist and for a crime that never occurred.

23          On the other side of the equation in sentencing of

24  course are the mitigating factors.  We came before you in a

25  plea, and now we are here in September of '08 with a very

1    different set of rules that govern sentences, than when Jack

2    first asked me to contact the Justice Department to admit his

3    crimes.  And I'll come back to the date of that in a moment

4    because it has been, I think, misstated today in court by one

5    of the victims.

6            But yet, notwithstanding the change in the rules,

7    Judge, the world, as I mentioned earlier, keeps talking about

8    sentencing guidelines and downward departures as if they're

9    sort of still mandatory.  But under the current law, there is

10   much to consider on the other side of the scale, on the other

11   side, than is wrongdoing.  There is the goals of sentencing,

12   Jack's acceptance of responsibility, his cooperation, and the

13   other often overlooked facts about Jack, including the impact

14   of the present sentence and a future sentence on his family.

15   All of these are sentencing factors for the courts in this

16   country to consider, and I'll only briefly touch on each one.

17           We have heard a lot of numbers in court today,

18   Judge; millions in fees, thousands in gifts, hundreds of

19   thousands in taxes.  But I would like to give the Court just a

20   few more numbers.  Twenty-nine, that is the number of months

21   before there was a plea in court when Jack asked me to contact

22   the various law enforcement authorities after his law firm

23   confronted him, to let them know that he had done wrong and

24   wanted to do something.  With this moment, was before there

25   was a deal, before there was an inclining of a deal, just Jack

1   Abramoff's desire to start down a different path.

2          Mr. Sprague, I'm afraid, got it wrong.  He went to

3   the Justice Department.  Indeed, when I looked at my computer

4   today, I saw that the first communication between Ms. Butler

5   and I was in the spring of 2004.

6          The next number is $1 million.  That's the amount

7   that Jack liquidated from the only retirement plans he and his

8   family had, long before he pled guilty in court to begin the

9   restitution process for his victims in Florida.

10          Three thousand.  That's the number of hours Jack

11   Abramoff has worked with various law enforcement agencies over

12   the past three years, to provide important information, very

13   often that which the government did not know and that would

14   have taken them years and countless hours to find out

15   themselves.  One hundred.  That is the number of agents and

16   attorneys from the many different agencies and offices with

17   whom Jack has spent those many hours.

18          Five hundred thousand.  That is the number of

19   documents and e-mails Jack has reviewed, often late at night

20   and on weekends, to cut down on the work of the government, to

21   allow them to act efficiently and effectively.  He searched

22   them, he interpreted them, and they never would have been able

23   to figure it out without him.

24          Thirteen.  That is the number of convictions that

25   has occurred since he came back.  The government has given him

1   full credit for ten; I think this Court knows better the

2   number that have appeared before you, and doesn't even

3   represent all the help he has provided, all the help he's

4   still providing and all the help he will provide in the

5   future.  There are active matters in which he is still

6   assisting the government and he will continue to do so.

7           Fifteen.  That's the number of years, Your Honor,

8   that Congress was talking about overhauling the system of

9   lobbying and ethics that did not occur before Jack decided to

10   come forward and reveal not just what he did, but what the

11   system allows to be done.  He doesn't take credit for the

12   changes that were made, but there can be little doubt that he

13   was the catalyst for them.  And this Court can confirm this by

14   looking at the articles and editorials at the time the reforms

15   were made, calling them the Abramoff ethics rules, or by

16   asking the then public integrity section chief, now federal

17   judge, who called Jack's decision to come forward a watershed

18   moment in the ability to make corruption cases and to address

19   the ills in the system.  And said that they would not have

20   occurred had Jack decided to fight it out and take his

21   chances.

22           And while those numbers that I have set forward do

23   not erase the other ones, they should be placed in the balance

24   of the scales that sit behind your bench, so that a proper

25   sentence can be assessed.

1          Judge, his cooperation has not been easy, nor has it

2     been without costs.  By 2006, when he knew he was going to

3     jail, no one would have begrudged him if he had wanted to

4     spend every last minute he could with his family.  Instead, he

5     continued to make working with the government his full-time

6     job.  And when he entered prison, he continued to cooperate

7     and meet with the government, even when that was risky.  And

8     if there is any question the Court has at sidebar, I can

9     elucidate, but since he has done that, he has been menaced for

10    his cooperation.

11         And even when there were only mandatory guidelines,

12    Your Honor, and only downward departures for cooperation, the

13    numbers I presented a moments ago would have been enough to

14    substantially reduce his sentence.  But now, in the context of

15    the sentencing laws today, this cooperation supports not the

16    40 percent of the government has asked, if you were

17    calculating off of what was then the guideline range that we

18    discussed when I first rose this afternoon, but actually, the

19    60 percent reduction that state prosecutors asked for from the

20    federal judge in Florida, Judge Huck, when they were seeking a

21    reduction, and it was the state prosecutors of his

22    codefendant, Mr. Kidan's sentence for his cooperation there.

23    And certainly, the 50 percent that Judge Huck decided to

24    impose, in looking at what was by any standard important, but

25    not anywhere near as involved cooperation as Jack has given.

1          Let me digress to answer the question the Court

2     asked Ms. Butler, and I'm sure will ask me.  It is not that we

3     are seeking more benefit than either the government thought

4     was reasonable, the government in Florida thought that was

5     reasonable.  Mr. Abramoff was sentenced off the bat because

6     the judge wanted to sentence him to 70 months, using a

7     guideline calculation.  The judge made clear he would

8     entertain a Rule 35 at the appropriate time, that has now been

9     submitted and it is to be heard next Wednesday.

10          THE COURT:  I take it the co-defendant down there,

11    they cut it in half, gave him 35.

12          MR. LOWELL:  Cut it in half.

13          THE COURT:  So that's your -- could be your --

14          MR. LOWELL:  I suspect that, I don't imagine --

15    look, I don't know, and one of the reasons I rise today is to

16    try to get clear that Jack is the guy who did what he did and

17    not the guy that he's been blown up to be.  But having said

18    that, I hope that the judge in Florida will see it clear to do

19    the same.

20          No one ever thought that because the government

21    couldn't get its coordination together, and I like the way the

22    Court and Ms. Butler phrased it, there was no plea agreement

23    between them and them, that we would end up in a consecutive

24    sentence.  I mean, Jack could be a murderer in two different

25    places and get two life sentences.  And they could run

1  concurrently, and dealing with the guidelines, they might be

2  grouped to do that.  In other words, it's not supposed to be

3  that he 70 months in Florida, and then we came here and he got

4  X number of months here; and then we added 70-plus to whatever

5  to get whatever.  It was always the point that under the

6  concept of the guidelines, you get a sentence.  And then some

7  other jurisdiction will look at that sentence and see whether

8  or not the amount you will serve behind bars reasonably

9  reflects the crime and the mitigating factors, such that if

10  you were to give the benefit of reduction and sentence Jack to

11  the amount that we said, whether it's -- I'm bad at math, but

12  if the 60 percent would be four years in jail, then he would

13  serve four years in jail.

14          And then, if the government and the court in Florida

15  assessed that he ought to have 48 months, 35 months, 46

16  months, it would not be 47 plus 43, it would be whatever the

17  highest amount was, and then it would be concurrent.  That was

18  the concept.  I don't know if we said it well enough, but that

19  is certainly the idea that's embodied.

20          So we are asking you to sentence him as you are

21  about to do, looking at what is the appropriate sentence, as I

22  said this afternoon, from the ground up.  It is not, in

23  effect, that he's going to be sentenced to 64, but it's only,

24  in effect, 39, no.  If you were to agree with the government,

25  he would have to account for all the time you give him.

1   Account by being incarcerated, by being in a program, by being

2   in what the Bureau of Prisons allowed.  All of it would have

3   to occur.  It's not as if he's only going to do 39 total

4   months; it's going to be that he'll have to do the amount of

5   time, but get benefit for the fact that he has been in jail

6   for the last better of two years.

7           I need to spend a moment on another factor in the

8   sentencing.  Judge, when you were preparing for this hearing,

9   and we certainly gave you a bunch to do, I have to imagine

10  that you had at least one reaction from the record that I had:

11  How can you understand the paradox of Jack Abramoff?

12          On one hand, the man of his confession and his plea,

13  the cold and calculating man who took advantage of his

14  clients, colleagues, public officials and the tax system.  And

15  on the other, the man who gave away 50 percent of what he

16  made.  The man who financed important community projects from

17  downtown Kosher restaurant, to schools to support religious

18  education in children with learning disabilities.  The man who

19  took in strangers and counseled dozens of kids with problems

20  of their own.  The man who did so many charitable and

21  wonderful acts, usually anonymously to protect the dignity of

22  those he was helping, and the man who stood up against

23  discrimination of people that were both in his workplace and

24  outside.  How can we be talking about the same people?

25          But that's the record.  A modern day Dr. Jekyll and

1  Mr. Hyde, who realizes in words he wrote to you in his letter,

2  better than I could say, that he has learned the very hard way

3  that charitable ends do not justify illegal means.  Yet, when

4  you consider what is fair, even, balanced, proportionate, in

5  line of your sentencing, I hope you will see the other side of

6  Jack, even if he doesn't seem to be able to get pass the

7  caricatures of those out there who would even make fun of the

8  religious hat he wore when he was taking his plea.

9          A good deal more of the reel of Jack's life is

10  contained in the submissions that you've received, and I know

11  you've reviewed them, but let me give you one more number.

12  The over 350 letters that you've received describing so many

13  acts of loving kindness, letters from people of all walks of

14  life; satisfied clients, friends, colleagues, religious

15  leaders, community members, people who experienced Jack's

16  generosity and charity, some of the hundred of children he

17  helped educate, and then the letters of his family.  And when

18  you consider what reduction is merited, or better said, what

19  sentence should be built from the ground up, we ask that these

20  acts too merit the sentence that we have asked for in our

21  papers.

22          Judge, I know you don't need me, of all people, to

23  go through the goals of sentencing, but I wanted to mention

24  just one.  You do this all the time and we provided some

25  information from studies that have been made because by all

1   the measures of sentencing that have been done by all the

2   sentencing commissions and all the people that look at this

3   matter, all the categories they ever measure; the education

4   involved, the type of offense involved, the career, the age,

5   the family, the history, the odds of any recidivism from a

6   complete unknown defendant with all the factors that Jack has

7   is less than one percent.

8           THE COURT:  I don't have any doubt about that,

9   Mr. Lowell.  I'm not concerned about recidivism here.

10          MR. LOWELL:  Then let me turn to another issue.  And

11  to those who argue, as I've heard in court today, that a

12  problem message has to be sent so that others will be

13  deterred, when that's done, Your Honor, consider this as I

14  know you have.  As Jack stands before you today, he is a

15  convicted felon in two jurisdictions; a man who has seen

16  everything he ever dreamed about disintegrate by his own

17  actions; a man who has lost his profession likely forever; a

18  man who never again will be welcomed in the political world he

19  loves so much.  A man who has barely a dollar left with tens

20  of millions of dollars in restitution to pay and will likely

21  never make more than a living again.  A man who has seen the

22  destruction that he has caused his family who are barely

23  holding on both financially and spiritually without him.

24          A man who has seen his name become synonymous with

25  the word corruption.  A man whose faith requires much of him,

1   but could not even properly mourn the passing of his mother

2   because his actions put him behind bars.  And not at least,

3   the man who has already spent two years in jail.

4          Who out there would honestly say that there is

5   another person considering whether the penalties Jack has

6   suffered and will suffer are worth the risks in being

7   dishonest with clients or partners, cutting corners, or taking

8   advantage on their taxes?

9          And one last word about sentencing goals, please,

10  and that is avoiding disparity.  Your Honor has had the task

11  of preceding over and sentencing in all the cases that have

12  resulted from Jack's cooperation, and there will be even more.

13  But in these circumstances, Your Honor, forgive us if we don't

14  apologize for adding to your docket or to your work.  We have

15  seen that you are not hesitant to give credit for real

16  acceptance of responsibility, nor are you slow to admonish

17  those who do not.

18         As I stand here on September 4th, for example,

19  Former Congressman Ney is now completely done with his

20  sentence and halfway house, despite barely able to be uttering

21  the word guilty at the time of his plea, and who at interview

22  just last week said that his prosecution was the result of

23  politics and his strong stand on Iran.  You sentenced him to

24  30 months for being a public official who breached his sworn

25  duty to protect the honest services of government.  So please,

1   Judge, compare his breach and his reluctance to accept

2   responsibility and his lack of cooperation, with the real

3   track record of cooperation, responsibility, historic

4   cooperation and acts of contrition the record has shown Jack

5   has done to date.

6            THE COURT:  I don't assume, Mr. Lowell, that he had

7   any cooperation to give.  I mean, I'm not in a position to

8   know whether he refused to.  I gave him a guideline sentence

9   consistent -- higher than asked for by the government, but his

10  guidelines were around 27 to 33 months, I believe.

11           MR. LOWELL:  I understand his plea, Judge.

12           THE COURT:  So proportionality is reflected in the

13  guidelines.  And he got no credit for cooperation, but nor do

14  I know whether he stonewalled.

15           MR. LOWELL:  And I didn't suggest otherwise.

16           I wanted to point two things out.  As the public

17  official, the person literally is sworn with the flag and the

18  Bible to support and defend and to protect the honest services

19  of government; his breach was not a short one.  In terms of

20  ready acceptance of responsibility for which he got the

21  benefit of having those guidelines in the range about which

22  you speak, as I said, I'll stand by what I said in terms of

23  his reluctance to say the word guilty and his interview of

24  last week.  And I'm not suggesting that Jack's wrongs aren't

25  worse; I'm suggesting that there are some benchmarks that you

1    have laid down that have helped the government and we to come

2    forward to make the requests that we've made, and that we

3    certainly took into consideration before we gave you our

4    recommendation.

5         And our recommendation was that in the

6    proportionality that have occurred and what has already been

7    done and what would be, we saw that sentences that looked

8    between the three and four year mark, the 43 months that 60

9    percent would get off of the guidelines that we were

10   calculating, that might be more if you take the criminal

11   history that you have done.  But a sentence in the range

12   better than the government has articulated, a sentence that

13   was more reflecting of the proportional difference, a sentence

14   even as Your Honor pointed out, that if let's say in the

15   reduction in Florida, the sentence were to be reduced, the

16   sentence that either the government has asked for or that we

17   are asking for is greater than the sentence in Florida, at

18   least in terms of the amount of time sentenced.

19        In terms of whether they should be concurrent, I

20   don't think anybody, not the government, not we, nor anybody

21   thought that there was the remotest possibility that there

22   should be consecutive amount of time.  The amount of time he

23   will have spent will be the highest amount of anybody who came

24   forward in this investigation, period.  Maybe his wrongs

25   deserve that, but how much more is the question.

1          And we wouldn't have had this complexity that has

2     taken you so much time and has caused me so much angst in

3     trying to describe, had we had a plea that was in one place at

4     one time with one sentence and one proceeding.  We would have

5     been able to work through the numbers of lost and assistance

6     and contemplation of who was the most involved in the offense,

7     and we would have presented something that made this less

8     difficult.  We didn't.  I tried very hard.  There were two

9     jurisdictions involved, and here we are.

10          The final point, Your Honor, to address in the

11     sentencing factors is the impact on a person's family.  It is

12     a factor that even when there were mandatory guidelines, were

13     one of the very few out there that would allow a Court to

14     substantially deviate and reduce.  Last time, the family

15     sought to express themselves, they were ridiculed and taunted

16     and embarrassed to the point of having to deny their own name

17     when asked, rather than to bare the burden of being seen as a,

18     quote, Abramoff.  You can only imagine the pain to them and to

19     Jack when that happened.  They've had TV cameras parked on

20     their lawn, people following them to school and a lot more.

21     They have asked me to say no more, and I won't.

22          THE COURT:  I have read the letters from the family

23     members.

24          MR. LOWELL:  And there's even more, Judge.  And I

25     was only going to say that if there was a means to talk about

1    what's going on so that you could assess it in the sentencing

2    factor, and if there was a way to protect their privacy, I

3    would.

4           But suffice it to say that even what's in the record

5    now, and he has no one to blame but himself, the truth is that

6    a sentence to date and any additional incarceration, bare down

7    hardest on his wife and his five children.  They were and are

8    a very traditional, observant family with each playing that

9    hard role.  Jack's actions has put them all upside down in

10   ways which we alluded to on our papers.  The record is clear

11   enough, even if I didn't say more, to merit the consideration

12   that we have asked.

13          In conclusion, the timing of the sentence holds very

14   special significance to Jack.  As you know, he and millions

15   are about to begin the holiest period of the year, these are

16   called the Days of Awe.  And they lead up to the day of

17   atonement where every Jewish person comes forward to admit his

18   or her shortcomings, to admit that he or she has sinned and to

19   seek repentance both from heaven and from those on earth.  And

20   I know because I've spent such time with him, it's been much

21   on his mind.

22          Over four years ago, Jack called me and he set out

23   on a path of such admission and repentance.  For him, it is

24   and will continue to be an arduous journey.  Given his crimes,

25   it should not be too short a journey.  But given all that he's

1   done, it should not be too long either.  Like many things,

2   Judge, in life, the right balance is very hard to find.  But

3   on the basis of the entire record, the whole reel of film, we

4   ask that in keeping with your practice, your sentence to him

5   to no more than the 43 months in jail, supervised release on

6   the terms which he and the Justice Department have agreed, and

7   that is proportionate to the offense, the cooperation, the

8   restitution.

9        Nobody is better off for Jack to continue to wait

10   for the day that he can come back and help fix and help repair

11   and help pay back the people he has harmed, and to save his

12   family.  A better and a wiser, and a man who has known Jack

13   for over 20 years, Rabbi Yitzchok Breitowitz wrote you, and

14   described Jack's sincere remorse.  And he summed up in a few

15   lines what I have been struggling with over the last however

16   many minutes.  And he says it better, so let me conclude with

17   his.

18        The Jack Abramoff I know, like all of us, has flaws

19   to be sure, but he is a person of good motivation and a

20   generous heart, a man of vision and commitment.  An individual

21   who genuinely wanted to make a difference for the better in

22   his community in the lives of others, who tragically lost his

23   bearing.

24        Like Rabbi Breitowitz, the hundreds of people who

25   have written you, and Jack himself, I ask this Court to render

1   a sentence that addresses his misconduct, but also takes into

2   account so many of the factors that we have put forward, so

3   that he can start repaying those he has harmed, and he can

4   start healing his family as soon as possible.  Thank you for

5   your time.

6            THE COURT:  Thank you.

7            Mr. Abramoff, you are welcome to address the Court

8   at this time.

9            THE DEFENDANT:  Thank you, Your Honor.

10           Your Honor, I come before you today as a broken man.

11  I'm not the same person who happily and arrogantly engaged in

12  a lifestyle of political corruption and business corruption

13  and the rest.  I've been thinking for years at this point

14  about what to say to you today.  And I've written about 15

15  versions of what to say, and I even have notes here.  And I

16  don't think I can get through them too well.

17           So if it's okay, if I could just speak for a few

18  minutes from my heart and just tell you how horrible I feel

19  that I've had to bring together in the storm today, my friends

20  and family because of such a situation.  And I'm a -- for what

21  I did that was wrong, not only to my clients who I loved and

22  my partners, my friends, and especially my family, but to all

23  those who I have caused suffering to.

24           I have had many hundreds of sleepless nights since

25  I've come to acknowledge and recognize what I did over the

1    course of my misconduct.  And this recognition has been

2    weighing heavily on me, one that led me to approach the

3    Justice Department and the officials to admit what I did was

4    wrong, and to agree to help in any way I could to make it

5    right.

6           And I want more than life itself to try to do what I

7    can to make things right.  I know that I may not have enough

8    years to make things right and I certainly may not have enough

9    time to ever get my name or reputation back.  But at least I

10   want to try.

11          And the pain for me and my family has been intense

12   and incomprehensible.  I regret in every fiber of my being

13   what I put my beloved children and my wife and my parents and

14   my mother's blessed memory through, let alone those that I

15   have caused harm to.  And I wish with all my power that I

16   could undo what I did do, those things that I did do that were

17   wrong.

18          I've had time to think about how did it come to

19   this.  How did it come to this?  I certainly was given every

20   advantage growing up.  I had what I thought were the right

21   values and aims and goals.

22          And perhaps it was out of an arrogant self

23   righteousness, wanting the things I thought were right to

24   happen, and slowly losing bearing, losing track of the means

25   to make those things happen and allowing corruption and bad

1    behavior and things that ran right to the core -- against the

2    core of what I did believe to take over all in an effort to

3    believe that the ends would justify the means, and they don't.

4    And I know they don't.  And I regret, I will regret for the

5    final days of my life.

6              I have fallen into an abyss, Your Honor, I don't

7    quite know how to get out.  My name is the butt of a joke, the

8    source of laughs, the title of scandals, the synonym of

9    perfidy.  And I'm not sure that that will ever change.

10             I can only hope that I can try to make any kind of

11   restitution possible for the rest of the days of my life to

12   those that I have victimized; to heal my beloved family; to

13   try to spend whatever time I'm given by you to do whatever

14   good I can in prison with my fellow inmates, and hope that

15   this horrible nightmare ends at some point.

16             And I beg Your Honor to consider all of the things

17   that you've heard today in rendering your judgment as to how

18   much longer I need to be away from my family and my community

19   and this society.  I appreciate the time you've had to spent

20   on this case and all the cases that relate to it.  And I'm

21   sorry, so sorry that I put everyone through all this.  Thank

22   you, Your Honor.

23             THE COURT:  All right.  Mr. Abramoff, if you would

24   remain standing, the Court is ready to proceed.

25             Mr. Lowell?

```
 1              I think Mr. Lowell has said it right when he said
 2      that this is a very challenging case.  It's hard to find the
 3      right balance.  Obviously, I understand full well that you
 4      have inflicted pain on yourself, on others, your children are
 5      paying the price for your sins.  I've read hundreds of
 6      letters, and they present an individual which -- an individual
 7      who has done a lot of good.  You have helped friends, family,
 8      your community; you have been generous in many ways.
 9              You, like many of the other people who have been
10      caught up in what has to be described as a wide ranging
11      scandal, cannot be easily characterized.  Your council put it
12      in the sentencing memorandum rather aptly, and he said on one
13      hand a great father, husband, son, friend, community activist,
14      observant religious man; and on the other, a man who would
15      mislead and defraud partners and clients and commit the other
16      serious crimes to which he has pled guilty.
17              And those serious crimes are serious.  They involve
18      the corruption of public officials.  Now, I understand that
19      these people are willing participants, don't get me wrong.
20      But it certainly, you, the extent of your activities so far
21      exceeded anybody else in a way who has appeared in front of me
22      that I have, in attempting to think about this case, tried to
23      keep in mind some proportionality and to understand where you
24      fit in the whole matter.  But it would be hard to say that you
25      are not certainly the center of activity so far, as far as I
```

1    understand.

2         You have served already, I understand, 22 months in

3    prison for the Florida offense.  I'm not quite clear on why it

4    is that the jurisdictions, the United States government can't

5    work out a situation where we don't have this conflict.  But

6    the judge there sentenced you to 70 months immediately, and he

7    expects to entertain a Rule 35 motion, which I understand will

8    be taken up next week.  And effectively, that sentence will

9    now be superseded by my sentence really because any sentence

10   here will not be -- is different and separate from the one in

11   Florida, and Florida will be running concurrently with my

12   sentence.

13        So that, I really have thought long and hard about

14   this, and I'm sentencing today as I believe I should be with

15   respect to the conduct to which you pled guilty before me.

16   You entered pleas to three counts; they're serious ones.  One,

17   conspiracy to defraud the United States.  Second count, to --

18   services, mail fraud, and the last of tax evasion.

19        Obviously, we've now come to learn that the tax

20   evasion certainly is nowhere near what was originally thought

21   to be.  But these do involve serious offenses.  And in some

22   ways, I would say far more serious than any conduct in

23   Florida.  This has far greater stretches, it goes far greater

24   into the government, both executive and legislative branch.

25        In determining a sentence, the Court must consider,

1    and we all know this is the law, I begin with the applicable

2    guideline range which I have determined to be 121 months with

3    an offense level of 31.

4           The guidelines are advisory, so the Court goes on to

5    consider the nature and circumstances of the offense, the

6    history and characteristics of the defendant, and the need for

7    the sentence to reflect the seriousness of the offense,

8    promote respect for the law, and provide just punishment, and

9    to afford adequate deterrence and to protect the public.

10          I don't think anyone here will dispute that you

11   present the opportunity or the possibility of recidivism, that

12   you need correctional treatment, or that I have no doubt

13   you're repentant.  It's clear to me from all that you've done

14   and said.

15          Rather, this is not an issue of rehabilitation, this

16   is an issue of promoting respect for the law and deterrence.

17   And as I said, the starting point is the guidelines.  There

18   has been a suggestion I should downwardly depart basically to

19   subtract the amount of time that's served in Florida, so that

20   I would impose, the government is asking for a sentence of

21   basically 39 months.

22          I find that there's -- really, that doesn't serve

23   any particular purpose, other than I understand that there has

24   been an agreement here, the government would seek concurrent

25   sentences.  But the guidelines tell me that I am to ensure a

 1   reasonable incremental punishment for the instant offense of

 2   conviction.  That is 5G1.3.  That is my job, and I am to do is

 3   consistent with the factors set forth in the statute, which

 4   I've just alluded to.

 5          I realize that the individuals from the Indian

 6   tribes would prefer that I not recognize the cooperation, but

 7   in my view, the government, not only depends on cooperation,

 8   but you have given enormous, extensive cooperation.  And that

 9   is what motivates me to reduce substantially any sentence that

10   I would impose here.

11          You are entitled to a departure under 5K1, and I

12   will grant the substantial one.  Your cooperation has been set

13   forth in the public filings, it's also been set forth in

14   sealed filings.  We know that you've helped to obtain the

15   conviction and plea from Congressman Ney, at least five

16   high-level congressional staffers, one former Department of

17   Justice employee, and a Senate confirmed executive branch

18   official from the Department of Interior, as well as people

19   outside the government.  And as I've noted, there could we'll

20   be other individuals, including public officials, who may well

21   be prosecuted as a result of your cooperation.

22          Balanced against this, and this is what Mr. Lowell

23   said, this is the problem:  How do you balance this?  I have

24   to consider a host of considerations, including the nature and

25   seriousness of the offenses here.  This conduct spanned many

1   years, going back to perhaps as early as 1997.

2         And it was not an aberratio, it was a consistent

3   course of corrupt conduct in the sense it got much worse over

4   time.  And there were not just one victim, there were a series

5   of victims.  Certainly, there is evidence that you

6   accomplished a lot for some tribes, but at the same time, you

7   did not deal with them honestly.  And you did not deal

8   honestly with your former law firm or the IRS.

9         But most importantly, what motivates me throughout

10  this is that I feel that the true victims here are the public,

11  members of public.  You've impacted seriously the public

12  confidence in the integrity of the government.

13        And your fraudulent activities were really quite

14  multifaceted.  Your clients weren't informed that you were

15  making -- that Mr. Scanlon and his organization were making

16  payments to you.  You directed clients to make contributions

17  to a nonprofit that you ran.

18        And I have no doubt the nonprofit did good things,

19  but you also, as a result of having clients pay the nonprofit,

20  you diverted funds from a law firm.  Your persuaded clients to

21  contribute to this nonprofit, and then used some of that money

22  to make payments to spouses of public officials for jobs or

23  for not doing any work, to pay expenses for your lobbying

24  efforts.  This included these golf trips.  So to say that

25  you've done charity works is true, but you've also funneled

1    money through that nonprofit to further your lobbying work and

2    your corrupt activities.

3            But really, to me the most egregious part of it was

4    your corrupt relationships that you developed through these

5    lobbying efforts.  I'm not so naive as to believe that

6    lobbyists don't provide many things of value to public

7    officials, and I realize that that has prompted reform.

8            But here we do have situations where public

9    officials, at least one congressman and staffers, they

10   provided official actions on behalf of your clients.  Your

11   clients benefited because you had a corrupt relationship with

12   them by lavishing gifts, whether they be gifts for meals,

13   tickets to sports events, golfing junkets or payments to

14   people's spouses for work or not for work.

15           You were able to trade on inside information from

16   executive branch officials that benefited your clients.  And

17   in exchange, you had people make gifts, your clients, gifts or

18   contributions to people, either campaign contributions or to

19   people associated with government officials.

20           These activities corrupted the political process and

21   deprived the public of the honest services of their own public

22   officials, both in the legislature and executive branch.  And

23   again, I recognize that the public officials obviously are to

24   blame just like you.  And so far the one congressman has been

25   sentenced a higher recommendation than the government because

1    I do think that obviously the publish officials have violated

2    their public trust.

3            So the Court has given a great deal of consideration

4    to the sentence, and it has spent a long time reading the very

5    excellent submissions; your letters, the letters of others in

6    the government's submissions.

7            I am intending to sentence on Counts One, Two and

8    Three to 48 months, to run concurrently with each other and

9    with any sentence imposed in the state of Florida.  This gives

10   you a significant amount of credit for your cooperation.  We

11   are talking in the neighborhood of 60 percent off of what I've

12   calculated the low end of the guidelines.  I recognize your

13   cooperation as being essential to the government's efforts,

14   and I would never have come downward, but for the government's

15   strong request for me to recognize this.

16           You will essentially serve just shy of six years

17   total on all sentences, and I view that as fair.  I think that

18   that's a substantial amount of time, but at the same time,

19   there has been serious wrongs both here and in Florida.  And I

20   cannot justify thinking that the Florida sentence in some

21   fashion is not anywhere near as serious as the matter here.

22           So I look at it as a total picture, what I believe

23   will be the ultimate result here is something shy of six

24   years, minus good-time credit.  And I'm doing this because I

25   do believe that this is necessary to promote respect for the

1   law and to act as a deterrent.

2          The Court also is required by law to give you a

3   $300 -- impose $300 special assessment that's paid out of

4   prison funds.  The Court is not imposing a fine.  You do not

5   have the financial ability to pay a fine, plus the restitution

6   amounts here are astronomical.

7          Put aside what's owed down in Florida, there's a

8   restitution order that has been prepared for the Court, which

9   I will sign in hopes to make this clear and set it forth as an

10   order to be appended to the judgment and commitment.  It

11   provides -- the amount of loss is recognizes as $23,134,695,

12   but that -- there is of that, $15,673,232 still remains due

13   and owing to the victims.  So we're talking restitution as a

14   practical matter of over $15 million.

15          There will be a period of supervised release when

16   you are released from incarceration.  It will run concurrent

17   on all counts and concurrent with Florida.  The restitution

18   amount also provides it will be concurrent with the

19   restitution ordered in Florida.

20          As part of your supervised release, you will also by

21   law be required to provide a DNA, and you must make available,

22   as requested by probation, any income tax returns, financial

23   information.  You may not incur new lines of credit or

24   consummate any financial transactions, including securing self

25   employment, without prior approval of the probation office.

1    You are excused from any drug testing requirements during the

2    three-year period of supervised release.

3         I know that this is not an easy time for your

4    family.  It would be a lot easier for everybody if no one had

5    to confront all these problems.

6         You have a right to appeal, sir.  You have ten days

7    to enter an appeal.  If you want -- from the time that

8    judgment is entered.  If you want your counsel to appeal the

9    sentence, you must inform him to do so and he will do so

10   within the ten-day limit.

11        Is there anything further, Mr. Lowell?

12        MR. LOWELL:  Just a clarification, Judge.  So, the

13   sentence on Counts One, Two and Three are in the District of

14   Columbia, 48 months?

15        THE COURT:  Yes, concurrent with each other and

16   concurrent with whatever his fate in Florida.

17        MR. LOWELL:  And it will be concurrent then with the

18   state in Florida?

19        THE COURT:  Is concurrent as of today in Florida.

20        MR. LOWELL:  So just to be clear, you are not, but I

21   suspect the Bureau of Prisons' issue, yet ruling on what, if

22   any, credit he gets for anything that happened in Florida yet?

23        THE COURT:  I am ruling he is not on my sentence

24   getting credit.  That would be under the guidelines, that's a

25   downward departure, and I do not think that it is necessary.

1    I have fashioned a sentence here to reflect what I believe is

2    the incremental just sentence for the activities before me.

3           So the Bureau of Prisons, the only way under the

4    5G1.3 to accomplish what you're saying is a downward

5    departure, similar to what the government has asked for.

6    That's the way credit is given.  I do not believe --

7    basically, the sentence I've given is somewhat more than the

8    government has requested, but not excessively more by any

9    means.

10           Anything further for the government?

11           MS. BUTLER:  No, Your Honor.

12           MR. LOWELL:  Not at this time, Your Honor.

13           THE COURT:  Okay.  Thank you very much for your

14    patience.

15           (Thereupon, the proceedings were adjourned at

16    4:08 p.m.)

17

18

19

20

21

22

23

24

25

1

2                    <u>CERTIFICATE OF REPORTER</u>

3

4          I, Lisa Walker Griffith, certify that the foregoing

5   is a correct transcript from the record of proceedings in the

6   above-entitled matter.

7

8

9

10  _____      _____

    Lisa Walker Griffith, RPR                    Date
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25