UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal No. 06-001 (ESH) |
| ) | |
| JACK A. ABRAMOFF, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**UNITED STATES' MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR RETURN OF SEIZED TAX REFUND**

Comes now the United States, through counsel, the United States Attorney for the District of Columbia, respectfully submitting this memorandum in opposition to Defendant's Motion for Return of Seized Tax Refund in Order to Pay Outstanding State Taxes and Accounting and Legal Fees. Notwithstanding the discussions between the Court and Counsel at the time of sentencing, Defendant's basis for seeking these funds finds little, if any, support in the actual terms of the restitution order signed by the Court and filed on September 4, 2008 [#43]. Moreover, nowhere in the transcript submitted by the Defendant can he find or cite statements by government counsel committing to relinquish monies seized by the United States in satisfaction of his multi-million dollar restitution obligation for payment of the Defendant's bills. Further, it is well-settled that under the Treasury Offset Program ("TOP") – an administrative debt collection program serving the federal government and the States, the United States Department of the Treasury is authorized to collect non-tax debt by withholding funds paid out by other federal agencies under the Debt Collection Improvement Act of 1982. *See* 31 U.S.C. § 3716(a); 31 C.F.R. § 285.5. The Defendant thus cannot challenge this administrative process without first exhausting administrative remedies. *See United States v. Beulke*, 892

F. Supp. 2d 1176, 1187 (D.S.D. 2012) (After referral to TOP, Defendant must exhaust administrative remedies before seeking redress in court.).

## BACKGROUND

On September 4, 2008, following his January 3, 2006 guilty plea to conspiracy, honest services fraud, and tax evasion charges, this Court sentenced Former lobbyist Jack A. Abramoff to serve 48 months in prison and to pay $23,134,695.00 in restitution to the victim Indian tribes. This Court also sentenced Abramoff, 49, to three years of supervised release following his imprisonment. Abramoff's guilty plea consummated a plea agreement in which he admitted that, from 1994 through early 2004, while working for two Washington, D.C. law firms, he and associate Michael Scanlon conspired to defraud four Native American Indian tribes that either operated or were interested in operating gaming casinos.

During this time, Abramoff lobbied public officials in the federal government, principally members of Congress and their staffs, and also sought to further his clients' interests through grassroots work, public relations services, and election campaign support. Abramoff admitted that he received undisclosed kickbacks from former lobbyist Michael Scanlon, who owned and operated Capitol Campaign Strategies, LLC (CCS). The four Native American Indian tribes—located in Mississippi, Louisiana, Texas, and Michigan—hired Abramoff through his employers to provide advice on how best to limit competing casinos or, in one instance, to re-open a casino that had been closed.

According to the plea agreement, once Abramoff had established a relationship with the tribal clients, he recommended Scanlon and CCS as the primary provider of grassroots work and public relations services. As Abramoff and Scanlon knew, Abramoff's clients relied on his recommendation because of his expertise in these matters. As part of the scheme described in

the criminal information and plea agreement, Abramoff and Scanlon charged fees incorporating huge profit margins and then split the net profits through a secret kickback arrangement. As both men eventually admitted, the secrecy of the kickback arrangement was crucial to the success of their scheme, and Scanlon and Abramoff concealed the arrangement from the tribal clients. In addition, Abramoff admitted to defrauding other clients by making affirmative false statements regarding various aspects of his lobbying and grassroots work. As stipulated in the agreement, through Abramoff's scheme with Scanlon as well as other fraudulent activity with others apart from Scanlon, Abramoff received more than $23 million in undisclosed criminal kickbacks and other fraudulently obtained funds.

Abramoff also admitted that, as part of the criminal conspiracy, and as one means of accomplishing results for their clients, he and others engaged in a pattern of corruptly providing things of value to public officials—including trips, campaign contributions, meals and entertainment—with the intent of influencing acts by the public officials for the benefit of Abramoff and his clients. For example, Abramoff admitted as part of his plea that he and others provided things of value to public officials and members of his staff, including, but not limited to, a lavish trip to Scotland to play golf on world-famous courses, tickets to sporting events and other entertainment, regular meals at Abramoff's upscale restaurant, and campaign contributions. At the same time, and in exchange for these things of value, Abramoff sought and received the public officials' agreements to perform directly and through others a series of official acts, including but not limited to, agreements to support and pass legislation, and agreements to place statements in the Congressional Record.

Count two of the criminal information charged Abramoff with aiding and abetting honest services fraud stemming from his making an arrangement with a Texas Indian tribe to solicit

another Indian tribe to mail a $50,000 payment, in order to assist Abramoff in paying for the golf trip he had offered and provided to public officials.

Count three of the criminal information charged Abramoff with tax evasion that stemmed largely from Abramoff's failure to report and pay taxes on income payments that he had attempted to hide by causing them to be sent instead to certain non-profit entities that he controlled.  As part of his plea, Abramoff admitted that he used the unreported income for his personal benefit and to carry out the fraud and corruption schemes described in the plea agreement and information.  Abramoff also admitted that, in order to carry out his tax evasion, he caused others to prepare false invoices and false entries in books and records of certain non-profit entities, and he caused them to file false reports with the Internal Revenue Service (IRS).  Abramoff admitted in his plea that through this conduct, he attempted to evade payment of approximately $690,000 in federal income tax from 2001 to 2003.

Following his guilty plea in November 2005 to a one-count information charging him with conspiring with others to commit bribery, mail and wire fraud, and honest services fraud, this Court sentenced Michael P.S. Scanlon, 40, on February 11, 2011, to serve 20 months in prison, to pay $20,191,537.00, jointly and severally with Abramoff, in restitution to his victims, and to complete three years of supervised release following his prison term, as well as 300 hours of community service.  According to court documents, Scanlon admitted that from March 2000 through 2001, he and Abramoff conspired to defraud the four Native American Indian tribes in a scheme referred to as "Gimme Five."  The investigation into this scheme and associated criminal conduct resulted in twenty-one separate lobbyists and public officials being charged, eighteen of whom pleaded guilty.[1]

---

[1]   Those charged and convicted in the investigation include: Tony C. Rudy, a former lobbyist and

By motion in his criminal case, Defendant Abramoff seeks the return of $448,135.02 of a tax refund from the Internal Revenue Service (IRS), which was seized by the Treasury Department as part of the TOP program.  He seeks this money, reportedly, to pay his Maryland State income taxes, and even higher bills from accountants and lawyers.  No allegations have been made, and no information supports the notion, that any of the persons or entities hoping to receive the benefit of these payments from Defendant Abramoff has otherwise initiated any formal action or effort to collect the monies they are allegedly owed by him.  So, the device of this motion would serve as a kind of super collection procedure that would eclipse all other creditors and all other legal devices and procedures available under the law.  Juxtaposed against the national federal statutory foundations of the TOP program, the viability of the Defendant's motion strains both logic and reason.

## The Mandatory Victims Restitution Act

Under the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A, restitution is mandatory for certain crimes.  *See* 18 U.S.C. § 3663A (a)(1), (c)(1)(A)(ii).  As explained by the First Circuit in *United States v. Witham*, 648 F.3d 40 (1st Cir. 2011), the MVRA

---

congressional staffer; Mark D. Zachares, a former aide to Congressman Don Young (Alaska); Robert W. Ney, a former Ohio Congressman; John C. Albaugh, a former Chief of Staff to former Congressman Ernest Istook (Oklahoma); Neil Volz, a former lobbyist and Chief of Staff to Congressman Ney; William Heaton, former Chief of Staff to Ohio Congressman Robert Ney; James Hirni, former staffer to former Senator Tim Hutchinson (Arkansas); Italia Federici, president of the Council of Republicans for Environmental Advocacy; James Steven Griles, the former Deputy Secretary of the U.S. Department of the Interior; Roger Stillwell, a former U.S. Department of the Interior staffer; Ann Copland, a former aide to Senator Thad Cochran (Mississippi); Horace Cooper, a former Chief of Staff to former House Majority Leader Dick Armey; Robert E. Coughlin II, a former deputy in the Justice Department's Office of Intergovernmental and Public Liaison; David Safavian, the Chief of Staff to the Administrator of the General Services Administration and, later, the Administrator of the Office of Federal Procurement Policy in the Office of Management and Budget, Executive Office of the President, was convicted at trial of obstruction of justice and three counts of making false statements, resulting in a sentence of one year in prison, and two years of supervised release; Kevin A. Ring, former staffer to former Congressman John Doolittle (California); Fraser Verrusio, a former aide to Congressman Don Young (Alaska); Adam Kidan, a former Abramoff business partner; Robert Jared Carpenter, Vice-President of the Council of Republicans for Environmental Advocacy (CREA).

"dramatically changed the statutory restitution scheme by mandating restitution to all victims and enhancing collection and enforcement rules." *Witham*, 648 F.3d at 45.

For mandatory restitution cases, "[i]n each order of restitution, the court *shall* order restitution to each victim *in the full amount of each victim's losses* as determined by the court and without consideration of the economic circumstances of the defendant. 18 U.S.C. § 3664(f)(1)(A) (emphasis added); *see also United States v. Monzel*, 641 F.3d 528, 530-532 (D.C. Cir.) (general description of the requirements of § 3664), *cert. denied*, 132 S.Ct. 756 (2011)*;* 18 U.S.C. § 3663A(d) (providing that an order of restitution under 18 U.S.C. § 3663A "*shall be issued* and enforced in accordance with section 3664") (emphasis added).

A sentence that imposes an order of restitution is a final judgment. *See* 18 U.S.C. § 3664; *see also United States v. Cohen*, 459 F.3d 490, 496 (4th Cir. 2006) (restitution is "part of the criminal defendant's sentence."). The entry of a restitution order as part of a criminal judgment vests in the United States a property right in the defendant's assets, such that "an order of restitution . . . is a lien in favor of the United States" on all of the defendant's property and rights to property. 18 U.S.C. § 3613(c).[1] More importantly, "[i]f a person obligated to provide restitution, . . . receives substantial resources from *any source*, including inheritance, settlement . . . *during a period of incarceration*, such person *shall be required* to apply the value of such resources to any restitution or fines still owed." 18 U.S.C. § 3664(n) (emphasis added).

In addition, victims may obtain an abstract of judgment, record a criminal restitution judgment as a lien and enforce the criminal judgment as if it were a state court judgment. *See* 18 U.S.C. § 3664(m)(1)(B); *see also United States v. Perry*, 360 F.3d 519 (6th Cir. 2004) (holding that a victim had standing under the MVRA and Article III to intervene and appeal a district

---

[1] While this section originally applied only to fines, other provisions, 18 U.S.C. §§ 3613(f) and 3664(m)(1)(A)(i), make this section applicable now to restitution orders.

6


court's decision that she was entitled only to a *pro rata* share of the restitution amount ordered); *United States v. Hawkins*, 392 F. Supp. 2d 757, 759 (W.D. Va. 2005) ("Under the [MVRA], a victim named in a restitution order has an independent right to enforce the restitution ...."); *United States v. James*, 312 F. Supp.2d 802, 807 (E.D. Va. 2004) ("18 U.S.C. § 3664(m) gives ... the victim named in a restitution judgment the power to enforce a restitution judgment."); *National Council On Compensation Insurance, Inc., v. Caro & Graifman, P.C.*, 2008 WL 450413, Slip Op. at *28 (D. Conn., Feb. 15, 2008) (finding that a defendant had fraudulently conveyed assets to his former attorneys to evade the court's restitution order in a civil action brought by victims to collect restitution).  It should also be noted that the Crime Victims Rights Act provides that crime victims have a right to full and timely restitution.  *See* 18 U.S.C. § 3771.[2]

## ARGUMENT

### I.   DEFENDANT CANNOT CHALLENGE THE ADMINISTRATIVE OFFSET OF HER TAX REFUND IN HIS CRIMINAL CASE

#### A.  The United States' Collection of the Tax Refund is Authorized by Statute

Defendant challenges whether the Treasury Department's seizure of his federal tax refund is consistent with the Court's Judgment and Commitment Order and Restitution Order. "The practice of withholding federal payment in satisfaction of a debt is known as administrative offset." *Reeves v. Astrue*, 526 F.3d 732, 738 n. 3 (11th Cir. 2008).  Here, inconsistent with the Defendant's inquiry, he is actually challenging an administrative offset of his federal tax refund. He seems to believe that the federal government should continue to pay him all of the monies it owes him without offsetting any monies he owes the federal government for the millions of dollars in harm to which he admittedly contributed.  Unfortunately, this case is an improper original forum for the Defendant's challenge to the administrative process.

---

[2] The Crime Victims Rights Act is Title I of the Justice for All Act of 2004.

The Debt Collection Improvement Act of 1982, 31 U.S.C. §§ 3701 *et seq.*, authorizes the United States Department of the Treasury ("Treasury Department") "to collect non-tax debts by withholding funds paid out by other federal agencies." *See* 31 U.S.C. § 3716(a); 31 C.F.R. § 285.5. The Treasury Offset Program ("TOP") is a debt collection program administered by the Financial Management Service Bureau of the Treasury Department to collect debts owed to the federal government and the States. *See* 26 U.S.C. § 6402(d) (debts to government agencies). Under the TOP, federal agencies with a claim against a debtor may collect the debt by administrative offset, after notifying the debtor that the debt is subject to administrative offset and providing an opportunity to dispute the debt or make arrangements to pay it. *See* 31 C.F.R. § 3716(a), (c)(6). *See Walker v. United States*, No. 3:13-CV-0205, 2014 WL 2505669, Slip op. at *9 (M.D. Pa. June 3, 2014) (Protections available under TOP.).

The creditor agency must certify to Treasury that the debt is eligible for collection by offset and that all due process protections have been met. *See* 31 C.F.R. § 285.5(d)(3)(ii), (d)(6). The relevant regulations for the U.S. Department of Justice are 28 C.F.R. § 11.4 (implementing section 3716 for purposes of debt collection), §11.9 (administrative offset), and §§ 11.10-11.12 (TOP for collection of debts). If properly certified by the agency, the Treasury Department must administratively offset the debt. *See* 31 U.S.C. § 3716(c)(1)(A). Even such federal payments as Social Security benefits are subject to administrative offset. *See Lockhart v. United States*, 546 U.S. 142 (2005); *see also Astrue v. Ratliff*, 560 U.S. 586, 592-593 (2010) (holding that attorney fee awards are subject to offset to satisfy pre-existing debt to Government); 31 C.F.R. § 285.5(e) (all federal payments are eligible for offset unless those payments are explicitly exempted from offset by law); 31 C.F.R. § 285.2 (offset for federal tax refund); *see also Guillermety v. Secretary*

*of Educ. of the United States*, 241 F. Supp. 2d 727, 747 (E.D. Mich. 2002) (offset of federal tax refund for federal student loan debt).

The FDCPA provides that the availability of proceedings, such as garnishment proceedings, as a mechanism for collecting debts "shall not be construed to curtail or limit the right of the United States under any other Federal law or any State law to collect any fine, penalty, assessment, restitution, or forfeiture arising in a criminal case." 28 U.S.C. § 3003(b)(2). The United States is authorized to enforce a judgment imposing a fine or restitution "in accordance with the practices and procedures for the enforcement of a civil judgment under Federal law or State law." 18 U.S.C. § 3613(a), (f). The TOP is an administrative practice and procedure under federal law that, by its terms, is available as a means to collect debts owed to the United States, including criminal restitution. *See United States v. Messervey*, 182 Fed. Appx. 318, 320 (2006) (It is well-settled that the term "debt" includes the amount due for restitution in criminal cases.).

### B. Defendant Has Failed To Exhaust Administrative Remedies

More importantly, because the offset process is an administrative process, Defendant must, in the first instance, seek administrative relief as prescribed by statute and implementing regulations.[2] *See United States v. Mayer*, 2010 WL 4916561, Slip op. at *1-2 (D.N.H., Dec. 3, 2010) (holding that relief from an administrative offset is available in the first instance only from the collecting agency). "Judicial review of administrative processes and decisions is available, of course, but it is limited, and to obtain relief defendant would generally be required [under the Administrative Procedure Act] to show arbitrary, capricious, or plainly unlawful conduct on the

---

[2] The United States Supreme Court has held that the United States can exercise common law offset just like any other creditor. *United States v. Munsey Trust*, 332 U.S. 234 (1947). For the right to offset to arise, there simply must be mutuality of parties and maturity of the debt. Both of these elements are present in this case.

part of the administrative decision-makers.  *Id*.; *see also United States v. Harrison*, 2007 WL 2332662, at *2 (N.D. Tex. Aug. 16, 2007) (holding that restitution debtor challenging the government's ability to collect the debt through offset must present those arguments "to the Department of Justice, not to the court."). "To the extent the court even has the authority to interfere with the government's ability to collect the restitution debt through TOP, it should decline to exercise that authority until defendant presents his claim to the appropriate federal agency."  *Id*.  *See also United States v. Beulke*, *supra*, 892 F. Supp. 2d at 1187 (After referral to TOP, Defendant must exhaust administrative remedies before seeking redress in court.). Accordingly, Defendant's motion in this case should be denied.

## II.   DEFENDANT'S JUDGMENT FOR RESTITUTION IS IMMEDIATELY ENFORCEABLE

In any event, Defendant Abramoff confuses the final criminal judgment imposed by the Court and the schedule of payments established set by the Court.  Under the Defendant's theory, his restitution is due and can only be collected under the terms of the payment schedule established by the Court.  The problem with Defendant's theory, however, is that it conflicts with the actual language of his judgment.  More importantly, it suggests that this Court failed to follow the "mandatory" restitution provision of the MVRA.  In fact, under Defendant's legal theory, a number of the MVRA's provisions would be rendered meaningless.

"[T]he underlying policy of the MVRA is 'to ensure that the loss to crime victims is recognized, and that they receive the restitution that they are due.'" *United States v. Hawkins*, 392 F. Supp. 2d 757, 759 (W.D. Va. 2005) (quoting S. Rep. No. 104-179, 1996 U.S.C.C.A.N. 924, 925); *see also United States v. Monzel*, 641 F.3d at 543 (discussion of MVRA). "The policy would be undermined if the court-imposed payment schedule created a right in the defendant to pay no more than the ordered installments." *Hawkins*, 392 F. Supp. 2d at 759. "The better view

is that a payment schedule simply serves as another collection method for the benefit of the victim rather than as a benefit to the defendant." *Id.*; *see United States v. Shusterman,* 331 Fed. Appx. 994 (3rd Cir. 2009); *United States v. Picklesimer*, 2010 WL 2572850 (W.D.N.C. June 24, 2010)*; United States v. Lawrence*, 538 F. Supp. 2d 1188, 1193 (D.S.D. 2008); *United States v. Smith*, 2007 WL 1225468 *1 (W.D. Va., April 25, 2007); *United States v. Hanhardt*, 353 F. Supp.2d 957, 959-960 (N.D. Ill. 2004).

Defendant's contrary view is also without merit because it ignores the clear language of the Restitution Order concerning the imposition of the full restitution amount to the victim Tribes. Paragraph (1) of the Court's order says "the defendant shall pay restitution in the total amount of $23,134,695 to the victims identified in this order which he agreed to do as part of his plea agreement with the government." There is no qualifying language in this section of the order. In fact, the total amount of restitution of $23,134,695.00 is listed on page 6 of the Judgment and Commitment order [Docket Document #48].

Finally, the Attorney General's authority under the MVRA is not dependent on such language in a judgment. *See* 18 U.S.C. § 3664(m)(1)(A)(ii). As recognized by the 7th Circuit Court of Appeals,

> [The defendants] owe the full amount. A statement along the lines of 'fulfill your legal obligations' does not undermine anyone's rights; instead it honors legal entitlements-including the victims' entitlement to restitution. All that a 'due immediately' statement in a judgment does is command the defendant to discharge his obligations as quickly as possible.

*United States v. Sawyer*, 521 F.3d 792, 796 (7th Cir. 2008). "Victims could obtain the same monetary judgment through civil litigation, and civil judgments are payable in full immediately." *Id*. at 797. "Judgment creditors may seize assets and garnish wages." *Id.* "Indeed, under

§ 3664(m)(1)(B), a person to whom restitution is due may register the criminal judgment and collect it through the civil process." *Id.*

In *United States v. Cooper*, 2006 WL 3512936 (D. Kan. Nov. 1, 2006), the government sought to garnish the funds from a settlement in an unrelated case in which the defendant was a party. The defendant, who was incarcerated and attempting to have the settlement funds transmitted to his wife, objected to the garnishment on the grounds that he was current with the court-ordered payment plan for the restitution he owed.

The Court held that the defendant's compliance with the court-ordered payment plan was not a defense to the government's use of a writ of garnishment. *United States v. Cooper*, 2006 WL 3512936 at *3. Citing 18 U.S.C. § 3664(n),[3] the Court stated that the court-ordered payment plan was "merely one of many forms of ensuring restitution," and noted that "[O]ther courts have taken the same approach." *Id*. (citing *United States v. James*, 312 F. Supp.2d 802, 806 (E.D. Va. 2004); *United States v. Bedonie*, 317 F.Supp.2d 1285, 1331 (D. Utah 2004), reversed and remanded on other grounds by *United States v. Bedonie*, 413 F.3d 1126 (10th Cir. 2005).

### III. <u>GOVERNMENT DID NOT COMMIT TO RELINQUISH TAXES</u>

The Defendant argues that there was discussion at a August 11, 2009 hearing about future tax refunds and that the government made a commitment to freeze a tax refund pending "this Court's authorization of permitted expenditures." Deft's Motion at 7. Actually, the discussion quoted by the Defendant occurred in the context of a discussion of payment of defense counsel's fees, a recurring theme, seemingly. Based on a reasonable reading of the exchange, the statements made by Assistant U.S. Attorney (AUSA) Butler were a description of her

---

[3] The Court pointed out that 18 U.S.C. § 3664(n) specifically provides that: "[I]f a person obligated to provide restitution, .... receives substantial resources from any source, including inheritance, *settlement* . . . during a period of incarceration, such person shall be required to apply the value of such resources to any restitution or fine still owed." *Id.* (emphasis added).

understanding about the steps to be taken by the U.S. Attorney's Office in the Southern District of Florida and by the U.S. Attorney's Office in the District of Columbia to hold and give notice about tax refunds. The statements do not appear to make a commitment to take such action, only a prediction or forecast about government action to be taken. *See* August 11, 2009 Transcript (Tr.) at 26-29.[4] However, no such commitment was ever firmly made or consummated. In fact, several lines down, the Court and AUSA Butler begin an exchange about notice about Abramoff and his family's other expenditures and other sources of income, including inheritance. Tr. at 27-28. However, no such notice provisions appear to have made it into a final order. In fact, there is a later recognition, in a conversation with Mr. Lowell, that making firm predictions about future taxes, would be difficult. *Id.* at 30. The Court made the following statement:

> I understand. I think the way we're going to come out here, Mr. Lowell, the Court is certainly willing to approve 50,000 to the State of Maryland. It's crazy the whole thing is sort of – and the property taxes. The property taxes for what year? That's the problem.

*Id.* This exchange strongly suggests that while these issues and possibilities were batted around, no definitive plan emerged, other that the language actually contained in the Court's orders. This language did not extend far enough beyond speculation to result in a firm commitment. *See Southern Pacific Communications Co. v. American Tel. and Tel. Co.*, 556 F. Supp. 825, 1084 (D.D.C. 1982) (Hypothetical transactions and projections of future profits insufficient basis for agreement).

---

[4] This transcript is attached to Defendant's motion as Exhibit 8.

## **CONCLUSION**

WHEREFORE, the foregoing considered, the United States submits that the Defendant's Motion for Return of Seized Tax Refund in Order to Pay Outstanding State Taxes and Accounting and Legal Fees is without merit and should be denied.

Respectfully submitted,

RONALD C. MACHEN JR., D.C. Bar # 447889
United States Attorney

DANIEL F. VAN HORN, D.C. Bar # 924092
Chief, Civil Division


_____/s/_____
OLIVER W. McDANIEL, D.C. Bar #377360
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2508 / (202) 252-2599 (Facsimile)
oliver.mcdaniel@usdoj.gov

July 24, 2014